# EXHIBIT A

The Honorable Robert J. Bryan

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ANNA OMELIN, Individually and as an
Administrator of the Estate of Anton Omelin,
deceased,

              Plaintiff,

vs.

HANSEN BEVERAGE COMPANY, a
Delaware Corporation, MONSTER ENERGY
COMPANY, a Delaware Corporation, and RED
BULL NORTH AMERICA, INC., a Foreign
Corporation, and DOES 1 through 100,
Inclusive,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:17-cv-05837-RJB

**PLAINTIFF ANNA OMELIN'S
SECOND AMENDED
COMPLAINT FOR DAMAGES**

**JURY DEMAND**

COMES NOW, Plaintiff ANNA OMELIN, Individually and as Administrator of

the Estate of ANTON OMELIN, deceased, by and through her, hereby files this Second

Amended Complaint in accordance with Fed. R. Civ. P. Rule 15 (a)(2) and pursuant to

Court's Order Granting Motion for Leave to Amend First Amended Complaint (Dkt. No.

42) issued on January 9th, 2018, against Defendants, and respectfully alleges as follows:

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 1
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 1**

Case 3:17-cv-05837-RJB Document 44 Filed 02/16/18 Page 2 of 33

## I. NATURE OF THE CASE AND PARTIES

1.      Plaintiff, ANNA OMELIN (hereinafter "Plaintiff"), brings the present survival and wrongful death action under Revised Code of Washington (hereinafter "RCW") 4.20.010-.020; 4.20.046 and 4.20.60, Individually and on Behalf of the Estate of ANTON OMELIN, deceased, for personal injuries suffered as a result of Mr. Omelin's death on October 30, 2014.

2.      Mr. Omelin's heirs at law under RCW 4.20.010-.020 and their relationship to Mr. Omelin are as follows: 1) ANNA OMELIN, spouse; 2) A. S., step-son, a minor; 3) A. O., daughter, a minor; 4) A. O., son, a minor. At all relevant times, the heirs resided, and continue to reside, at 4219 69th Ave. E, Fife, WA 98424.

3.      HANSEN BEVERAGE COMPANY, a defendant, is a Delaware corporation with a principal place of business at 550 Monica Circle, Suite 201, Corona, California, 92880. At all relevant times, Defendant engaged in and was responsible for design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of "Monster Energy" and "NOS Original" energy drinks. Defendant's registered agent, CSC – Lawyers Incorporating Service, is located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California, 95833.

4.      MONSTER ENERGY COMPANY, a defendant, is a Delaware corporation with a principal place of business at 550 Monica Circle, Suite 201, Corona, California, 92880. At all relevant times, Defendant engaged in and was responsible for design, manufacture, production, testing, study, inspection, mixture, labeling,

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 2
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 2

marketing, advertising, sales, promotion, and/or distribution of "Monster Energy" and "NOS Original" energy drinks. Defendant's registered agent, CSC – Lawyers Incorporating Service, is located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California, 95833.

5.      RED BULL NORTH AMERICA, INC, a defendant, is a foreign profit corporation with a principal place of business at 1740 Steward Street, Santa Monica, California 90404, USA. At all relevant times, Defendant engaged in and was responsible for design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of "Red Bull Energy Drink." Defendant's registered agent, C T Corporation System, is located at 711 Capitol Way S, Ste. 204, Olympia, Washington 98501-1267.

6.      The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of Defendants DOES 1 through 100, inclusive, are unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names. When the true names and capacities of said Defendants have been ascertained, Plaintiff will amend this Complaint accordingly. Plaintiff is informed and believes, and thereon alleges, that each Defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the Plaintiff, as hereinafter alleged.

## II.  JURISDICTION AND VENUE

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 3
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 3**

7.     Plaintiff brings this complaint under federal diversity jurisdiction under 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

8.     Venue is proper in the Western District of Washington at Tacoma, under 28 U.S.C. 1391(b), where Mr. Omelin and survivors resided and the death occurred.

### III. FACTUAL ALLEGATIONS

9.     At about 7am on October 30, 2014, Ms. Omelin, found her 25-year-old husband, Anton Omelin, laying unresponsive on the bathroom's floor. There were apparent feces and vomit noted in the toilet and vomit in the bathroom sink and on the counter.

10.     Per death certificate, Mr. Omelin's cause of death was due to aspiration of gastric contents with alcohol intoxication as a contributing condition.

11.     Per medical examiner's report, Mr. Omelin's death was most likely due to aspiration of gastric contents, with alcohol intoxication as a significant contributing condition.

12.     Mr. Omelin's toxicology testing showed an ethanol concentration of 0.095g/100mL with a margin of error of 0.0078 g/100mL.

13.     With an ethanol concentration of 0.096g/100mL, a person is generally experiencing a **slight impairment of balance, speech, vision, reaction time, and hearing**. *Effects of Specific B.A.C. levels*, http://www.brad21.org/effects_at_specific_bac.html (last visited on December 21, 2017).

14.     When medical personnel arrived at the scene, no life saving measures were taken, as Mr. Omelin's death was obvious.

15.     In a 24-hour period preceding his death, Mr. Omelin consumed at least four

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 4
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 4**

(4) 16-oz cans of "NOS Original" and "Red Bull Energy Drink."

16.     Prior to and since his marriage to Ms. Omelin, in the year of 2010, Mr. Omelin regularly consumed at least four (4) 16-oz cans of "Monster Energy," "NOS Original" and "Red Bull Energy Drink" per day.

17.     Mr. Omelin purchased "Monster Energy," "NOS Original" and "Red Bull Energy Drink" from a local gas station, grocery stores, and/or COSTCO.

18.     Prior to his death, Mr. Omelin got the news that he will receive a full-ownership of the family business. Mr. Omelin purchased fruits, chocolate and a bottle of Courvoisier cognac to celebrate with Ms. Omelin.

19.     At about 7-9pm on October 29, 2014, Mr. Omelin had two to three (2-3) shots of cognac, which he consumed along with at least two (2) 16-oz cans of "Red Bull Energy Drink."

20.     Mr. Omelin had no prior medical problems. He did not use illicit drugs and drank in moderation.

21.     As a result of large consumption of caffeinated drinks, i.e., "Monster Energy," "NOS Original" and "Red Bull Energy Drink," Mr. Omelin lacked in sleep averaging only four to five (4-5) hours of sleep per day.

22.     Ms. Omelin frequently caught Mr. Omelin sitting in front of the computer, jittery, with bloodshot eyes, late at night, without being able to fall asleep.

23.     As a result of his insomnia, Mr. Omelin had a habit of performing physical exercises on an exercise machine located at his garage and a pull-up bar. After exercising he usually showered in the bathroom in which he was found dead on October 30, 2014.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 5
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 5

24.     Mr. Omelin thought that "Monster Energy," "NOS Original" and "Red Bull Energy Drink" were no more dangerous than a regular soda drink, such as carbonated lemonade.

25.     Mr. Omelin consumed "Monster Energy," "NOS Original" and "Red Bull Energy Drink" because he was drawn to the flavor, taste, and the additional energy provided by the products.

26.     Mr. Omelin was survived by his wife, Anna Omelin; his stepson, A.S., a minor; his biological son, A.O., a minor; his biological daughter, A.O., a minor, who at the time of Mr. Omelin's death was three (3) weeks old.

27.     At all relevant times, HANSEN BEVERAGE COMPANY was responsible for the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of "Monster Energy" and "NOS Original," before it reached Mr. Omelin.

28.     At all relevant times, MONSTER ENERGY COMPANY was responsible for the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of "Monster Energy" and "NOS Original," before it reached Mr. Omelin.

29.     At all relevant times, RED BULL NORTH AMERICA, Inc. was responsible for the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of "Red Bull Energy Drink," before it reached Mr. Omelin.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 6
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 6

30.     HANSEN BEVERAGE COMPANY, MONSTER ENERGY
COMPANY and RED BULL NORTH AMERICA, INC., (hereinafter referred to as
"MONSTER and RED BULL") target their advertising campaign "primarily towards
young males, with alluring product names." Chad J. Reissig, *et.al*., *Caffeinated Energy
Drinks: A Growing Problem*, 99(1-3) DRUG ALCOHOL DEPEND. 4 (2009)
[hereinafter, "DRUG ALCOHOL DEPEND.]. "These advertising campaigns promote
the psychoactive, performance-enhancing, and stimulate effects of energy drinks and
appear to glorify drug use." *Id*.

a.      RED BULL's advertising campaign slogan "Red Bull gives you wings,"
is associated with "excitement and risk-taking." In addition, RED BULL's marketing
permeates the action sports world. *Red Bull Paper Wings and the 'Gives You Wings'
Slogan*, http://www.businessinsider.com/red-bull-paper-wings-slogan-2012-10 (last
visited October 12, 2017).

b.      MONSTER's marketing uses "product taglines like 'Unleash the Beast,'
and its bold advertising campaigns reflect its edgy and aggressive image." *Monster
Beverage's Bold Marketing Approach*, http://marketrealist.com/2015/01/monster-
beverages-bold-marketing-approach/ (last visited October 16, 2017). MONSTER's
"advertising and marketing efforts are associated with adventure sports and sports
personalities." *Id*. "The macho image, and the promotion of these drinks as an
immediate energy booster, made them the military's drink of choice." *Id*. In the recent
advertising campaign, MONSTER featured a famous boxer preparing for a match and
declaring "I am the beast." *Monster Energy TV Commercial, 'I Am the Beast' Featuring*

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 7
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 7**

*Conor McGregor*, https://www.ispot.tv/ad/w6tq/monster-energy-i-am-the-beast-featuring-conor-mcgregor (last visited October 13, 2017).

31. In order to promote its products, including "Red Bull Energy Drink," as energy enhancers and as a part of healthy lifestyle, RED BULL places "Vitalizes Body and Mind" on its product's packaging, including cans.

32. The efficacy of the "Red Bull Energy Drink," and RED BULL's other products, is promoted by sports figures, whose quotes are published on RED BULL's website:

    a. "I drink a Red Bull Sugarfree before my second training session." CrossFit Champion Camille Leblanc-Bazinet

    b. "Red Bull is one of my go to tools for high intensity workouts, during an endurance workout, or just when getting some work done!" Triathlete Jesse Thomas

    c. "I drink Red Bull 30 minutes before every race." Olympic skier Lindsey Vonn

33. On its website, MONSTER claims that "Monster Energy" "[has] the ideal combo of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can. Monster packs a powerful punch but has a smooth easy drinking flavor. Athletes, musicians, anarchists, co-ed's, road warriors, metal heads, geeks, hipsters, and bikers dig it- you will too." *Monster Energy*, https://www.monsterenergy.com/us/en/products/monster-energy (last visited November 30, 2017).

34. MONSTER promotes "NOS original" and other products by prominently placing "High Performance Energy Drink" on its product's packaging.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 8
Case No. 3:17-cv-05837-RJB

35.     In 2015, RED BULL and MONSTER dominated energy drink market with respective market shares of 43% and 39%. *Monster, Red Bull, Rockstar Ranked* http://time.com/3854658/these-are-the-top-5-energy-drinks/ (last visited October 13, 2017).

    a.  RED BULLS' sales of energy drinks increased by 1.8% from 2015-2016, capping the sales at 6.06 billions of cans sold worldwide in 2016, a dramatic 50% increase in sales since 2011. *Number of Red Bull Cans Sold World Wide From 2011 to 2016*, https://www.statista.com/statistics/275163/red-bulls-number-of-cans-sold-worldwide/ (last visited October 13, 2017).

    b.  MONSTER's sales of energy drinks increased by 13% from 2015 to 2016, capping the sales at $3.5 billions in 2016, an 80% increase in sales since 2011. *Monster Beverage Corporation*, http://investors.monsterbevcorp.com/annuals.cfm (last visiting October 17, 2017).

36.     Substance Abuse and Mental Health Services Administration (SAMHSA) reported "the number of emergency department (ED) visits involving energy drinks doubled from 10,068 visits in 2010 to 20,783 visits in 2011." *Substance Abuse and Mental Health Servs. Admin., The Dawn Report: Update on Emergency Department Visits Involving Energy Drinks: A Continuing Public Health Concern* (Jan. 10, 2013). The majority of these visits were people between ages of 18 to 39. Id.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 9
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 9**

a.  Approximately 44 percent of non-alcoholic energy drink-related hospital visits happened when people combined alcohol and/or drugs with energy drinks. *Id.*

b.  The increase in ED visits was proportionate to an increase in sales of energy drinks. *Id.*

c.  The report defines "energy drinks" as "flavored beverages containing high amounts of caffeine and typically other additives, such as vitamins, taurine, herbal supplements, creatine, sugars, and guarana" *Id.*

37.  Although MONSTER began disclosing the caffeine content on its cans, as a result of a lawsuit filed against them by the parents of a 14-year-old girl who died after consuming energy drinks, MONSTER believed that "***the actual numbers are not meaningful to most consumers.***" *Energy Drinks Caffeine Levels Often Stray From Labels, Study Shows*, https://www.huffingtonpost.com/2012/10/25/energy-drink-caffeine-labels-_n_2016314.html (last visited October 17, 2017).

38.  Marketed benefits of "Monster Energy," "NOS Original" and "Red Bull Energy Drink" are achieved through addition of caffeine. Sara M. Seifert, *et.al.*, *Health Effects of Energy Drinks on Children, Adolescent, and Young Adults*, 127[3]:511 PEDIATRICS, 2011 [hereinafter "PEDIATRICS"].

39.  "Energy drinks, ["beverages that contain caffeine, taurine, vitamins, herbal supplements, and sugar or sweeteners and are marketed to improve energy, weight loss, stamina, athletic performance, and concentration,"] have no therapeutic benefit and many ingredients contained in such drinks are understudied and not regulated." *Id.*

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 10
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 10**

40.   Pharmacology of contained agents, commonly found in energy drinks, such as "Monster Energy," "NOS Original" and "Red Bull Energy Drink," combined with reports of toxicity, raises concern for potentially serious adverse effects associated with energy drinks consumption. *Id.*

41.   "Caffeine in doses up to 400 mg (about five cups of coffee) is generally recognized as safe by the Food and Drug Administration [("FDA")]." *Potentially harmful effects of energy drinks - it's not the caffeine,* https://www.reuters.com/article/us-health-heart-energy-drinks/potentially-harmful-effects-of-energy-drinks-its-not-the-caffeine-idUSKBN17S2SM (last visited November 30, 2017) (hereinafter "REUTERS")

42.   Caffeine intoxication and negative effects thereof are much more common when the daily consumption increases to more than 500 milligrams. *This Is How Much Caffeine It Takes to Kill an Average Person,* https://www.usatoday.com/story/news/nation-now/2017/05/16/south-carolina-teen-dies-caffeine-how-much-coffee-can-kill-you/99975022/ (last visited October 11, 2017). Mr. Omelin's daily caffeine intake was approximately 800-1040mg.

43.   FDA-imposed caffeine limit per 12 fl oz of soda is 71mg (approximately 6mg per 1 fl oz). DRUG ALCOHOL DEPEND. at 2. The caffeine content in 16 oz can of "Red Bull Energy Drink" is 151mg (approximately 9mg per 1 fl oz ); 16oz "Monster Energy" is 160mg (approximately 10mg per 1 fl oz), and NOS Original's 24oz can contains 240mg (approximately 10mg per 1 fl oz). All per oz caffeine contents in MONSTER and RED BULL's products exceed the allowed amount for sodas and the like.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 11
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 11**

44.     In addition to pure caffeine, "Monster Energy," "NOS Original" and "Red Bull Energy Drink" "contain additional amounts of caffeine through additives." PEDIATRICS at 512. All RED BULL products, for example, contain taurine, while MONSTER's products contain both taurine and guarana.

45.     Each gram of guarana can contain 40 to 80 mg of caffeine, and has a potentially longer half-life. *Id.*

46.     Because manufacturers are not required to post the amount of caffeine contained in additional additives, the actual caffeine content in a single serving may exceed the listed amounts. Naren Gunja, *et.al., Energy Drinks: Health Risks and Toxicity*, MED J AUST, 196 (1): 46-49, (2012).

47.     The health risks associated with energy drinks are primarily related to high caffeine content. Studies have shown that caffeine overdose can cause cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death. Breda João Joaquim, *et.al., Energy Drink Consumption in Europe: A Review of the Risks, Adverse Health Effects, and Policy Options to Respond*, FRONTIERS IN PUBLIC HEALTH, VOL. 2 at 2, 2014 [hereinafter "BREDA"].

48.     Per 2017 Reuters' article, a group of researchers conducted a study with 18 healthy adults. The study focused on effects of additional components commonly found in energy drinks, including "Monster Energy," "NOS Original" and "Red Bull Energy Drink." "Blood pressure increased by close to 5 points after drinking the energy drink, but by just under 1 point after drinking the caffeine beverage. Blood pressure also remained elevated six hours later." *See*, REUTERS.

     a. "The energy drink industry claims that their products are safe because they

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 12
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 12**

have no more caffeine than a premium coffee house coffee," said Dr. Jennifer L. Harris

from University of Connecticut's Rudd Center for Food Policy and Obesity in Storrs.

*Id.*

      b.  "[E]nergy drinks also contain a proprietary 'energy blend,' which typically

           consists of stimulants and other additives. Some of these ingredients

           (including taurine and guarana) have not been FDA-approved as safe in the

           food supply, and few studies have tested the effects of caffeine

           consumption together with these 'novelty' ingredients." *Id.*

      c.  "On top of that, energy drinks are highly marketed to adolescent boys in

           ways that encourage risky behavior, including rapid and excessive

           consumption," she said. "As a result, emergency room visits by young

           people in connection with energy drinks are rising." *Id.*

     49.     Per FDA's CAERS Adverse Events Reports, a total of twenty-one

(21) reports were attributed to Red Bull from 2004-2012. Reports included nausea,

vomiting and overdose symptoms that resulted in hospitalizations and serious

outcomes.

     50.     Per FDA's CAERS Adverse Events Reports, a total of forty (40) reports

were attributed to Monster Energy from 2004-2012. Record shows a total of five (5) deaths.

Numerous reports included nausea, vomiting, loss of consciousness, choking, diarrhea and

headache symptoms that resulted in hospitalizations and were life-threatening.

     51.     A combination of excessive consumption of caffeine- and taurine-

containing energy drinks and strenuous physical activity can produce myocardial ischemia

by inducing coronary vasospasm with potentially fatal results. "Both taurine and caffeine

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 13
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
**Exhibit A - Page 13** Phone: (425)296-8868 | Fax: (877)230-2429

have been shown in vitro to have physiological effects on intracellular calcium concentration within vascular smooth muscle, and they could conceivably induce coronary vasospasm." *Adam J Berger, et. al., Cardiac Arrest in a Young Man Following Excess Consumption of Caffeinated "Energy Drinks",* MJA, 190: 41 (2009) [hereinafter "BERGER"].

52.     National Federation of State High School Associations recommends that energy drinks not be used prior to, during or after physical activity. Furthermore, a common ingredient in energy drinks, guarana, is mentioned in the NCAA's 2016-17 banned drugs list. *What That Energy Drink Can Do To Your Body*, http://www.cnn.com/2017/04/26/health/energy-drinks-health-concerns-explainer/index.html (last visited October 17, 2017).

53.     In one of the cases involving physical activity, a healthy 33-year-old man, Cory Terry, died after drinking a Red Bull shortly after playing basketball. Mr. Terry was an avid Red Bull drinker and had been consuming the beverage for many years. *Death By Red Bull*, https://www.caffeineinformer.com/death-by-red-bull (last visited October 13, 2017).

54.     A 28-year-old motocross rider had a cardiac arrest following a consumption of seven to eight (7-8) cans of energy drinks within seven hours. The man denied having any previous chest pains and was otherwise fit and well. BERGER at 42.

55.     Although sudden cardiac death in people under the age of forty are a result of structural heart disease, 10-20% of autopsies showed that the subject in that "age group had no obvious cardiac abnormalities on postmortem examination." BERGER at 42.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED COMPLAINT FOR DAMAGES- 14
Case No. 3:17-cv-05837-RJB
COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429
Exhibit A - Page 14

56.     Studies have shown that consumption of energy drinks, such as "Monster Energy," "NOS Original" and "Red Bull Energy Drink," causes life-threatening heart rhythm disorders, not found in coffee-drinkers. Mixing energy drinks with alcohol significantly increases negative side effects. *Dr. Campbell: New Study Highlights Dangerous Effects of Energy Drinks*, http://wncn.com/2017/05/07/dr-campbell-new-study-highlights-dangerous-effects-of-energy-drinks/ (last visited October 12, 2017).

57.     U.S. Center for Disease Control and Prevention warned against mixing energy drinks and alcohol, arguing energy drinks mask the depressant effects of alcohol. "For years, research has suggested that mixing alcohol and heavily-caffeinated energy drinks could have negative health effects." *Why You Might Not Want To Mix Alcohol and Energy Drinks*, http://time.com/3677044/alcohol-energy-drinks/ (January 22, 2015) (last visited November 30, 2017).

58.     "When people mix energy drinks with alcohol, people drink more than they would if they had just consumed alcohol, which is associated with a cascade of problems." Id.

59.     The Federal Institute for Risk Assessment ("FIRA") concluded that warnings about the use of energy drinks such as Red Bull with intensive physical activity or alcohol beverages should be mandatory. *Energy Drinks Safety Questioned by German agency*, https://www.nutraingredients.com/Article/2008/06/05/Energy-drinks-safety-questioned-by-German-agency (last visited October 17, 2017).

60.     FIRA reported that "energy drinks have led to adverse reactions including death in combination with alcohol and alone." *Id.* In Sweden, two young people died after consuming Red Bull mixed with alcohol. *Id.*

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 15
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 15

61.     Mixing energy drinks with alcohol is a prominent practice among 71%
of young adults. BREDA at 2.

    a.   A study of American college students found that "those who reported
combining energy drinks with alcohol were more likely to experience
adverse consequences due to their own drinking compared to those who
only drank alcohol." *Id.*

    b.   Energy drink consumers were more likely to have a higher breath
alcohol concentration reading. *Id.*

62.     The National Poison Data System in United States recorded 4854
calls to emergency departments (0.2% of total calls) related to energy drinks over the
year 2010-2011. 39.3% of these calls involved alcohol mixed energy drinks and led
to more severe adverse effects. *Id.* at 3.

63.     Foreign countries took steps to limit the consumption of energy drinks
or to ban it altogether. PEDIATRICS at 521.

64.     Argentinian Senate proposed to ban energy drinks in nightclubs, and
Finland requires a warning for drinks that contain more than 150mg/L of caffeine and a
statement of maximum allowable daily intake. Id. France put a ban on taurine, an
ingredient contained in "Monster Energy," "NOS Original" and "Red Bull Energy
Drink". *Energy Drinks Safety Questioned by German agency*,
https://www.nutraingredients.com/Article/2008/06/05/Energy-drinks-safety-
questioned-by-German-agency (last visited October 17, 2017). Denmark and Norway
had banned or recommended banning energy drinks altogether. *Id.*

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 16
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 16

65.     Defendants' failures in designing, manufacturing, marketing, distributing, warning and/or selling "Monster Energy," "NOS Original" and "Red Bull Energy Drink" directly and proximately caused Mr. Omelin's death on October 30, 2014.

## IV. SURVIVAL ACTION CAUSES OF ACTION
### First Cause of Action Under Washington Product Liability Act
### (By Plaintiff Against All Defendants)

66.     Plaintiff re-alleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

67.     MONSTER and RED BULL placed their products, "Monster Beverage," "NOS Original" and "Red Bull Energy Drink," in the stream of commerce, with the expectation that they would reach an end consumer, such as Mr. Omelin, without substantial change in its condition, which they all did.

68.     Mr. Omelin consumed "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" energy drinks in a way contemplated by the Defendants, namely, by ingesting the products orally to promote stamina and increase energy.

69.     In violation of the Washington Products Liability Act (WPLA), RCW 7.72.030 (1), at the time "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" left the control of MONSTER and RED BULL, they were defective and not reasonably safe. The products were not reasonably safe for the following reasons:

70.     MONSTER and RED BULL owed a duty to Mr. Omelin and all consumers of "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" to exercise reasonable care in the design, formulation, testing, manufacturing, labeling, marketing, distribution, promotion and/or sale of their products.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 17
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 17

71.     MONSTER and RED BULL were required to ensure that their products did not pose an unreasonable risk of bodily harm, such as cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death, when taking alone or in combination with alcohol, physical activities, or as a result of overconsumption.

72.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" energy drinks were not reasonably safe in design.

73.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" energy drinks were not reasonably safe in design because, at the time they left their respective manufacturer's control, all products contained dangerous mixture of high amounts of caffeine and additional ingredients, namely taurine ("Red Bull Energy Drink"), and guarana/taurine mix ("Monster Beverage" and "NOS Original"), and when mixed with alcohol, consumed before, during, and after physical activity, and/or overused, resulted in cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death.

74.     The risks posed by the defective design of "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" are beyond those contemplated by the ordinary consumer, such as Mr. Omelin. Namely, an ordinary consumer would not and could not anticipate that a product designed to promote vitality and increase energy would lead to severe health risks.

75.     MONSTER and RED BULL failed to conduct adequate testing and post-marketing surveillance of their products to prevent the health risks associated with products' consumption, such as cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 18
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 18

76.     MONSTER and RED BULL failed to cease manufacturing or otherwise alter the composition of their products to produce a safer alternative despite the fact that they knew or should have known that original composition posed severe health risks.

77.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" were unreasonably dangerous and defective in manufacture, were not properly tested, and were not fit for intended purpose, i.e., ingested orally to increase energy, in that they caused severe health risks, such as cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death.

78.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" were not reasonably safe because existing warning "Not recommended for children, pregnant or nursing women and persons sensitive to caffeine" is inadequate to prevent consumers, like Mr. Omelin, from a serious risk of cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death, when the products are being used in an intended manner, i.e., ingested orally to increase energy.

79.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" were not reasonably safe because adequate warnings or instructions were not provided with the products to warn against the use with alcohol, before/during/after physical exercises, and/or overconsumption.

80.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" were not reasonably safe because adequate warnings or instructions were not created and/or provided in order to ensure that their products were used in a safe and reasonable

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 19
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 19

Case 3:17-cv-05837-RJB   Document 44   Filed 03/26/18   Page 20 of 35

manner to prevent serious health risks, i.e., cardiovascular problems, nausea,

vomiting, insomnia, convulsions, and death.

81.     Placing a warning(s), such as "Do not use with alcohol and while

exercising," "Do not exceed two drinks in a 24-hour period," "May cause

cardiovascular problems, nausea, vomit, insomnia, and death," would be adequate to

warn customers of severe health risks associated with consumption of "Monster

Beverage," "NOS Original" and "Red Bull Energy Drink." The number of drinks to

be consumed within a 24-hour period shall vary depending on caffeine amount in any

given product.

82.     If warnings were visibly placed on the "Monster Beverage,"

"NOS Original" and "Red Bull Energy Drink" cans, they would have caught Mr.

Omelin's attention and would have prevented him from misusing Defendants'

products.

83.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink"

were not reasonably safe because adequate warnings or instructions were not

provided at the time MONSTER and RED BULL learned or should have learned that

their products, namely "Monster Beverage," "NOS Original" and "Red Bull Energy

Drink," were dangerous or were likely to be dangerous when used in a manner for

which they are intended, i.e., ingested orally to increase energy.

84.     Such scientific knowledge was readily available to both MONSTER

and RED BULL in the form of medical articles and studies, and numerous reported

cases of people suffering from serious health problems and/or dying from ingesting

their products. The materials are dated before and after the year of 2004.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 20
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 20

85.     The risks posed by inadequate warnings of "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" are beyond those contemplated by the ordinary consumer, such as Mr. Omelin. Namely, an ordinary consumer would not and could not anticipate that a product designed to promote vitality and give energy would cause severe health risks.

86.     In violation of WPLA, RCW 7.72.030 (2), at the time "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" left Defendants' control, they were not reasonably safe in construction and/or not reasonably safe because they did not conform to the implied warranties under Title 62A RCW, including RCW 62A.2-314, and the implied warranty of merchantability.

87.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" energy drinks were not reasonably safe in construction because, at the time they left their respective manufacturer's control, all products contained dangerous mixture of high amounts of caffeine and additional ingredients, namely taurine ("Red Bull Energy Drink"), and guarana/taurine mix ("Monster Beverage" and "NOS Original"), and when mixed with alcohol, consumed before, during, and after physical activity, and/or overused, resulted in cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death.

88.     The risks posed by the unsafe construction of "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" are beyond those contemplated by the ordinary consumer, such as Mr. Omelin. Namely, an ordinary consumer would not and could not anticipate that a product designed to promote vitality and give energy would cause severe health risks enumerated above.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED COMPLAINT FOR DAMAGES- 21
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 21

89.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink"

were not reasonably safe in construction because, when it left MONSTER and RED

BULL's control, the energy drinks' composition materially deviated from

Defendants' design specifications and/or performance standards.

91.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink," are

products consumed to increase energy and improve vitality. MONSTER and RED

BULL's design specifications, i.e., choice and amount of ingredients, failed to

anticipate the severe health risks associated with the consumption of their products.

   a.   Specifically, the design specifications failed to appreciate the danger and

        health risks resulting from mixing energy drinks, such as "Monster

        Beverage," "NOS Original" and "Red Bull Energy Drink," with alcohol,

        and/or the use of the products at or near the time of physical activity, and/or

        overconsumption.

92.     Prior to and on the day of his death on October 30, 2014, Mr. Omelin

purchased and regularly consumed "Monster Beverage," "NOS Original" and "Red

Bull Energy Drink" for at least four (4) years.

93.     Mr. Omelin purchased energy drinks on the day of his death and

consumed at least two (2) 16oz "Red Bull Energy Drink" cans with two to three (2-3)

shots of cognac at about 7-9pm on October 29, 2014.

94.     Within 24 hours before to his death, Mr. Omelin consumed at least four

(4) 16oz cans of "NOS Original" and "Red Bull Energy Drink," manufactured by

MONSTER and RED BULL, respectively, causing his death in the early morning

hours of October 30, 2014.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 22
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 22

95.     Energy drinks, "Monster Beverage," "NOS Original" and "Red Bull Energy Drink," consumed by Mr. Omelin before his death were harmful at the time of consumption in that they caused cardiovascular problems, nausea, vomit, insomnia, and death when consumed with alcohol, before/during/after physical activities, and/or overconsumed.

96.     The severe health risks associated with "Monster Beverage," "NOS Original" and "Red Bull Energy Drink," which ultimately lead to Mr. Omelin's death, could not have reasonably been expected by an ordinary consumer.

97.     The harmful conditions and severe health risks associated with "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" were a substantial factor in bringing about conditions that ultimately caused Mr. Omelin's death.

98.     Prior to Mr. Omelin's consumption of "Monster Beverage," "NOS Original" and "Red Bull Energy Drink," MONSTER and RED BULL warranted to Mr. Omelin, and other similarly situated consumers, that their products were of merchantable quality and safe and fit for the use for which it was intended, i.e., to promote stamina and energy.

99.     Mr. Omelin relied entirely on the expertise, knowledge, skill, judgment, and implied warranty of MONSTER and RED BULL in choosing to consume "Monster Beverage," "NOS Original" and "Red Bull Energy Drink."

100.     "Monster Beverage," "NOS Original" and "Red Bull Energy Drink" consumed by Mr. Omelin were neither safe for their intended use nor of

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 23
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 23

merchantable quality in that they possessed a dangerous mixture of ingredients that, when put to its intended use, caused severe and fatal injuries to Mr. Omelin.

101.     By selling, delivering and/or distributing defective products to Mr. Omelin, MONSTER and RED BULL breached its implied warranty of merchantability and the implied warranty of fitness.

102.     Plaintiff is entitled to recover economic and non-economic damages against MONSTER and RED BULL for the wrongful death proximately caused by Mr. Omelin's consumption of "Monster Energy," "NOS Original" and "Red Bull Energy Drink," and directly attributable to MONSTER and RED BULL's failures as described herein.

103.     As a direct and proximate result of MONSTER and RED BULL's violations of RCW 7.72 *et.seq*., Mr. Omelin suffered an untimely and painful death.

104.     As a direct and proximate result of MONSTER and RED BULL's violations of RCW 7.72 *et.seq.,* Ms. Omelin and her children were deprived of the love, companionship, comfort, affection, support, and society of Mr. Omelin.

### Second Cause of Action
**Fraud – Concealment, Suppression or Omission of Material Facts
(By Plaintiffs Against All Defendants)**

### Fraud Allegations Against Monster Energy Company

105.     Plaintiff re-alleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

106.     Prior to and during the years of 2009-2014, MONSTER fraudulently concealed and/or suppressed facts in its advertising, labeling, packaging, marketing and promotion of "Monster Beverage" and "NOS Original" that led consumers, such as Mr.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 24
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
**Exhibit A - Page 24** Phone: (425)296-8868 | Fax: (877)230-2429

Omelin, to falsely believe that the products posed no greater risk to the health of its consumers than did regular soft drinks, such as carbonated lemonade.

107.    Specifically, MONSTER advertised and labeled its products as "the ideal combo of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can. Monster packs a powerful punch but has a smooth easy drinking flavor. Athletes, musicians, anarchists, co-ed's, road warriors, metal heads, geeks, hipsters, and bikers dig it- you will too."

108.    MONSTER promotes their products, "Monster Beverage" and "NOS Original," through the use of sport themed events and prominent sports figures, which would lead an ordinary consumer, such as Mr. Omelin, to believe that the energy drinks are safe and healthy to use.

109.    Due to serious health risks associated with consumption of "Monster Beverage" and "NOS Original," MONSTER owed a duty to disclose the truth about the significant adverse health risks associated with the consumption but failed to do so. Health risks include, but are not limited to, cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death.

110.    MONSTER knew of potential health risks associated with consumption of "Monster Beverage" and "NOS Original," which were caused by high amount of caffeine and caffeine's interaction with other active ingredients and alcohol, use of the products as a hydration during physical activity, and/or over consumption, yet MONSTER took steps in advertising, labeling, packaging, marketing and promotion of "Monster Beverage" and "NOS Original," to fraudulently conceal and/or suppress such

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 25
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 25**

facts to prevent consumers from learning about the risks arising out of consumption of its products.

    a.   Namely, advertising consists primarily out of sporting figures and events, music personalities, and video games which would lead an ordinary consumer to believe that the advertised product is safe for intended use, i.e., to promote vitality and increase energy.

    b.   Moreover, nothing on the website or the packaging would indicate that the contents of the above-mentioned products have the potential for creating undesirable consequences for its consumers, i.e., cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death.

111.    The concealment of the risks associated with advertising, labeling, packaging, marketing and promotion of "Monster Beverage" and "NOS Original" was done with the intent to induce consumers, such as Mr. Omelin, to purchase and consume MONSTER's products.

112.    MONSTER intended for its consumers, such as Mr. Omelin, to rely on advertising, labeling, packaging, marketing and promotion of "Monster Beverage" and "NOS Original," and to believe that no harm would result from their consumption.

113.    The reliance by Mr. Omelin on the safety of "Monster Beverage" and "NOS Original" was justified and reasonable in that MONSTER appeared to be, and represented itself to be, a reputable company that would not fail to disclose the truth about any harmful health effects of consuming its products. MONSTER appeared that way by supporting active and healthy lifestyle through its collaboration with major sporting events.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 26
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 26

114.     As a direct and proximate result of MONSTER's fraudulent
concealment and/or suppression of material facts regarding its products, Mr. Omelin
suffered an untimely and painful death.

115.     As a direct and proximate result of MONSTER's fraudulent
concealment and/or suppression of material facts regarding its products Ms. Omelin
and her children were deprived of the love, companionship, comfort, affection,
support, and society of Mr. Omelin.

### Fraud Allegations Against Red Bull North America, Inc.

116.     Plaintiff re-alleges each and every allegation contained in this
Complaint with the same force and effect as if fully set forth herein.

117.     Prior to and during the years of 2009-2014, RED BULL fraudulently
concealed and/or suppressed facts in its advertising, labeling, packaging, marketing and
promotion of "Red Bull Energy Drink," that led consumers, such as Mr. Omelin, to
falsely believe that the product posed no greater risk to the health of its consumers than
did regular soda drinks, such as carbonated lemonade. Specifically, RED BULL
advertises their product as "Red Bull Gives You Wings," and the website proudly
states "Wings When You Need Them."

118.     RED BULL's website claims that "Red Bull Energy Drink" should be
used "on the road, during lectures & study sessions, at work, while doing sports,
playing video games, or going out day and night."

119.     Due to serious health risks associated with consumption of "Red Bull
Energy Drink," RED BULL owed a duty to disclose the truth about the significant
adverse health risks associated with the consumption of its product but failed to do so.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 27
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Health risks include, but are not limited to, cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death.

120.    RED BULL knew of potential health risks associated with consumption of "Red Bull Energy Drink," which were caused by high amount of caffeine and caffeine's interaction with other active ingredients and alcohol, use of the products as a hydration during physical activity, and/or over consumption, yet RED BULL took steps in advertising, labeling, packaging, marketing and promotion of "Red Bull Energy Drink" to conceal such facts to prevent consumers from learning about the risks arising out of consumption of its products.

121.    Namely, advertising consists primarily out of sporting figures and events. RED BULL's website contains quotes from sports figures, such as: "Red Bull is one of my go to tools for high intensity workouts, during an endurance workout, or just when getting some work done!"

122.    Despite known risks caused by consumption of "Red Bull Energy Drink," nothing on the RED BULL's website or product's packaging would indicate that the contents of the above-mentioned product could create undesirable consequences for its consumers, i.e., cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death. Quite to the contrary, RED BULL's web-site "screams" of products' positive effects.

123.    The fraudulent concealment and/or suppression of the known risks associated with advertising, labeling, packaging, marketing and promotion of "Red Bull Energy Drink" was done with the intent to induce consumers, such as Mr. Omelin, to purchase and consume RED BULL's products.

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 28
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 28

124.    RED BULL intended for its consumers, such as Mr. Omelin, to rely on advertising, labeling, packaging, marketing and promotion of "Red Bull Energy Drink," as well as on its suppression of the true facts about the risks and dangers associated with consumption of its products.

125.    The reliance by Mr. Omelin on the safety of "Red Bull Energy Drink" was justified and reasonable in that RED BULL appeared to be, and represented itself to be a reputable company that would not fail to disclose the truth about any harmful health effects of consuming its products. RED BULL appeared that way by supporting active and healthy lifestyle through its collaboration with major sporting events.

126.    As a direct and proximate result of RED BULL's fraudulent concealment and/or suppression of material facts regarding its products, Mr. Omelin suffered an untimely and painful death.

127.    As a direct and proximate result of RED BULL's fraudulent concealment and/or suppression of material facts regarding its products, Ms. Omelin and her children were deprived of the love, companionship, comfort, affection, support, and society of Mr. Omelin.

## V. PUNITIVE DAMAGES ALLEGATIONS

### (By Plaintiff Against All Defendants)

128.    Plaintiff re-alleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

129.    At all pertinent times, MONSTER and RED BULL knew that their products contain dangerous mix and levels of caffeine and other ingredients, and knew

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 29
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 29

the serious health risks to consumers associated with consumption of their products,

such as cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death.

130.    With such knowledge and in furtherance of their own financial interests,

MONSTER and RED BULL willfully, wantonly and maliciously engaged in the

design, manufacture, production, testing, study, inspection, mixture, labeling,

marketing, advertising, sales, promotion, and/or distribution of "Monster Energy,"

"NOS Original" and "Red Bull Energy Drink," while simultaneously failing to warn

potential consumers of the dangerous propensities.

131.    With such knowledge and in furtherance of their own financial interests,

MONSTER and RED BULL willfully, wantonly and maliciously, and with conscious

disregard for, and indifference to, the health and safety of consumers, including Mr.

Omelin, failed and refused to supply adequate warnings and/or information to protect

consumers and/or otherwise reduce and eliminate the health risks, namely

cardiovascular problems, nausea, vomiting, insomnia, convulsions, and death, to

consumers associated with the consumption of "Monster Energy," "NOS Original" and

"Red Bull Energy Drink" along or in combination with alcohol,

before/during/following physical activity, and as a result of overconsumption.

132.    As a direct and proximate result of MONSTER and RED BULL's

conduct, and because their acts and omissions were willful, wanton, malicious,

intended and in conscious disregard for, and indifference to, the health and safety of

potential consumers, such as Mr. Omelin, an award of exemplary or punitive damages

is appropriate and necessary to punish MONSTER and RED BULL, and to deter them

from engaging in such misconduct in the future and to affect significant change in the

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 30
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit A - Page 30

Case 3:17-cv-05837-RJB Document 44 Filed 02/26/18 Page 31 of 35

way MONSTER and RED BULL design, manufacture, market, promote, warn about, distribute and/or sell their products.

### VII. JURY DEMAND

133.    Plaintiff requests a 12-person jury to hear this matter.

### VIII. PRAYER FOR RELIEF AS TO ALL CLAIMS

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants, jointly and severally, including:

1. General damages for the physical pain and suffering, mental and emotional distress, anguish, anxiety, impairment of earning capacity, loss of services, including loss of love, affection, care, companionship, society and consortium, loss of enjoyment of life and all such other damages as are just and recoverable as general damages for the death of Mr. Omelin;

2. Special damages in an amount to be proven at the time of trial for destroyed earning capacity of Mr. Omelin occasioned by his death and loss of lifetime earnings, and all other such recoverable special damages as are just arising from the injuries to each of Anna Omelin, A.S, a minor, A.O., a minor, and A.O., a minor;

3. Special damages in an amount to be proven at the time of trial for net economic loss to the Estate of Mr. Omelin and/or loss of support of all beneficiaries of the Estate of Mr. Omelin occasioned by the wrongful death of Mr. Omelin;

4. General damages for the pain and suffering occasioning by the death of Mr. Omelin, including his knowledge and awareness of impending doom;

5. As to the Second Cause of Action against all Defendants, Ms. Omelin, as surviving spouse and successor in interest to Mr. Omelin, prays for punitive or

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 31
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

exemplary damages recoverable under Washington state law or any other

applicable law, in an amount to be determined at trial;

      6. Funeral and burial expenses relating to Mr. Omelin;

      7. All other general and special damages recoverable under Washington state

law or any other applicable law;

      8. Pre- and post-judgment interest;

      9. Costs, including reasonable attorney fees as allowed by law; and

      10. Such other further relief that the Court may deem just and equitable.


Respectfully submitted this on 16th day of January, 2017.

s/ *Olga Efimova*
Olga Efimova, WSBA #52498
**Cosmopolitan Legal, PLLC**
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Telephone: (425) 296-8868
Fax: (877) 230-2429
E-mail: olgae@cosmopolitanlegal.com
***Attorney for Plaintiff Anna Omelin***

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 32
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 32**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

### CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2018, I electronically filed the foregoing with

the Clerk of the Court using CM/ECF system, which will send notification of such filing to

all parties of record who have appeared in this matter

DATED this 16th day of January, 2018.

s/ *Olga Efimova*
Olga Efimova, WSBA #52498
**Cosmopolitan Legal, PLLC**
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Telephone: (425) 296-8868
Fax: (877) 230-2429
E-mail: olgae@cosmopolitanlegal.com
***Attorney for Plaintiff Anna Omelin***

PLAINTIFF ANNA OMELIN'S SECOND AMENDED
COMPLAINT FOR DAMAGES- 33
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit A - Page 33**

# EXHIBIT B

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

ANNA OMELIN, individually and as          )
an administrator of the Estate of         )
Anton Omelin, deceased,                    )
                                           )
                    Plaintiff,             )
                                           )
            vs.                            ) No. 3:17-cv-05837
                                           )
HANSEN BEVERAGE COMPANY d/b/a              )
MONSTER BEVERAGE CORPORATION, a            )
Delaware corporation, MONSTER             )
ENERGY COMPANY, a Delaware                 )
corporation, RED BULL NORTH                )
AMERICA, INC., a California                )
corporation, and DOES 1-100,               )
inclusive,                                 )
                                           )
                    Defendants.            )


VIDEOTAPED DEPOSITION OF ANNA OMELIN

August 6, 2018

Seattle, Washington




Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square          2208 North 30th Street, Suite 202
600 University St.        Tacoma, WA 98403
Suite 2300                (253) 627-6401
Seattle, WA 98101         (253) 383-4884 Fax
(206) 340-1316            scheduling@byersanderson.com
(800) 649-2034            www.byersanderson.com


Serving Washington's Legal Community since 1980

```
 1                   APPEARANCES
 2   For the Plaintiff:
 3                Olga Efimova
                  Cosmopolitan Legal PLLC
 4                155 108th Avenue NE
                  Suite 210
 5                Bellevue, WA  98004
                  425.296.8868
 6                Olgae@cosmopolitanlegal.com
 7   For Defendant Red Bull:
 8                 Michael Ernest Williams
                  Quinn Emanuel
 9                865 South Figueroa Street
                  10th Floor
10                Los Angeles, CA  90017
                  213.443.3251
11                Michaelwilliams@quinnemanuel.com
12                Kristin Carlson
                  Red Bull Legal Counsel
13                1630 Stewart Street
                  Santa Monica, CA  90404
14                310.460.4573
                  kristin.carlson@redbull.com
15
     For Defendant Monster & Hansen Beverage Company:
16
                  Marc P. Miles
17                Shook Hardy & Bacon LLP
                  5 Park Plaza
18                Suite 1600
                  Irvine, CA  92614-2546
19                949.475.1500
                  Mmiles@shb.com
20
                  Aaron Sonhalter
21                Monster Vice President and Chief
                  Litigation Counsel
22                1 Monster Way
                  Corona Way, CA  92879
23                951.817.6064
                  Aaron.sonhalter@monsterenergy.com
24
25   Also present:  Dan Bassett, Videographer
                    Linda Noble, Interpreter
                    Linda Noble, Interpreter
```

Page 2

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

```
 1        there, he was very friendly to them.

 2            He would invite them over to our house not that

 3        often but maybe like once a month.

 4   Q    Do you remember the names of anyone else that would come

 5        over to the house?

 6   A    Well, they would be rotating pretty often.

 7            Some of them I saw a few times.

 8            I remember them, yeah.

 9   Q    Do you remember any names that you can provide of people

10        who would come over to the house?

11   A    Yeah, I can recall a few.  Just a second.

12            Yeah, Oleg.  His last name-- just a second.

13            His last name just slipped my mind.  I know his

14        last name.  It just slipped my mind.  I'll recall it.

15            So there was an Ilya, a Boris.  I don't remember--

16        I don't know his last name.  Volodya, I think his last

17        name was Ivaschuk, but I'm not sure.

18            There were some other guys too, but, honestly--

19        well, their names-- no, I can't-- I can't name any other

20        names.

21            So they would come over, and I would meet them, and

22        then I was usually going off and doing-- taking care of

23        the kids, and they would go like into the backyard and

24        have a barbecue or something.

25   Q    Were these all people that also worked at Balt Trade?
```

Page 33

1    A    I'm not sure.  I don't think so.

2    Q    Do you know what else Anton would do when these people

3         came over, other than have a barbecue?

4    A    They socialized, they would make barbecues, and

5         sometimes like I would make them a salad or something to

6         put on the table.

7             I basically didn't interfere in the male

8         conversation or their business or--

9    Q    Would you see them drinking alcohol?

10   A    Sometimes, yes.

11   Q    What kind of alcohol?

12   A    Beer.

13   Q    Any other types of alcohol?

14   A    At least I didn't see anything aside from beer.

15   Q    Would you see them smoking?

16   A    Yes.

17   Q    You mentioned earlier that Anton would be doing coding

18        on the computer for the website.

19            Do you recall that?

20   A    I'm not sure that he was writing code, but I saw like

21        random letters and numbers, and he said that it was a

22        programming language.

23   Q    Do you know if Anton had any training in computer

24        programming or software languages?

25   A    As far as I know, he taught himself that.

```
1  Q   And how do you know that?

2  A   He told me.

3  Q   Did Anton have a habit of exercising?

4  A   Yes, all the time.

5  Q   And when you say "all the time," how many times per week

6      would you say?

7  A   So at home we had--

8                      INTERPRETER:  The interpreter needs

9      to clarify the word "training device."

10                     THE WITNESS:  And also at work, his

11     work was physical.

12                     INTERPRETER:  The interpreter

13     clarified the training device is like a weight--

14     multi-facetted weight machine.

15                     THE WITNESS:  And we also have-- at

16     home we have pull-up bars in the doorways.

17                     MS. EFIMOVA:  I would like to

18     interfere here.

19         It's like a Bowflex machine, what they have.

20                     INTERPRETER:  She said, "What's

21     that," so that's a conversation between the two of them.

22                     MR. WILLIAMS:  I think I have enough

23     of an idea.

24                     MS. EFIMOVA:  I think we're good

25     here.
```

Page 35

```
 1      while he was exercising?
 2   A  He had an energy drink with him everywhere he went.
 3          Just like I would give the kids a bottle and they
 4      would have a bottle with them, that's how he would have
 5      his energy drink, all the time, everywhere.
 6   Q  My question:
 7          Did you ever see him drink an energy drink while he
 8      was exercising?
 9   A  Yes.
10   Q  On how many occasions?
11   A  I wasn't with him every time he did that, but when I was
12      with him, he would stop, take a gulp, and then continue.
13   Q  And for how long do you recall seeing him drinking
14      energy drinks while he was exercising?
15                          INTERPRETER:  Can the interpreter
16      clarify the question?
17          Do you mean over what period of time or--
18                          MR. WILLIAMS:  Correct, over what
19      period-- let me rephrase it.
20                          INTERPRETER:  Okay.
21   Q  (By Mr. Williams)  Would Anton exercise-- let me start
22      over.
23          When did you first get the exercise machine in your
24      house?
25   A  I can't say.
```

1          What I can tell you is the sequence of events was

2      that he painted the garage, and then at some point that

3      training machine, exercise machine, appeared in the

4      garage, but I can't tell you when it was.

5   Q   Was-- do you recall Anton drinking energy drinks while

6      he was exercising during the entire time that you had

7      the exercise machine in your garage?

8   A   Yes.  I saw it several times, yes.

9   Q   Did Anton ever complain to you that he felt different or

10     sick after exercising and drinking energy drinks?

11  A   No.

12  Q   Did you ever see Anton throw up or vomit after

13     exercising while drinking energy drinks?

14  A   No.

15  Q   Did Anton smoke cigarettes?

16  A   Yes.

17  Q   And what kind?

18  A   Marlboro Red.

19  Q   And how much did he smoke?

20  A   Well, if he opened a pack in the morning, then by

21     evening it was pretty much finished.

22  Q   Did he typically smoke a pack every day?

23  A   Yes.

24  Q   And had he been smoking at the time you first met him?

25  A   Yes.

```
 1   Q    Do you know for how long he had been smoking cigarettes?
 2   A    I couldn't tell you exactly.
 3   Q    Do you smoke cigarettes?
 4   A    Yes.
 5   Q    And how long have you smoked cigarettes?
 6   A    I need to add it up.
 7            So from 16, and then when I got pregnant, I
 8        stopped, and then I started again that night, let's see,
 9        so 16-- I can't-- I can't add it up.
10   Q    When you say you started again that night, what night
11        are you referring to?
12   A    Well, not that night, but maybe that morning-- on that
13        ill-fated day.
14   Q    You started smoking again the day that you found Anton
15        had passed away?
16                        INTERPRETER:  There wasn't an answer.
17        There was a nod.
18                        MS. EFIMOVA:  You have to say
19        something out loud.
20                        THE WITNESS:  Yes, okay.
21            Yes, that time.
22   Q    (By Mr. Williams)  And how much do you smoke a day?
23   A    Five, maybe seven.
24   Q    Five to seven cigarettes per day?
25   A    Yes.
```

1  A   I don't remember.

2  Q   Do you smoke Marlboro Reds?

3  A   No.

4  Q   What do you smoke?

5  A   Virginia.

6  Q   Had you ever seen Anton use any kind of drugs?

7  A   No.

8  Q   Have you ever seen him take any type of prescription

9      pills or medication?

10 A   Once.

11 Q   And when was that?

12 A   They were painkillers.

13 Q   And when was he taking painkillers?

14 A   He had a tooth extracted and the doctor prescribed

15     painkillers.

16 Q   Do you recall when that was?

17 A   No.

18 Q   Do you recall what kind of painkillers they were?

19 A   No.

20 Q   Do you recall how long he took the painkillers?

21 A   He probably took them for about two or three days and

22     then stopped.

23 Q   Other than painkillers, have you seen him ever take any

24     other type of medication or prescription pills?

25 A   No.

```
 1   Q   Did you ever see him take any type of supplements for

 2       working out?

 3   A   No.

 4   Q   How often would Anton drink alcohol, to your knowledge?

 5   A   Well, beers, maybe once a month, like a couple of

 6       bottles, and then hard liquor, maybe two or three times

 7       per year.

 8   Q   And for beers, what kind of beers would he drink?

 9   A   I don't know.

10   Q   For hard alcohol, what kind of hard alcohol would you

11       see him drink?

12   A   Cognac, brandy.

13   Q   Anything else?

14   A   That's it.

15   Q   And when you saw him drink cognac or brandy, how would

16       he drink it?

17           Would it be mixed or as a shot?

18   A   He didn't drink it mixed, and he wouldn't drink shots.

19           He would pour it into like a bigger cup and then

20       drink it slowly.

21   Q   Did you ever see him drink wine?

22   A   Maybe once or twice.

23   Q   Had you ever seen Anton drunk before?

24   A   Never.

25   Q   Have you ever seen him throw up after drinking?
```

1    A    No.

2    Q    Have you ever seen him pass out after drinking?

3    A    No.

4    Q    Would you keep alcohol in the house?

5    A    Yes.

6    Q    And what kind of alcohol would you keep in the house?

7    A    Mainly cognac or brandy.

8    Q    Did you ever notice any change in Anton's drinking

9         habits, in terms of how often or how much he would

10        drink?

11   A    No.

12   Q    Do you drink alcohol?

13   A    Sometimes, yes.

14   Q    And when you drink, what do you drink?

15   A    Whiskey.

16   Q    What type of whiskey?

17   A    Jack Daniels Honey.

18   Q    When you drink whiskey, how much would you typically

19        drink?

20   A    I'm not sure how much it is, but less than half a glass.

21   Q    Do you drink coffee?

22   A    Yes.

23   Q    Regular or decaf?

24   A    Regular.

25   Q    How often?

1   A   Every morning.

2   Q   And how many cups would you have in a particular given

3       day?

4   A   One cup for sure, and then I might make or buy another

5       one.

6   Q   Would you typically make coffee at home?

7   A   Yes.

8   Q   And what kind of coffee would you use?

9   A   I don't know the name, but it was, you know, like ground

10      coffee that we would make using like a coffee maker.

11  Q   Would you typically-- would you or Anton typically buy

12      the ground coffee from Costco?

13  A   So from Costco, but also we had some kind of coffee from

14      work that sometimes he would bring home.

15  Q   Did you drink the coffee that he would bring home from

16      work?

17  A   Yes, of course.

18  Q   Do you recall if it was stronger than the coffee that

19      you would buy from Costco?

20  A   No, the same-- just the same sort of-- not strong.

21  Q   How often would Anton drink coffee, that you would see?

22  A   In the morning for sure I saw him make some coffee in

23      the morning.

24  Q   Do you know if he would drink coffee at work?

25  A   Yes, I do.

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1          **He did.**

2   Q    And how do you know that?

3   **A    Sometimes I would go to see him at the office.**

4   Q    And do you know how he drank his coffee?

5   **A    He would brew it.**

6   Q    Let me rephrase it.

7          Did he use sugar or creamer in his coffee?

8   **A    With sugar and cream, but sometimes he would drink it**

9   **      without cream.**

10  Q    Would he typically use Coffee-Mate creamer?

11  **A    I don't know if he would buy the ready-made bottles at**

12  **      the store.**

13  Q    Did you use creamer-- do you use creamer in your coffee?

14                       INTERPRETER:  The interpreter wants

15        to clarify one thing.

16          When you say "creamer," are you referring to like

17        artificial cream as opposed to milk--

18                       MR. WILLIAMS:  Let me rephrase it.

19                       INTERPRETER:  Okay.

20  Q    (By Mr. Williams)  With regard to the large bottles of

21        creamer that he would buy at the store, did you use that

22        in your coffee?

23  **A    Sometimes, yes.**

24  Q    And would Anton also buy coffee from Starbucks on

25        occasion, to your knowledge?

Page 45

```
 1  A    Yes, I saw some-- I saw Starbucks cups.

 2  Q    Do you know what he would drink from Starbucks?

 3  A    When I was with him, he would usually get a vanilla

 4       latte.

 5  Q    Did Anton also drink caffeinated tea?

 6  A    He drank tea, but I don't know whether it had caffeine

 7       or not.

 8                  MS. EFIMOVA:  Can you clarify this

 9       question?  Because every single type of tea has caffeine

10       in it, technically.

11           Do you mean like decaf tea?

12                  MR. WILLIAMS:  Right.

13                  MS. EFIMOVA:  Yeah.

14  Q    (By Mr. Williams)  How often would Anton drink tea?

15  A    I don't know.

16           Sometimes he drank tea.

17  Q    And do you know where he would buy the tea from?

18  A    He would get it at work.

19  Q    Does Balt Trade sell different types of tea?

20  A    Yes, lots of different kinds.

21  Q    Do you know if there are records from Balt Trade that

22       would show what Anton took from work to bring home?

23  A    I don't know.

24  Q    Do you know if Anton drank Mountain Dew soda?

25  A    I think he did.
```

Page 46

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1   Q   And did he drink Coca-Cola?

 2   A   He did.

 3   Q   And Dr. Pepper?

 4   A   Yes.

 5   Q   Did Anton ever tell you that caffeine made him feel

 6       sick?

 7   A   No.

 8   Q   Did he ever tell you that caffeine made him feel

 9       nauseous?

10   A   No.

11   Q   Did you ever tell him not to drink so much caffeine?

12   A   No.

13   Q   Did he drink coffee in the evenings to stay awake?

14   A   I don't know whether he did it to stay awake, but I-- as

15       a drink, he drank coffee in the evenings as well.

16   Q   How much coffee would he typically drink in the

17       evenings?

18   A   One cup.

19   Q   Approximately what time of the evening?

20   A   When he came home from work.

21           It was at various times.

22                           (Exhibit No. 1 marked

23                            for identification.)

24

25   Q   (By Mr. Williams)  I would like to show you what we'll
```

Page 47

```
 1        mark as Exhibit No. 1.
 2             I will ask you if you recognize this photograph.
 3   A    Mm-hm.
 4   Q    I'm sorry?
 5   A    Yes.
 6   Q    And where was this photo taken?
 7   A    At the office.
 8   Q    At the Balt Trade office?
 9   A    Yes.
10   Q    Do you know when it was taken?
11   A    No.
12   Q    Do you know who took the photo?
13   A    No.
14   Q    If you see, there's an orange bag on the table which
15        says, "Big Leaf Ceylon Tea."
16             Do you see that?
17   A    I see it.
18   Q    Is that tea that he would-- is that tea that Balt Trade
19        sells, if you know?
20   A    Yes.
21   Q    Did you ever see him drink that type of tea?
22   A    No.
23   Q    Did you ever see that tea at home?
24   A    I don't remember.
25   Q    And if you look above the microwave, there's a coffee
```

```
 1   A   At first I didn't even notice or pay attention to what
 2       he was drinking or when or how, but then after a while I
 3       noticed that he was coming to work with energy drinks.
 4   Q   When you say you noticed he was coming to work with
 5       energy drinks, how did you notice that?
 6   A   What do you mean?  Like when a person comes in and he's
 7       holding an energy drink-- that's how I noticed.
 8   Q   When Anton first started working at Balt Trade, were you
 9       working there as well?
10   A   No.
11   Q   Would you visit the offices at Balt Trade?
12   A   Very often.
13   Q   And that's when you would notice Anton come to work with
14       energy drinks?
15   A   It wasn't something that I like particularly noticed or
16       paid attention to, but I noticed that he would come to
17       work with an energy drink in the morning.
18   Q   And at some point in time did you notice he was drinking
19       more energy drinks?
20   A   So it's not like there was some sudden change, you know,
21       over time.
22           There were some days when people drink less or
23       people drink more, but over a period of time it
24       gradually became more and more.
25                             (Exhibit No. 2 marked
```

Page 50

```
 1                            for identification.)

 2

 3   Q   (By Mr. Williams)  I would like to show you what we'll

 4       mark as Exhibit No. 2.

 5           And if you could turn to Page 5, and starting at

 6       the end of Line No. 15, it says, "Mr. Omelin normally

 7       consumed 16-ounce cans of 'NOS Original,' replacing it

 8       with 'Monster Energy Drink' and 'Red Bull Energy Drink'

 9       when NOS Original was not available."

10           Do you see that?

11   A   Yes.

12   Q   Is that accurate?

13   A   Yes.

14   Q   Did Anton ever tell you why he would normally drink NOS

15       Original?

16   A   It was-- he liked the taste.

17   Q   Did he tell you that?

18   A   Yes.

19   Q   Did he tell you he liked the taste of NOS Original

20       better than Monster Energy or Red Bull Energy Drink?

21   A   Yes.

22   Q   Did he typically keep NOS Original Energy Drink at home?

23   A   He didn't keep it.  He would come with open cans.

24   Q   Okay.  Did Anton ever keep any type of energy drink at

25       home, at the house?
```

```
 1  A   So he might get like two cans and have one open and then
 2      the other one keep until morning or even drink it in the
 3      evening.
 4  Q   But other than maybe having two cans, did he ever bring
 5      home a case of energy drinks that he would keep at the
 6      house or some larger quantity?
 7  A   He did, but I found out about that myself only recently,
 8      relatively recently.
 9                      INTERPRETER:  Interpreter correction.
10  Q   (By Mr. Williams)  And how did you find out about that
11      recently?
12  A   I heard it from his friend and former work colleague.
13  Q   And what did they tell you?
14                      INTERPRETER:  The interpreter needs
15      to correct.  That was one of the-- that was one person,
16      friend and former work colleague.
17                      MR. WILLIAMS:  Okay.
18                      INTERPRETER:  Can you restate the--
19                      MR. WILLIAMS:  Sure.
20  Q   (By Mr. Williams)  Who was this friend and former work
21      colleague?
22  A   Gennadiy.
23  Q   And what did Gennadiy tell you?
24  A   That Anton and Gennadiy would go to Costco, and Anton
25      would buy entire cases and keep it at work-- keep--
```

```
 1   Q   And does anyone use the other bedroom on the second
 2       floor?
 3   A   Right now?
 4   Q   Correct.
 5   A   No, not really.
 6   Q   Was anyone using that other bedroom on the second floor
 7       as of October 2014?
 8   A   No.
 9   Q   As of October 2014, with respect to your infant
10       daughter, was she staying in your bedroom?
11   A   She slept in the same place where I was sleeping, which
12       was, for the most part, on the first floor of the house.
13   Q   And where were you sleeping on the first floor of the
14       house?
15   A   We had a couch, a big couch.
16   Q   Was that in the living room?
17   A   Yes.
18   Q   And were you staying on the first floor of the house
19       because you had had a C-section?
20   A   Exactly.
21   Q   So had you been staying on the first floor of the house
22       with your infant daughter since you came home from the
23       hospital after giving birth to her?
24   A   The first couple of days, maybe two days, after I got
25       back, I slept in our bedroom, but then I realized it was
```

1       too difficult for me, so we moved down to-- my daughter

2       and I moved down to the first floor.

3    Q  Did you have a home office where Anton would work from

4       home?

5    A  Yes.

6    Q  And where was that located?

7    A  It was next to the younger-- my little son's bedroom.

8    Q  On the second floor?

9    A  Yes.

10   Q  Was that one of the four bedrooms in the house that was

11      being used as an office?

12   A  Yes.

13   Q  And who lives in the house now with you?

14   A  Just me and the children.

15   Q  I'd like to talk now about the events on October 29th,

16      2014.

17   A  All right.

18   Q  When was the first time that you saw Anton that day?

19   A  So the 29th, so that is the day before the incident, so

20      I-- I saw him in the morning.

21   Q  Approximately what time?

22   A  I couldn't tell you exactly.  It was very early,

23      possibly between 5 and 6 a.m.

24   Q  Do you remember where you saw him?

25   A  So I was sleeping in the living room, and I woke up to

1      feed my daughter, and Anton woke up and came down to the

2      living room.

3   Q  Do you recall having any conversation with him that

4      morning?

5   A  So I had just given birth.  I was kind of sleepy all the

6      time, and I know that we said, "Hello" to one another,

7      but I don't think-- like we weren't really having

8      conversations at that point.

9   Q  Did you notice anything unusual about Anton's behavior

10     that morning?

11  A  No.  He was just like-- just like usual, looked the

12     same.

13  Q  How much time passed between when you first saw him that

14     morning and when he left for work?

15  A  I don't remember.

16  Q  Did you actually see him leave for work or had you

17     fallen back asleep at that point?

18  A  I heard him leaving for work.

19  Q  When you say you heard him leaving, did you actually see

20     him leave?

21  A  So the main door, the entry door, and the door to the

22     garage are sort of behind the stairwell, and then

23     there's-- the kitchen is right there, so you can't

24     really see it, and I heard him say, "I'm leaving," and

25     that was it.

```
 1   Q   Did Anton speak fluent English?
 2   A   He didn't speak very well, of course, but, you know,
 3       some people understood him.
 4   Q   Do you know if he was able to read English?
 5   A   Yes.
 6   Q   And in your opinion did he understand English when he
 7       was having a conversation with someone?
 8   A   Yes.
 9   Q   Did you see Anton eat anything the morning of 10--
10       October 29th, before he left for work?
11   A   No.
12   Q   Did you see him drink anything before he left for work
13       on October 29th?
14   A   No.
15   Q   When was the next time you spoke to Anton on October
16       29th, 2014?
17   A   Over the course of the day for sure.
18   Q   Was that by telephone?
19   A   Yes.
20   Q   Do you recall how many times you spoke to him during the
21       course of the day?
22   A   I don't remember how many, but I know for sure at least
23       once because we always talked on the phone-- we always
24       talked on the phone once a day.
25   Q   Do you remember anything about the conversation or
```

1      conversations you had with him during the day while he
2      was at work?
3    A  I do remember because I remember when we connected by
4      phone, he said he was going to-- he had something
5      interesting to tell me that evening.
6    Q  Other than telling you he had something interesting to
7      tell you that evening, did he explain what he was
8      referring to?
9    A  I don't remember.
10         I think maybe he said that it was something to do
11      with the business.
12   Q  Do you remember anything else about your conversations
13      with Anton during the day on October 29th?
14   A  No, nothing.
15   Q  What time did he come home from work that day?
16   A  I think it was at about 7:00 that he came home.
17   Q  And did you notice anything unusual about his behavior
18      when he came home that evening?
19   A  He was-- well, he was happier, he was in a good mood.
20   Q  Did you see him bring anything in with him when he came
21      home that day?
22   A  Yes.
23   Q  And what was that?
24   A  It was an open can of Red Bull, and there was two cans
25      of boiled meat.

```
 1   Q   Anything else?

 2   A   No.

 3   Q   Did he tell you what he had had to eat during the day at

 4       work?

 5   A   No.

 6   Q   Did he tell you anything that he had to drink at work

 7       that day?

 8   A   No.

 9   Q   What time did you have dinner on October 29th?

10   A   I don't remember.

11          Our dinner is just whenever it happens, especially

12       for me.

13   Q   Was there-- let me rephrase that.

14          Did you eat dinner with Anton the night of October

15       29th?

16   A   No.

17   Q   When he got home at 7 p.m., had you and the children

18       already had dinner?

19   A   Yes.

20   Q   And what did you have for dinner?

21   A   I don't remember, but I usually tried to make something

22       simple because it was rather difficult for me to take

23       care of three kids and then stand at the oven, so maybe

24       it was some kind of soup.

25          I don't remember.
```

Page 72

```
1   Q   Did Anton bring any type of alcohol home with him on
2       October 29th, 2014?
3   A   No.
4   Q   You mentioned that he brought two cans of boiled meat.
5           Do you recall what kind of meat it was?
6   A   So I do remember it was either pork or beef, and it was
7       Army brand.
8   Q   And had he brought that kind of boiled meat home before?
9   A   Yes.
10  Q   Did you see Anton eat dinner at the house that evening
11      after he arrived?
12  A   I didn't see him actually eating.  He started preparing
13      food for himself.
14  Q   Do you recall what he started preparing for himself?
15  A   Macaroni with that canned meat.
16  Q   Did anyone else come over that evening?
17  A   Yes.
18  Q   And who came over?
19  A   My mom.
20  Q   Anyone else?
21  A   No.
22  Q   What time did your mom arrive?
23  A   They came at the same time that evening.
24                      INTERPRETER:  Interpreter correction.
25          They came together that evening.
```

Page 73

| | | |
|---|---|---|
| 1 | | waiting for my mom because it was hard for me to go walk |
| 2 | | by myself. |
| 3 | Q | So at what-- how long after Anton and your mom arrived |
| 4 | | did you go for a walk with your mom? |
| 5 | A | So maybe five minutes. |
| 6 | | I knew that they were on their way. |
| 7 | | I was already getting ready. |
| 8 | | I had gotten my-- the baby ready, and we left |
| 9 | | pretty much right away. |
| 10 | Q | Did Anton stay at the house when you went on the walk? |
| 11 | A | Yes. |
| 12 | Q | And how long were you gone on the walk? |
| 13 | A | Not for very long, maybe 20 minutes. |
| 14 | Q | And when you came back, is that when you saw Anton |
| 15 | | preparing his food for dinner? |
| 16 | A | No.  He started making food immediately when we got |
| 17 | | home. |
| 18 | | I saw him get out a pan and put water in it to boil |
| 19 | | for the macaroni, and then when we got back, he had |
| 20 | | pretty much eaten his entire portion. |
| 21 | Q | And when you got back, you invited your mom and your |
| 22 | | oldest son to eat some of the macaroni as well? |
| 23 | A | My older son didn't go with us on the walk.  He stayed |
| 24 | | with my husband and was eating, and then when we came |
| 25 | | back with my mom, Anton asked her if she would like to |

```
 1        have something to eat, and she said, "Yes," and so he

 2        served her.

 3    Q   Do you know whether Anton had anything to drink while

 4        you were on the walk with your mom?

 5    A   I saw a can of Red Bull on the table near him, and I

 6        assumed that he probably drank some of that.

 7    Q   Was that the same can of Red Bull that he came home with

 8        when he got home from work?

 9    A   I don't know.

10            Maybe it was a different one.

11    Q   Did you see him come home-- let me rephrase that.

12            When he arrived, you said he had one open can of

13        Red Bull with him as well as the two cans of boiled

14        meat, correct?

15    A   Yes.

16    Q   At some point-- well, other than seeing the can of Red

17        Bull on the table, are you aware of whether he drank

18        anything else while you were gone on the walk?

19    A   I didn't see it.  I was out for a walk.

20    Q   When you got home from the walk, did you see Anton eat

21        anything, other than the macaroni that he had made?

22    A   No.

23    Q   Did you see Anton drink anything when you got home from

24        the walk?

25    A   So I remember that when he was sitting at the table with
```

1    that plate in front of him with the food not completely

2    eaten, his computer was open, and he was typing

3    something, and he took some more gulps of the Red Bull.

4  Q  Did you see him drink any alcohol once you got home from

5     your walk?

6  A  He drank some alcohol, but it was much later.

7  Q  When you say "much later," what time was it that you saw

8     him drink alcohol?

9  A  It was after my mom had left.

10        I had already put my daughter to bed, so it was

11     probably after 9 p.m.

12  Q  What time did you typically put your daughter to bed?

13  A  Well, she was a three-week-old infant, and she didn't

14     really have a particular bedtime.  She was still

15     breastfeeding, and basically she slept almost all the

16     time, so I just rocked her to sleep.

17  Q  Did you actually see Anton drink alcohol that evening?

18  A  Yes.

19  Q  What did you see him drink?

20  A  Cognac.

21  Q  And how much cognac did you see him drink?

22  A  Well, he doesn't drink, you know, shots, so I saw him

23     put-- pour it into a glass three, maybe four, times, and

24     just a little bit, like-- like this amount.

25  Q  And approximately what time was it that you saw him

```
 1       drinking cognac?
 2   A   It was after-- probably after 9, and we were-- maybe
 3       until midnight we were talking.
 4   Q   So between 9 and midnight, that's when you saw him have
 5       three or four glasses of cognac?
 6   A   Not a glass.
 7           So each time he was pouring about this amount, and
 8       then if you add up that three or four times, the total
 9       would be about like this.
10   Q   And by "this amount," each time that he poured it, was
11       it approximately an inch of alcohol in the glass?
12   A   I don't know like if it's between inches and
13       centimeters.
14           It was like-- I can show you here.  It was about
15       this much.
16           I'm not sure how much-- is this an inch?  Is this a
17       centimeter?
18   Q   And you recall speaking with him-- you stayed awake
19       until midnight talking with him; is that correct?
20   A   Yes.
21   Q   Do you recall what you spoke about?
22   A   I do.
23   Q   What did you speak about?
24   A   I do remember that he was telling me the thing that he
25       told me was going to be interesting that he was going to
```

Page 78

```
 1         tell me about, and he told me that my stepfather had
 2         officially proposed that he take the company entirely
 3         under his own wings.
 4    Q    Did he tell you when your stepfather told him he would
 5         take over the company?
 6    A    I don't remember the time, but what I understood from
 7         his conversation was that it had been that day.
 8    Q    He was given the news that day that he would take over
 9         the company; is that correct?
10    A    It was a proposal that my stepfather made to him, was
11         "Would you like to take over the company and lead it
12         yourself?"
13    Q    Had you ever heard from your mom or your stepfather that
14         they were considering Anton take over the company?
15    A    I had sort of vaguely heard it.
16    Q    What had you heard?
17    A    Well, it wasn't like a specific like, "Oh, here you go,"
18         but it was more like my stepfather is quite elderly and
19         not well, and he would say things like, "Oh, I am just
20         going to give everything over to my son-in-law and let
21         him run the company."
22    Q    Does your father-in-law have any health issues, that
23         you're aware of?
24    A    Yes.
25    Q    And what are those?
```

1  A   A stomach cancer.

2  Q   And with regard to the cognac that Anton was drinking

3      that night, was this a bottle that you had at the house?

4  A   Yes, it was at the house.

5  Q   Was it a full bottle when he started drinking from it?

6  A   Yes.

7  Q   Do you know if it was unopened before he started

8      drinking from it that night?

9  A   I assume so because prior to that nobody had taken any.

10 Q   Other than the cognac and the sips of Red Bull that you

11     said you saw him take while he was eating dinner, did

12     you see him drink anything else that night?

13 A   So he was drinking energy drink not only while he was

14     eating dinner.  He was drinking it at the same time as

15     we were drinking the cognac.

16         Besides that, I didn't see him drink anything else.

17 Q   Did you have any cognac that evening?

18 A   Yes.

19 Q   How much did you have?

20 A   A teaspoon-- I mean, literally a teaspoon because my

21     husband poured it into a teaspoon, and I drank it.

22 Q   Were you breastfeeding your daughter around that time?

23 A   Yes.

24 Q   Did anyone else drink cognac that evening at your house,

25     besides you and Anton?

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

1   **A    No.**

2   Q    You said you saw him drinking energy drinks while you

3        were drinking the cognac; is that correct?

4   **A    Yes.**

5   Q    And what kind of energy drinks did you see him drinking?

6   **A    Red Bull.**

7   Q    Anything else?

8   **A    No, I don't recall anything.**

9   Q    Do you know if it was a separate can or a different can

10       than the one he came home with?

11  **A    I don't know.**

12  Q    Now, did you see him drink anything else, other than the

13       Red Bull and the cognac, that night when he got home?

14  **A    I think he also drank coffee-- I think he also drank**

15       **coffee because when I came back, there was a cup maybe**

16       **half full of coffee on the table that hadn't been there**

17       **before.**

18  Q    When you came back, do you mean when you came back from

19       your walk?

20  **A    Yes, when I was clearing off the table, I saw a cup of**

21       **coffee.**

22  Q    At what point did you last see Anton that-- on October

23       29th?

24  **A    I went to bed, and he laid down next to me as well, and**

25       **then after a little bit of time, he got up.**

**Anna Omelin**
**August 6, 2018**
**Exhibit B - Page 33**

1          I don't know what time it was.

2                         INTERPRETER:  Interpreter needs to

3     clarify.

4          (Clarifies.)

5                         THE WITNESS:  I don't know how much

6     time had passed since we had laid down.

7  Q   (By Mr. Williams)  How do you know it was midnight when

8     you were-- you said you were drinking cognac from

9     approximately 9 p.m. to midnight; is that correct?

10 A   Approximately, yes.

11 Q   And how do you know it was midnight when you were

12    drinking the cognac?

13        Did you check your watch at that point?

14 A   I can't say now how I knew what time it was.

15        I know when the police asked me about it, there was

16    some way I was able to determine what time it was, but

17    maybe I guess I must have looked at a clock or somehow I

18    knew what time it was.

19 Q   Between the time you put your daughter to sleep on

20    October 29th and midnight, do you recall her waking up

21    at all?

22 A   No.

23 Q   And when Anton laid in the bed next to you, did he ask

24    you if you wanted to have sex?

25 A   Yeah, something like that.

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1    Q    And what did you say in response?

2    A    **I told him that I wasn't able to, that it hadn't been**

3         **long enough-- not enough--**

4                        INTERPRETER:  Interpreter correction.

5                        THE WITNESS:  Not enough time had

6         passed since the operation.

7    Q    (By Mr. Williams)  And had he also asked you the night

8         before, on October 28th, to have sex as well?

9    A    **No.**

10   Q    Did Anton seem intoxicated to you when he had laid down

11        next to you on the couch?

12   A    **No, like usual.**

13   Q    Did you see Anton eat anything else between the time he

14        had the macaroni dinner and the time he laid down next

15        to you in the bed?

16   A    **Yes.**

17   Q    What did you see him eat?

18   A    **It was cheese and slices of lemon.**

19   Q    And what time did you see him eat that?

20   A    **So it was between that time when we were drinking the**

21        **cognac.**

22        **He had gone out to buy cheese and lemon, and he had**

23        **cut the lemon.  It was next to the cheese, and we were**

24        **sitting there talking.**

25   Q    What time was it that he went out to buy the cheese and

```
 1        the lemon?
 2   A    It wasn't much before 9.
 3             Maybe 8:30.
 4   Q    Had he already started drinking cognac when he went out
 5        to get the cheese and the lemon?
 6   A    No.  It was after.
 7   Q    Do you know where he got the cheese and the lemon from?
 8   A    I don't actually know where, but he said he was going to
 9        go to the gas station.
10   Q    And other than the cheese and the lemon, did you see him
11        bring in anything else?
12   A    No.
13   Q    How long was he gone?
14   A    He was gone for maybe 20, 25, 30 minutes.
15   Q    And how far is the gas station from your house?
16   A    It's not very far.
17             I guess if you calculate it, maybe at the most ten
18        minutes.
19   Q    Do you know if he smoked anything that evening?
20   A    Cigarettes.
21   Q    And how many cigarettes did you see him smoke that
22        night?
23   A    I don't know.
24             He was smoking, he was going out, coming in.
25             I can't recall how many.
```

```
1    Q    Do you recall if he went out to smoke more than five
2         times that evening?
3    A    I don't know.
4              He went out on the balcony frequently, but he was
5         also calling someone, so I don't know whether he was
6         smoking every time he went out or whether he was talking
7         on the phone.
8              The thing is, is that the condition I was in at
9         that time, I was sitting most of the time, and the way
10        that the couch is positioned with respect to the kitchen
11        and the balcony, it has its back to the kitchen and the
12        balcony, so I couldn't see every time he was going out,
13        and so I didn't know whether he was going out with a
14        cigarette or without a cigarette.
15   Q    Where was the bottle of cognac when you were sitting
16        there talking with him in the living room?
17   A    On the little table right in front of us.
18   Q    And-- now, did you eat any of the cheese and lemon that
19        night?
20   A    I honestly don't recall, but logically, probably, yes.
21   Q    You said that Anton was calling someone that night; is
22        that correct?
23   A    Yes.
24   Q    Do you have any idea who he was calling?
25   A    He was calling his cousin, and he wasn't able to get
```

Page 85

```
 1                    VIDEOGRAPHER:  Back on record.  Here
 2      marks the beginning of Media Unit No. 4 in the
 3      continuing deposition of Anna Omelin.
 4          The time now is 2:31 p.m.
 5   Q  (By Mr. Williams)  Ms. Omelin, with regard to the
 6      sleeping arrangements on October 29th, 2014, you were on
 7      the first floor in the living room with the infant,
 8      correct?
 9   A  Yes.
10   Q  And was the infant sleeping on the couch or in a
11      bassinet?
12   A  She was in a bassinet.
13   Q  And you said that there was an alarm clock next to-- on
14      the table in the living room; is that correct?
15          I'm sorry, you said there was an alarm clock on the
16      windowsill.
17          Do you recall that?
18   A  Yes, on the second floor on my-- in my husband's phone
19      he had the alarm clock.
20   Q  So are you able to hear the alarm clock from the couch
21      in the living room if it's going off in the bedroom on
22      the second floor?
23   A  It's a terrible vibration.
24   Q  When you say "terrible vibration," so you could hear the
25      vibration from the second floor down to the first floor?
```

1    A    Yes.

2    Q    At the time you also-- as of October of 2014, you had a

3         son who was approximately 3 years old; is that correct?

4    A    Not quite 3.

5    Q    And he was sleeping on the second floor, correct?

6    A    Not that night.

7         He was sleeping downstairs with me, with us.

8    Q    Where was the 3-year-old sleeping that night?

9    A    On the same couch.

10   Q    And your other son, who was 8 years old at the time-- is

11        that correct?

12   A    12.

13   Q    12, and he was sleeping on the third floor; is that

14        correct?

15   A    Yes, in his own room.

16   Q    And did your son, who was 2, almost 3, do you recall him

17        waking up at any point during the night on October 29th?

18   A    No, I don't think he woke up.

19        I don't remember that he did.

20   Q    Was it common for your son, who was not yet 3, to sleep

21        throughout the night without waking up?

22   A    Mostly, yes.

23        Sometimes he would wake up at night once, or at

24        most twice, and ask for a drink.

25   Q    But that did not happen on October 29th, correct?

1  A  **It did not.**

2  Q  **And going back to the two cans of boiled meat that Anton**

3     **brought home that night, you said he used one of them to**

4     **make the pasta with; is that correct?**

5  A  **Yes.**

6  Q  And do you recall that he used the entire can of the

7     meat with the pasta?

8  A  **I don't know.  I didn't pay attention to it.**

9  Q  And you said there was another can that was not opened

10    when he was cooking dinner; is that correct?

11 A  **Yes.**

12 Q  When you woke up at 5 a.m., where was the bottle of

13    cognac that you and Anton had been drinking from the

14    night before?

15 A  **The evening before, I put it away on the counter, on the**

16    **island counter.**

17    **     I put away the dishes and the glasses.**

18 Q  And did you notice the bottle of cognac when you woke up

19    in the morning?

20 A  **No, I didn't see it.  It was in the kitchen.**

21 Q  You didn't see it in the kitchen the next morning?

22 A  **Maybe it would be better if I were to draw them a plan,**

23    **a floor plan, of the house so that they would see that**

24    **even though the kitchen and the living room are one big**

25    **room, that it's rather large, and the light is separate**

```
1        for the two different spaces, so it was dark in the

2        kitchen.

3    Q   At any time on October 30th did you see the bottle of

4        cognac that you and Anton had been drinking from the

5        night before?

6    A   No.

7    Q   Do you recall what kind of cognac it was?

8    A   I remember the name.

9    Q   And what was the name?

10   A   Courvoisier.

11   Q   Do you still have the bottle of cognac at your house?

12   A   No.

13   Q   What happened to it?

14   A   Honestly, I don't know.

15          It's possible I threw it out.  Maybe one of the

16       other relatives threw it away.

17          I don't know, but I know it's not around anymore.

18   Q   Did you ever see the bottle of cognac again, at any

19       time, after you moved it from the living room and put it

20       into the kitchen the night of October 29th?

21   A   I don't remember it again after that.

22   Q   At some point on October 30th did you find Anton in the

23       house somewhere?

24   A   Yes.

25   Q   And when was that?
```

Page 93

1   A   It was sometime between 7 and 8 in the morning.

2   Q   And where did you find him?

3   A   In the bathroom.

4   Q   And which bathroom was this?

5   A   The one that's off of our bedroom.

6   Q   How was he laying?

7       What position was he in when you found him?

8                       MS. EFIMOVA:  Can we take a break?

9                       MR. WILLIAMS:  Sure.

10                      VIDEOGRAPHER:  Going off the record.

11      The time now is 2:43 p.m.

12                      (Recess 2:43 to 2:49 p.m.)

13

14                      VIDEOGRAPHER:  Back on record.  The

15      time now is 2:49 p.m.

16   Q   (By Mr. Williams)  Ms. Omelin, I know this is difficult

17      and emotional for you, so I am only asking questions

18      that I need to in order to defend the lawsuit that you

19      brought.

20   A   All right.

21   Q   When-- before you found Anton on the morning of October

22      30th, had you heard anything from the upstairs after you

23      woke up around 5 a.m.?

24   A   No.

25   Q   When you went into the bathroom where you found Anton,

```
 1      did you move him in any way?
 2   A  I touched him, but he didn't change the position that he
 3      was in.
 4   Q  When you went into the bathroom, did you notice anything
 5      unusual about the bathroom itself, separate from finding
 6      Anton?
 7   A  No.
 8          In a situation like that, when you see something
 9      like that, you don't look at anything else.
10   Q  What did you do after you touched Anton and he didn't
11      move?
12          What did you do next?
13   A  I went out and I called my mom.
14   Q  And what did you tell your mom?
15   A  I told her that Anton had died.
16   Q  Do you recall what she told you?
17   A  She said, "We'll call an ambulance right now and
18      everything will be okay," that the doctors will come and
19      save him or something like that.
20   Q  When you found Anton, did you know at that time that he
21      had already died?
22   A  So the many times that I recalled that situation since
23      it happened, I remember when I opened the door, the
24      first thing I saw were his feet or legs, and they were
25      blue, purple color, and the color of his body was like
```

| | |
|---|---|
| 1 | **this paper, completely white, and he was-- and his body** |
| 2 | **was sort of hard.** |
| 3 | Q   Were any of your children with you when you found Anton? |
| 4 | **A   My daughter.** |
| 5 | Q   Other than calling your mom, did you call anyone else |
| 6 | after you found him? |
| 7 | **A   I don't remember.** |
| 8 | Q   Who was the first person to arrive at your house after |
| 9 | you called your mom? |
| 10 | **A   My mom.** |
| 11 | Q   Did she come by herself? |
| 12 | **A   With my father--** |
| 13 | INTERPRETER:  Interpreter correction. |
| 14 | THE WITNESS:  With my stepfather. |
| 15 | Q   (By Mr. Williams)  How long did it take them to get to |
| 16 | your house? |
| 17 | **A   They came very quickly.** |
| 18 | **I don't remember how long, but very, very fast.** |
| 19 | Q   After you called your mom, did you go into another room |
| 20 | to wait for them to get there? |
| 21 | **A   So I was-- after I saw Anton, I was sort of crying--** |
| 22 | **screaming and crying, and then I was standing on the--** |
| 23 | **at the base of the stairs that go up to the third floor.** |
| 24 | **There is sort of like a bonus room there, and I was** |
| 25 | **standing there, and my eldest son woke up from the** |

1      sounds and came down the stairs, and I told him, "Don't

2      go in there," and the two of us went downstairs.

3   Q   Did you have any discussion with your oldest son about

4      whether he had heard anything during the night?

5   A   I asked him.  He said he hadn't heard anything.

6   Q   Who else showed up at your house that morning after your

7      mom and your stepfather?

8   A   So a whole bunch of people came.  It was the police and

9      ambulance, firemen.

10         There were a whole bunch of people.

11         There was another woman who introduced herself as

12      like a criminal psychologist, and then I called a friend

13      of mine, a girlfriend of mine, who speaks English very

14      well, and I asked her to come over so that she could

15      help me communicate with the police and everybody else.

16   Q   When your mom and stepfather arrived at the house, did

17      either of them go into the bathroom where Anton was?

18   A   My stepfather did.

19   Q   Did you see him go in the bathroom?

20   A   I didn't hear him-- I didn't see--

21                  INTERPRETER:  Interpreter correction.

22                  THE WITNESS:  I didn't see him go in,

23      but I heard him go in, and then I heard him cry out and

24      start to cry as well.

25   Q   (By Mr. Williams)  After your mom and stepfather showed

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1      up, do you recall who were the next people that showed
 2      up first?
 3   A  I think it was a fire truck.
 4          I remember because I ran out to meet them because
 5      they kind of passed the house-- they went past the house
 6      a little bit, so I ran out to tell them to come here,
 7      and then after that, I don't remember-- there was just a
 8      lot of people.
 9   Q  What was the name of your friend that came over to
10      translate?
11   A  Julia Lawrence.
12   Q  And where does she live?
13   A  Right now she lives in an apartment building not far
14      from my house.
15   Q  Where did she live as of October 30th, 2014?
16   A  She lived in the adjacent area-- neighborhood.
17   Q  Do you remember your father-in-law translating for you
18      when the police showed up?
19   A  My father-in-law?
20   Q  I'm sorry, stepfather.
21   A  Yeah, I think that someone was trying somehow to help me
22      communicate with people because they were asking a lot
23      of questions.
24   Q  Do you recall telling anyone on October 30th that you
25      heard Anton in the bathroom at some point during the
```

Page 98

| | | |
|---|---|---|
| 1 | | night but didn't know what time it was? |
| 2 | A | So when I woke up again at sometime around 7:00, I |
| 3 | | looked outside and I saw that the car was still there, |
| 4 | | and I went upstairs into the bedroom, and the way that |
| 5 | | the bedroom and the bathroom are situated, if you go |
| 6 | | into the bedroom, you can see the light in the bathroom, |
| 7 | | and I saw the light was on, and I heard the sound of |
| 8 | | running water, so I thought he was taking a shower, and |
| 9 | | I didn't go in.  I left and went back downstairs. |
| 10 | Q | When you went into the bathroom later, did you see any |
| 11 | | running water in the bathroom? |
| 12 | A | You know, it's either that I saw the water running or |
| 13 | | somebody told me that the water was running. |
| 14 | | I can't remember that precise moment. |
| 15 | Q | Do you recall speaking to someone named Melissa Baker |
| 16 | | from the medical examiner's office, on October 30th? |
| 17 | A | I spoke with a woman, but I don't remember what her name |
| 18 | | was. |
| 19 | Q | Did Ms. Lawrence help you translate when you were |
| 20 | | speaking to the woman? |
| 21 | A | I don't remember. |
| 22 | | That morning it was just such chaos, and there were |
| 23 | | so many people, and people were asking questions, and I |
| 24 | | don't remember now who interpreted for whom, and |
| 25 | | everything just is like-- ended up in one big-- like one |

```
 1      big mess for me.
 2   Q  Do you recall telling anyone, on October 30th, that
 3      Anton had been complaining of headaches for several
 4      months?
 5   A  I don't recall that.
 6   Q  Do you recall telling anyone, on October 30th, that
 7      Anton had refused to see a doctor?
 8   A  No, I don't recall.
 9          I don't think I was even able to talk at that
10      point.
11   Q  Do you recall telling anyone, on October 30th, that
12      Anton had been drinking a lot of coffee and Red Bull to
13      stay alert?
14   A  There were a lot of-- some people were asking me about
15      something-- they'd seen the can of Red Bull, and they
16      were asking about that, and I said that he had been
17      drinking Red Bull and coffee as well.
18   Q  Do you recall who was asking you about the can of Red
19      Bull?
20   A  One of those that came.
21   Q  Do you recall telling anyone, on October 30th, that a
22      few days earlier Anton was hallucinating and seeing
23      circles in his eyes at work?
24   A  No, I don't remember that.
25   Q  Did anyone ever tell you, before Anton passed away, that
```

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1      he was hallucinating and seeing circles in his eyes at

2      work?

3  A   **I think my mom told me that.**

4  Q   Do you recall when she told you that?

5  A   **I think it was a day or two before he was gone, that she**

6      **told me that he was having headaches and was seeing**

7      **either circles or stars or dots.**

8  Q   Did you ever ask Anton about that?

9  A   **No, because that happens to me sometimes too if I'm**

10     **overly tired or I don't sleep for a long time.**

11 Q   Did you ever see in the bathroom, on October 30th, a

12     beer bottle next to the bathtub, when you went in?

13 A   **I didn't see anything at that point.**

14         **When I saw him, I didn't see anything else after**

15     **that.**

16 Q   At some point on October 30th did Michael Naccarato come

17     to your house?

18 A   **Yes, along with his wife, my mother-in-law.**

19 Q   Do you recall about what time they arrived at your

20     house?

21 A   **They came after everybody had gone and they had taken**

22     **Anton away, and maybe it was two hours later or an hour**

23     **later.**

24 Q   Did anyone ever tell you that they found an open can of

25     meat in the bathroom near Anton, on October 30th?

```
 1   Q   October of 2017?

 2   A   Yes.

 3   Q   Were you ever told about the toxicology reports that

 4       were done on Anton after he died?

 5   A   So I never saw documents.

 6           My mother-in-law said there was something where

 7       they had weighed his internal organs.

 8   Q   Were you ever told that the blood results showed that

 9       Anton was intoxicated at the time he passed away?

10                       INTERPRETER:  The interpreter wants

11       to clarify.

12           Do you mean intoxicated with alcohol or--

13                       MR. WILLIAMS:  Yes.

14                       INTERPRETER:  Thank you.

15                       THE WITNESS:  So I think I saw those

16       documents, I'm not sure, but I know that my

17       mother-in-law told me that he was very, very drunk.

18   Q   (By Mr. Williams)  What was your reaction when your

19       mother-in-law told you that?

20   A   So my mother-in-law and I are not very close, and at the

21       time when she said that, I felt like maybe she was

22       saying that just to make me feel bad.

23           I didn't believe it because the amount that he

24       drank over three or four hours for an adult man, healthy

25       man, was just not enough for him to be very, very drunk.
```

```
 1   Q   Now, you said earlier that Anton only drank hard alcohol
 2       maybe two or three times a year; is that correct?
 3   A   Yes.
 4   Q   And did anyone tell you, from the medical examiner's
 5       office, what time they think Anton passed away?
 6   A   So I know when the ambulance was there, the ambulance
 7       people told me that-- they said he had died at about 3
 8       at night, 3 in the morning.
 9            I don't think I heard after that, but at that point
10       it didn't really make any difference to me.
11   Q   And you said that Anton laid next to you on the couch
12       around midnight on the 29th; is that correct?
13   A   Yeah, approximately.
14   Q   And then at some point he got up and told you he was
15       going out to smoke; is that correct?
16   A   Yes.
17   Q   But you don't recall what time it was that he got up to
18       go smoke; is that correct?
19   A   I can't say what time it was because I just went to
20       sleep.  I didn't follow him.
21   Q   And after you went back to sleep, you don't know whether
22       he had any more alcohol to drink between the time you
23       last saw him and when he passed away; is that correct?
24   A   No, I didn't see him anymore.
25                          THE WITNESS:  May I step out and call
```

```
 1      my kids?
 2                     MR. WILLIAMS:  Sure, we can take a
 3      break.
 4                     VIDEOGRAPHER:  Going off record.  The
 5      time now is 3:50 p.m.
 6                          (Recess 3:50 to 4:05 p.m.)
 7                          (Exhibit No. 3 marked
 8                           for identification.)
 9
10                     VIDEOGRAPHER:  Back on record.  The
11      time now is 4:05 p.m.
12  Q   (By Mr. Williams)  Ms. Omelin, I would like to mark
13      Exhibit No. 3.
14         At some point did you set up a GoFundMe page to
15      raise money after Anton passed away?
16  A   Yes.
17  Q   And who helped you?  If anyone, who helped you set up
18      the GoFundMe page?
19  A   Yeah, my mother-in-law and her husband, Michael.
20  Q   And if you look at the GoFundMe page, there's a
21      paragraph that starts, "Please help save Father's home
22      for his children."
23         Do you see that?
24  A   Yes, I do.
25  Q   Did you write the words that are under that and have
```

```
1    Q    How often would Anton drink Dr. Pepper?
2    A    Often.  He drank it often.
3    Q    What is your best estimate as to how many per day or
4         week of Dr. Pepper Anton would drink?
5    A    So-- well, we would buy a case at Costco.  I think
6         there's 24, I think, cans in a case.  That would be
7         enough for three, four-- no, maybe five days, because my
8         older son also--
9    Q    How many Dr. Peppers would you see Anton drink on a
10        daily basis?
11   A    So if we would buy a case of cola or a case of
12        Dr. Pepper, it would be the same amount of time for
13        either one of those.
14   Q    I know your son drank some of the sodas, correct?
15   A    Sometimes, yes.
16   Q    So we can't look at how many cans is in a case to figure
17        out how much Anton drank, so what is your best estimate
18        as to how many cans of Dr. Pepper and Coke Anton was
19        drinking per day?
20   A    So I guess we can calculate it by saying there's 24 in a
21        case.  I would allow my son to drink one can a day.  It
22        would last for five days, and so if my son drank a total
23        of five and I would drink maybe one or two, that would
24        be seven, so 24 minus seven is how much?  17.
25             17.
```

1          If we divide 17 by five, it's about three.

2   Q   Roughly three Dr. Peppers or Coke per day Anton was

3       drinking on average?

4   A   Easily.

5   Q   And Anton was also drinking multiple energy drinks per

6       day, in your opinion, right?

7   A   Yes.

8   Q   And Anton was also drinking multiple cups of coffee a

9       day, in your opinion, correct?

10  A   Yes.

11  Q   And sometimes he was also drinking caffeinated ice tea

12      during the day as well, correct?

13  A   I can't say anything about ice tea.

14  Q   Anton was also complaining about not being able to

15      sleep, right?

16  A   Yes.

17  Q   Did he ever say to you that his inability to sleep might

18      be due to the amount of caffeine he was drinking each

19      day?

20  A   No.

21  Q   Was that ever concerning to you?

22  A   I never made a connection between Coca-Cola, Dr. Pepper,

23      like sodas and coffee and energy drinks and considered

24      that it might harm his health.

25  Q   Do you know how much caffeine is in a Monster Energy

Page 139

```
 1       Drink?
 2   A   No.
 3   Q   Do you know how much caffeine is in a NOS Energy Drink?
 4   A   No.
 5   Q   Are you aware of Anton ever receiving free samples of
 6       Monster Energy Drinks?
 7   A   I don't know.
 8   Q   Are you aware of Anton ever receiving free samples of
 9       NOS Energy Drink?
10   A   I don't know.
11   Q   Had you ever been with Anton-- strike that.
12           Are you aware of Anton ever seeing any advertising
13       by Monster Energy?
14   A   I don't know.
15   Q   Are you aware of Anton ever seeing any advertising from
16       NOS Energy?
17   A   I don't know.
18   Q   Was it your understanding that Anton was drinking
19       Monster Energy Drinks prior to you first meeting him?
20   A   I'm not sure.
21   Q   Was it your understanding that Anton was drinking NOS
22       Energy Drinks prior to you first meeting him?
23   A   I'm not sure.
24   Q   You first met Anton in July of 2010, correct?
25   A   Correct.
```

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Was Anton sick at all within the month prior to his |
| 3 | | death? |
| 4 | A | No. |
| 5 | Q | To your knowledge Anton never saw a medical doctor, |
| 6 | | correct? |
| 7 | A | That's correct. |
| 8 | Q | If Anton needed medication, was there a pharmacy that he |
| 9 | | went to? |
| 10 | A | There was that one time when he got painkillers, but |
| 11 | | it's possible that the doctor gave them to him himself. |
| 12 | Q | What about medication that's not prescribed that you can |
| 13 | | buy over-the-counter? |
| 14 | A | Well, if there was anything, it was like something I |
| 15 | | would buy for the kids for a fever or maybe for |
| 16 | | allergies. |
| 17 | Q | We talked earlier about the canned meat and the pasta. |
| 18 | | Do you remember that? |
| 19 | A | Yes. |
| 20 | Q | Did you eat any of the canned meat and pasta dish the |
| 21 | | night before Anton's death? |
| 22 | A | No. |
| 23 | Q | Did you see any open cans of meat in your house after |
| 24 | | his death? |
| 25 | A | After his death? |

1   Q   Yes.

2   A   **You know, I-- I don't remember anything.**

3       **There was about two days that I just can't really**

4       **connect at all.**

5   Q   Do you remember seeing any closed can of the Army meat

6       in your house after his death?

7   A   **I'm not sure when it was, but I saw a closed can.**

8   Q   Where is that can today?

9   A   **I presume somewhere in a garbage.**

10      **I don't have it anymore.**

11  Q   Do you remember if it was consumed by anyone?

12  A   **The closed one?**

13  Q   Yes.

14  A   **Honestly, I don't know.**

15  Q   Have you ever eaten that Army canned meat again after

16      his death?

17  A   **No.**

18  Q   Why not?

19  A   **I don't know, just haven't.**

20      **No real reason.**

21  Q   There was vomit found in the bathroom that Anton died

22      in, correct?

23  A   **Yes.**

24  Q   Do you know why Anton was vomiting that night?

25  A   **I can only guess.  I can't know for sure.**

```
 1   Q   Did anyone ever tell you, other than your lawyer, why he
 2       may have been vomiting that night?
 3   A   No.
 4   Q   Putting aside conversations with your lawyer, did anyone
 5       ever tell you why Anton died?
 6   A   Well, some people said that he was a drug addict, but I
 7       don't even take that into consideration.
 8   Q   Other than that, and conversations with your lawyer, has
 9       anyone ever told you why Anton died?
10   A   Only the person who did the autopsy.  He named the cause
11       of death.
12            That's it.
13   Q   And what do you recall that to be?
14   A   She called it asphyxia.  It's a hard word.
15   Q   Other than your lawyer, has anyone ever told you that
16       Anton's death was caused by Monster Energy Drinks?
17   A   No.
18   Q   Other than your lawyer, has anyone ever told you that
19       Anton's death was caused by NOS Energy Drinks?
20   A   No.
21   Q   If the jury in this lawsuit determines that Anton's
22       death was not caused by a Monster Energy Drink, will you
23       accept that?
24   A   Will I have a choice?
25                           MR. MILES:  Can you repeat the
```

1          Do you mean his name?

2    Q    Yes.

3    **A    Serhey Shipilov.**

4    Q    Can you spell his last name?

5    **A    I can write it.**

6                        INTERPRETER:  Would you like the

7         interpreter to read the--

8                        MR. MILES:  Sure.

9                        INTERPRETER:  S-H-I-P-I-L-O-V.

10   Q    (By Mr. Miles)  And where is he today?

11   **A    In Latvia.**

12   Q    When is the last time you've spoken to him?

13   **A    Probably a month ago.**

14                        MR. MILES:  Why don't we go off the

15        record for a brief moment, and then I should be able to

16        wrap it up.

17                        VIDEOGRAPHER:  Going off record.  The

18        time now is 6:12 p.m.

19                        (Recess 6:12 to 6:28 p.m.)

20

21                        VIDEOGRAPHER:  Back on record.  The

22        time now is 6:28 p.m.

23                        MR. WILLIAMS:  Do you mind if we just

24        put that on the record?

25                        MR. MILES:  Sure.

Page 154

```
 1                    MR. WILLIAMS:  During the break,

 2       counsel for Plaintiff indicated that she will not be

 3       here for tomorrow morning's deposition, which is of

 4       Officer Schwan (phonetic), scheduled for 9 a.m., but

 5       that she has given consent for the deposition to proceed

 6       in her absence.

 7                    MS. EFIMOVA:  That's correct.

 8                    MR. WILLIAMS:  Thank you.

 9                         (Exhibit No. 12 marked

10                          for identification.)

11

12   Q   (By Mr. Miles)  Ms. Omelin, I have given you a stack of

13       photos, which consist of 17 pages.

14          Some of the pages have two photos on them, and some

15       of the pages has just one photo on it.

16          Have you had a chance to review each and every

17       photo?

18   A   Yes.

19   Q   Understanding the sensitivity of you having lost your

20       husband and these photos are rather graphic, I am not

21       going to go through every photo one by one.

22   A   All right.

23   Q   Does each and every one of the photos contained in

24       Exhibit No. 12 reflect your house either on the inside

25       or on the outside as it existed on the morning of
```

1      October 30, 2014?

2    A   **So on the outside of the house, yes, but as far as the**

3        **inside of the house, the photos that show him, I didn't**

4        **see him that way.**

5    Q   How did he look different?

6    A   **When I saw him, he was completely on his stomach, his**

7        **head was turned to one side, and it was on his arm like**

8        **this.**

9    Q   Okay.  Let's put aside all of the pictures that have

10       Anton in them for a moment, okay?

11   A   **Okay.**

12   Q   For all of the photos that do not have Anton depicted in

13       them, does each and every one accurately reflect how the

14       outside and the inside of your house looked on the

15       morning of October 30, 2014?

16   A   **Well, I assume so because only the specialists were**

17       **there and nobody else touched anything, including me.**

18   Q   Okay.  You were there as well, right?

19   A   **"There as well" where?**

20   Q   At your house on the morning of October 30, 2014.

21   A   **Yes, I was at home.**

22   Q   You had an opportunity to see each of these rooms as

23       they existed that morning, correct?

24   A   **I did.**

25   Q   And except for the photos that have Anton in them, do

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1     each of these photographs accurately reflect how your

2     house looked that morning?

3  A  Yes.

4  Q  With respect to the photos that have Anton in them, do

5     the photos accurately reflect what you saw that morning,

6     except for the position of his body?

7  A  Yes.

8  Q  Looking at the first page of Exhibit No. 20, whose

9     vehicle is that-- sorry, looking at the first page of

10    Exhibit No. 12, whose vehicle is that?

11 A  My husband's car.

12 Q  Is that the Dodge Durango you mentioned earlier?

13 A  Yes.

14 Q  Did you also have a vehicle?

15 A  No.

16 Q  How would your husband get to work?

17 A  In this car.

18 Q  If you went to visit him at work, how would you get

19    there?

20 A  I had my mom's car.

21 Q  Was it at your house every day?

22 A  Pretty much, yes.

23 Q  How far away did your mother live from your house in

24    2014?

25 A  It was about a ten-minute walk.

1               MR. MILES:  I have no further

2      questions at this time.

3               MR. WILLIAMS:  Nothing further.

4               MS. EFIMOVA:  Nothing for us as well.

5               VIDEOGRAPHER:  This is the end of

6      Media Unit No. 5 and concludes the deposition of Anna

7      Omelin.

8         The time now is 6:35 p.m.  Going off record.

9                    (Deposition concluded at 6:35 p.m.)

10                   (Signature reserved.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      STATE OF WASHINGTON )    I, Terilynn Simons, CCR, RMR, CRR
                            ) ss a certified court reporter
 2      County of Pierce    )    in the State of Washington, do
                                 hereby certify:
 3

 4

 5           That the foregoing deposition of ANNA OMELIN was taken
        before me and completed on August 6, 2018, and thereafter
        was transcribed under my direction; that the deposition is a
 6      full, true and complete transcript of the testimony of said
        witness, including all questions, answers, objections,
 7      motions and exceptions;

 8           That the witness, before examination, was by me duly
        sworn to testify the truth, the whole truth, and nothing but
 9      the truth, and that the witness reserved the right of
        signature;
10
             That I am not a relative, employee, attorney or counsel
11      of any party to this action or relative or employee of any
        such attorney or counsel and that I am not financially
12      interested in the said action or the outcome thereof;

13           That I am herewith securely sealing the said deposition
        and promptly delivering the same to Michael Ernest Williams.
14
             IN WITNESS WHEREOF, I have hereunto set my signature on
15      the 13th day of August, 2018.

16

17

18

19
                                _____
20                              Terilynn Simons, CCR, RMR, CRR
                                Certified Court Reporter No. 2047
21                              (Certification expires 07/07/19.

22

23

24

25
```

# EXHIBIT C

The Honorable Robert J. Bryan

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9    ANNA OMELIN, Individually and as an            )
     Administrator of the Estate of Anton Omelin,   )
10   deceased,                                       )       Case No. 3:17-cv-05837-RJB
                                                     )
11                         Plaintiff,                )
                                                     )       **PLAINTIFF ANNA OMELIN'S**
12   vs.                                             )       **OBJECTIONS AND**
                                                     )       **RESPONSES TO DEFENDANT**
13                                                   )       **MONSTER ENERGY**
     HANSEN BEVERAGE COMPANY, a                      )       **COMPANY'S REQUESTS FOR**
14   Delaware Corporation, MONSTER ENERGY            )       **ADMISSION (NOS. 1-17)**
     COMPANY, a Delaware Corporation, and RED        )
15   BULL NORTH AMERICA, INC., a Foreign             )
     Corporation, and DOES 1 through 100,            )
16   Inclusive,                                      )
                                                     )
17                         Defendants.               )
                                                     )

18        Plaintiff Anna Omelin ("Responding Party") serves these Objections and

19   Responses to Defendant Monster Energy Company's ("Propounding Party") Requests for

20   Admission (Nos. 1-17) under Federal Rules of Civil Procedure ("FRCP") 26 and 36.

21                              **PRELIMINARY STATEMENT**

22        The following responses are made solely for the purposes of this action. Each

23   response is subject to all objections as to relevance, materiality, and admissibility, and to

24   any and all objections on any ground that would require exclusion of any response if it

25   were introduced in court.

26

27

PLAINTIFF'S OBJECTIONS AND RESPONSES                    COSMOPOLITAN LEGAL, PLLC
TO MONSTER'S REQUESTS FOR ADMISSION– 1                  155 108th Ave NE, Unit 210
Case No. 3:17-cv-05837-RJB                              Bellevue, WA 98004
                                                        Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit C - Page 1**

No incidental or implied admissions are intended by these responses. The fact that Responding Party has objected or responded to any request shall not be deemed an admission that Responding Party accepts or admits the existence of any fact set forth or assumed by such request or that such objection or response constitutes admissible evidence. The fact that Responding Party has responded to part or all of any request is not intended to and shall not be construed to be a waiver by Responding Party of any part of any objection to any request.

The responses and objections are made on the basis of information and writings currently available to and located by Responding Party upon reasonable investigation. Responding Party expressly reserves the right to modify, revise, supplement, or amend her responses as she deems appropriate.

## GENERAL OBJECTIONS

1. Responding Party objects to any request that seeks information, constituting attorney work product, contain attorney-client communications, or is otherwise privileged.

2. Responding Party objects to any request to the extent it purports to impose on her obligations beyond those imposed by the Federal Rules of Civil Procedure.

3. Responding Party objects to any request to the extent that it is overbroad, unduly burdensome, vague, ambiguous, confusing, require speculation to determine its meaning or uses imprecise specifications of the information sought.

4. Responding Party objects to any request as unduly and unnecessarily burdensome to the extent that it seeks information that is matter of public record, already in Propounding Party's possession, or otherwise readily available to Propounding Party,

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 2
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
**Exhibit C - Page 2** Phone: (425)296-8868 | Fax: (877)230-2429

1   and/or may be accessed and obtained by Propounding Party with less burden than the

2   Responding Party can identify and provide requested information.

3       5.   Responding Party objects to the undefined term "Monster Energy drinks" to the

4   extent it is vague, ambiguous, confusing, require speculation to determine its meaning or

5   uses imprecise specifications of the information sought. Responding Party understands the

6   term "Monster Energy drinks" to include "Monster Energy" and "NOS Original" drinks as

7   specified in the Responding Party's Second Amended Complaint and incorporates this

8   definition in her following responses.

9

10  **SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION**

11  **REQUEST NO. 1:**

12       Admit that Anton Omelin did not consume a Monster Energy drink in the 24 hours

13  before his death.

14  **RESPONSE TO REQUEST NO. 1:**

15       Responding Party objects to this request as it is vague, ambiguous, confusing,

16  requires speculation to determine its meaning or uses imprecise specifications of the

17  information sought as to the term "Monster Energy drink." For the purposes of her

18  response, Responding Party incorporates the definition proposed in General Objection 5.

19  The request further seeks information that is equally or more available to Propounding

20  Party, or already in Propounding Party's possession. Responding Party further objects to

21  the extent the request seeks information not within Responding Party's knowledge. The

22  request further seeks information protected by the attorney client privilege, the attorney

23  work product doctrine, and other applicable privileges.

24

25

26

27

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 3
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit C - Page 3**

Answering further, and subject to the foregoing objections, Responding Party cannot admit or deny this request and therefore denies it. Responding Party states that she has no information on Mr. Omelin's consumption of Monster Energy drinks after she went to bed on October 30, 2014.  Responding Party further states that Mr. Omelin consumed Monster Energy drinks at work, where he stored purchased cans in the refrigerator.

**REQUEST NO. 2:**

Admit that Anton Omelin did not suffer a cardiac arrest on October 29, 2014.

**RESPONSE TO REQUEST NO. 2:**

Responding Party objects to this request as ambiguous and the extent the request requires speculation to determine its meaning and uses imprecise specifications of the information sought as to the term "cardiac arrest" and incorporates the American Heart Association definition of the term as "an abrupt loss of heart functioning."  The request further seeks information not within Responding Party's knowledge and expertise.

Answering further, and subject to the foregoing objections, Responding Party admits the request. Responding Party further states that Mr. Omelin showed no signs of possible cardiac arrest on the evening of October 29, 2014.

**REQUEST NO. 3:**

Admit that Anton Omelin did not suffer a cardiac arrest on October 30, 2014.

**RESPONSE TO REQUEST NO. 3:**

Responding Party objects to this request as ambiguous and the extent the request requires speculation to determine its meaning and uses imprecise specifications of the information sought as to the term "cardiac arrest" and incorporates the American Heart

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 4
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit C - Page 4**

**RESPONSE TO REQUEST NO. 5:**

Subject to the general objections, Responding Party admits the request.

**REQUEST NO. 6:**

Admit that no PERSON who examined Anton Omelin following his death has ever told YOU that his aspiration of gastric contents was caused by a Monster Energy drink.

**RESPONSE TO REQUEST NO. 6:**

Responding Party objects to this request as ambiguous and the extent the request requires speculation to determine its meaning and uses imprecise specifications of the information sought as to the term "examined" and interprets the term to mean any physical examination performed on Mr. Omelin's body by the medical examiner, police officers present on the scene of Mr. Omelin's death, and any other medical professional having access to Mr. Omelin's body. The request further seeks information protected by the attorney-client privilege, the attorney work product doctrine, and any other privileges. Responding Party further objects to the extent the request seeks information provided by experts prior to the time designated for disclosure.

Subject to and without waiving the foregoing objections, Responding Party admits the request to the extent it encompasses examinations performed by the individuals identified above.

**REQUEST NO. 7:**

Admit that no PERSON who examined Anton Omelin following his death has ever told YOU that his death was caused by a Monster Energy drink.

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 6
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit C - Page 6**

**RESPONSE TO REQUEST NO. 7:**

Responding Party objects to this request as ambiguous and the extent the request requires speculation to determine its meaning and uses imprecise specifications of the information sought as to the term "examined" and interprets the term to mean any physical examination performed on Mr. Omelin's body by the medical examiner, police officers present on the scene of Mr. Omelin's death, and any other medical professional having access to Mr. Omelin's body. The request further seeks information protected by the attorney-client privilege, the attorney work product doctrine, and any other privileges. Responding Party further objects to the extent the request seeks information provided by experts prior to the time designated for disclosure.

Subject to and without waiving the foregoing objections, Responding Party admits the request to the extent it encompasses examinations performed by the individuals identified above.

**REQUEST NO. 8:**

Admit that Anton Omelin's blood alcohol concentration at his time of death was only 0.095g/100mL.

**RESPONSE TO REQUEST NO. 8:**

Subject to and without waiving the foregoing objections, Responding Party admits the request.

**REQUEST NO. 9:**

Admit that the only alcohol Anton Omelin consumed on October 29, 2014, was two to three shots of cognac.

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 7
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit C - Page 7

**RESPONSE TO REQUEST NO. 9:**

Subject to and without waiving the foregoing objections, Responding Party admits the request.

**REQUEST NO. 10:**

Admit that on October 29, 2014, Anton Omelin did not appear to be intoxicated to YOU before YOU went to bed.

**RESPONSE TO REQUEST NO. 10:**

Subject to and without waiving the foregoing objections, Responding Party admits the request.

**REQUEST NO. 11:**

Admit that on the evening of October 29, 2014, YOU did not see Anton Omelin performing physical exercises on an exercise machine located in YOUR garage.

**RESPONSE TO REQUEST NO. 11:**

Subject to and without waiving the foregoing objections, Responding Party admits the request.

**REQUEST NO. 12:**

Admit that on the evening of October 29, 2014, YOU did not see Anton Omelin performing physical exercises on a pull-up bar located in YOUR garage.

**RESPONSE TO REQUEST NO. 12:**

Subject to and without waiving the foregoing objections, Responding Party denies the request to the extent that no pull-up bar has ever been placed in her garage. Responding

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 8
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit C - Page 8

Party admits the request to the extent that she did not see Mr. Omelin performing physical

exercises on a pull-up bar in the evening of October 29ᵗʰ, 2014.

**REQUEST NO. 13:**

Admit that prior to his death, Anton Omelin heavily smoked Marlboro Red

cigarettes.

**RESPONSE TO REQUEST NO. 13:**

Responding Party objects to this request as ambiguous and the extent the request

requires speculation to determine its meaning and uses imprecise specifications of the

information sought as to the term "heavily smoked" and interprets the term to mean at least

one pack (20 cigarettes) of Marlboro Red cigarettes a day.

Subject to and without waiving the foregoing objections, Responding Party admits

the request to the extent that Mr. Omelin smoked a pack of Marlboro Red cigarettes a day.

**REQUEST NO. 14:**

Admit that an open can of meat from Russia was found in YOUR home on October

30, 2014.

**RESPONSE TO REQUEST NO. 14:**

Subject to and without waiving the foregoing objections, Responding Party denies

the request to the extent that no can of meat from Russia has been found at her residence

on October 30, 2014. Responding Party admits the request to the extent that a can of meat

from Poland, identified as an "Army Brand" pork pattie loaf has been found at her

residence on October 30, 2014.

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 9
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108ᵗʰ Ave NE, Unit 210
Bellevue, WA 98004
**Exhibit C - Page 9** Phone: (425)296-8868 | Fax: (877)230-2429

**REQUEST NO. 15:**

Admit that on October 31, 2014, Anton Omelin's stepfather Michael Naccarato, reported to the Fife Police Department that an open can of meat from Russia was found in YOUR home on October 30, 2014.

**RESPONSE TO REQUEST NO. 15:**

Subject to and without waiving the foregoing objections, Responding Party admits the request.

**REQUEST NO. 16:**

Admit that on October 31. 2014, Anton Omelin's stepfather, Michael Naccarato, reported to the Fife Police Department his concern that Anton Omelin had food poisoning from the open can of meat from Russia.

**RESPONSE TO REQUEST NO. 16:**

Subject to and without waiving the foregoing objections, Responding Party admits the request.

**REQUEST NO. 17:**

Admit that there is no evidence of any caffeine in Anton Omelin's body at the time of his death.

**RESPONSE TO REQUEST NO. 17:**

Responding Party objects to the extent the request seeks information not within Responding Party's knowledge.

Answering further, and subject to the foregoing objections, Responding Party cannot admit or deny this request and therefore denies it. Responding Party states the tests

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 10
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit C - Page 10**

in question are not considered to be required for the purposes of establishing the cause of

death, and, therefore, were not performed.


DATED: June 28, 2018                    By: *s/Olga Efimova*
                                        OLGA EFIMOVA
                                        olgae@cosmopolitanlegal.com
                                        **Cosmopolitan Legal, PLLC**
                                        155 108th Ave. NE, Unit 210
                                        Bellevue, WA 98004
                                        Phone: (425)296-8868
                                        *Attorney for Plaintiff Anna Omelin*

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 11
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit C - Page 11**

1

## VERIFICATION

2     I, Anna Omelin, have read the foregoing Responses, which are based on a diligent and

3   reasonable effort by me to obtain information currently available.  I reserve the right to

4   make changes in or additions to any of these answers if it appears at      time that errors or

5
6   omissions have been made or if more accurate or complete information becomes available.

7   Subject to these limitations, these Responses are true to the best of my present knowledge,

8   information, and belief.

9     Subscribed and sworn to under the penalties of perjury that the foregoing is true on

10  correct on this 25 day of _june_ , 2018.

11

12

13                                   By:    Anna Omelin, Plaintiff

14

15  As to Objections:

16

17  Olga Efimova, WSBA #52498

18  Cosmopolitan Legal, PLLC
    155 108th Ave. NE, Unit 210
19  Bellevue, WA 98004
    Tel: (425)296-8868
20  Fax: (877)230-2429
21  Email: olgae@cosmopolitanlegal.com

22

23  Dated: June 28, 2018

24

25

26

27

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION—12
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

Exhibit C - Page 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2018, I served a true and correct copy of the

**Plaintiff Anna Omelin's Objections and Responses to Defendant Monster Energy**

**Company's Request for Admission (Nos. 1-9)** by mailing a true and correct copy of the

above document via UPS in a sealed envelope addressed to the following recipients:

STEPHANIE BLOOMFIELD
sbloomfield@gth-law.com
Gordon Thomas Honeywell, LLP
1201 Pacific Avenue, Suite 2100
Tacoma, WA 98402
Phone: (253)620-6500

MARC P. MILES (*pro hac vice*)
mmiles@shb.com
Shook, Hardy & Bacon LLP
5 Park Place, Ste. 1600
Irvine, CA 92614
Phone: (949)475-1500

***Attorneys for Defendants Hansen
Beverage Company and Monster
Energy Company***

THOMAS C. RUBIN
tomrubin@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
600 University Street, Suite 2800
Seattle, WA 98101-4123
Phone: (206)905-7000

S. KAREN BAMBERGER
kbamberger@bmplaw.com
Betts, Patterson, Mines, P.S.
701 Pike St., Suite 1400
Seattle, WA 98101-3927
Phone: (206)292-9988

MICHAEL E. WILLIAMS (*pro hac vice*)
michaelwilliams@quinnemanuel.com
VALERIE A. LOZANO (*pro hac vice*)
valerielozano@quinnemanuel.com
AARON PERAHIA (*pro hac vice*)
aaronperahia@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-5003
Phone: (213)443-3000
***Attorneys for Defendant Red Bull North
America, Inc.***

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 13
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit C - Page 13**

1        I certify under penalty of perjury under the laws of the United States of America

2   that the foregoing is true and correct.

3        DATED this 28th day of June, 2018

4

5                       *s/ Olga Efimova*

                        Olga Efimova, WSBA #52498

6                           **Cosmopolitan Legal, PLLC**

                        155 108th Ave NE, Unit 210

7                           Bellevue, WA 98004

8                           Telephone: (425) 296-8868

                        Fax: (877) 230-2429

9                           E-mail: olgae@cosmopolitanlegal.com

                        ***Attorney for Plaintiff Anna Omelin***

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S OBJECTIONS AND RESPONSES
TO MONSTER'S REQUESTS FOR ADMISSION– 14
Case No. 3:17-cv-05837-RJB

COSMOPOLITAN LEGAL, PLLC
155 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868 | Fax: (877)230-2429

**Exhibit C - Page 14**

# EXHIBIT D

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | |
|---|---|
| ANNA OMELIN, individually and as an administrator of the Estate of Anton Omelin, deceased, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. 3:17-cv-05837 ) |
| HANSEN BEVERAGE COMPANY d/b/a MONSTER BEVERAGE CORPORATION, a Delaware corporation, MONSTER ENERGY COMPANY, a Delaware corporation, RED BULL NORTH AMERICA, INC., a California corporation, and DOES 1-100, inclusive, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

VIDEOTAPED DEPOSITION OF THOMAS B. CLARK, M.D.

August 8, 2018

Tacoma, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square
600 University St.
Suite 2300
Seattle, WA 98101
(206) 340-1316
(800) 649-2034

2208 North 30th Street, Suite 202
Tacoma, WA 98403
(253) 627-6401
(253) 383-4884 Fax
scheduling@byersanderson.com
www.byersanderson.com

Serving Washington's Legal Community since 1980

```
 1                    APPEARANCES
 2   For Defendant Red Bull:
 3            Michael Ernest Williams
             Quinn Emanuel
 4           865 South Figueroa Street
             10th Floor
 5           Los Angeles, CA  90017
             213.443.3251
 6           213.443.3000 Fax
             Michaelwilliams@quinnemanuel.com
 7
             Kristin Carlson
 8           Red Bull Legal Counsel
             1630 Stewart Street
 9           Santa Monica, CA  90404
             310.460.4573
10           kristin.carlson@redbull.com
11   For Defendant Monster & Hansen Beverage Company:
12           Marc P. Miles
             Shook Hardy & Bacon LLP
13           5 Park Plaza
             Suite 1600
14           Irvine, CA  92614-2546
             949.475.1500
15           949.475.0016 Fax
             Mmiles@shb.com
16
             Carly Rothenberg (via telephone)
17           Monster Litigation Counsel
             1 Monster Way
18           Corona Way, CA  92879
             951.817.6064
19           Carly.Rothenberg@monsterenergy.com
20   For Thomas B. Clark, M.D.:
21            David H. Prather
             Deputy Prosecuting Attorney
22           955 Tacoma Avenue South
             Tacoma, WA  98402
23           David.prather@piercecountywa.gov
24
25   Also present:  Dan Bassett, Videographer
                    Anna Omelin and Artem Shpakov
                    Anna Omelin and Artem Shpakov
```

Page 2

1    would not be able to attend.

2         She did say that we can proceed without her.

3         Ms. Omelin and her son are present here today, and

4    with respect to waiver of confidentiality over the

5    medical examiner's report and Dr. Clark's testimony, I

6    had e-mailed her to confirm that she was waiving it.

7         She responded, copied Mr. Prather on the e-mail

8    saying, "Michael, I e-mailed Mr. Prather, included in

9    this e-mail, yesterday regarding the waiver of

10   confidentiality.  Just in case he would like me to

11   confirm the waiver again, Ms. Omelin waives

12   confidentiality in respect to medical examiner's report

13   contents as well as to Dr. Clark's testimony.  Thank you.

14   Sincerely, Olga Efimova."

15                   MR. PRATHER:  Thank you very much, and

16   that's acceptable to us.

17                   MS. WILLIAMS:  Thank you.

18   Q   (By Ms. Williams)  Dr. Clark, have you been deposed

19       before?

20   **A   Yes.**

21   Q   Approximately how many times?

22   **A   More than 100.**

23   Q   I take it you're familiar with the proceedings that

24       you're here for today?

25   **A   Yes.**

```
 1  Q  Would you like me to go over any of the ground rules
 2     regarding a deposition or do you feel comfortable?
 3  A  I feel comfortable.
 4  Q  And today are you represented by counsel, Mr. Prather?
 5  A  Yes.
 6  Q  I want to talk about your-- well, let me start with:
 7        Where are you currently employed?
 8  A  I'm the Pierce County medical examiner.
 9  Q  How long have you been the Pierce County medical
10     examiner?
11  A  Since June 1st, 2010.
12  Q  And where did you work prior to June 1st, 2010?
13  A  I was the deputy chief medical examiner for the state of
14     North Carolina and a faculty member at the school of
15     medicine at the University of North Carolina.
16  Q  And how long did you hold those positions?
17  A  Since approximately 1988.
18  Q  And as deputy chief medical examiner for North Carolina,
19     can you tell me what your responsibilities were?
20  A  North Carolina has a state office.  I began there as a
21     fellow in 1988 and progressed to an assistant, then
22     associate medical examiner and then ultimately to deputy
23     chief before I took early retirement.
24        At the same time I was a faculty member in the
25     school of medicine.  I was a course director and served
```

```
 1        on medical school committees.

 2            My responsibilities included both worlds.

 3            I had-- I performed my share of autopsies.  I was

 4        available for pathologists and medical examiners

 5        throughout the state for consultation, and I carried my

 6        course load in the school of medicine.

 7   Q    I would like to touch on your educational background.

 8            Where did you get your undergraduate degree?

 9   A    Duke University.

10   Q    And what was your major?

11   A    Music.

12   Q    And where did you go to medical school?

13   A    Medical University of South Carolina in Charleston.

14   Q    And what year did you graduate from there?

15   A    1983.

16   Q    Did you do any fellowships or residency programs while

17        you were there?

18   A    Yes-- not while I was there, no.

19   Q    Did you do any fellowships?

20   A    I returned to Duke Hospital where I did postgraduate

21        training in internal medicine and then pathology.

22            I went to the office of the chief medical examiner

23        in Chapel Hill, North Carolina for a fellowship in

24        forensic pathology and remained on the staff after that.

25   Q    And what is forensic pathology?
```

Page 8

1   A   Forensic pathology is the branch of medicine that deals

2       with the interface between the medical and the legal

3       systems.

4           A pathologist is a physician who has specialized in

5       the study of diseases.

6           A pathologist might be found in a hospital setting,

7       for example, interpreting slides from an operation or

8       running a hospital laboratory.

9           A forensic pathologist has done additional training

10      and practices in the area of interface between the

11      medical and the legal systems by performing autopsy

12      examinations, typically on cases in which a government

13      agency has an interest.

14  Q   Do you have any-- hold any licenses?

15  A   I do.

16  Q   And what are those?

17  A   I'm licensed by the State of Washington to practice

18      medicine.

19  Q   Now, with respect to your role as the Pierce County

20      medical examiner, can you explain what your primary

21      responsibilities are?

22  A   Washington law requires that certain types of deaths be

23      reported to a medical examiner.

24          Washington law also gives a medical examiner the

25      option of accepting jurisdiction over any or all of those

1    deaths.

2        If the medical examiner chooses to accept

3    jurisdiction over a death, that obligates the medical

4    examiner to perform an investigation and ultimately to

5    certify that death as to cause and manner on a document

6    prescribed by the Washington Department of Health.

7  Q  How many people are on your staff in the medical

8     examiner's office?

9  A  Approximately 18.

10 Q  And what are the different roles that those people play?

11 A  There is an associate pathologist who just started last

12    week.

13        There is a group of investigators.  There are eight

14    of them.  They operate around the clock, seven days a

15    week.

16        We have three full-time and one part-time autopsy

17    technicians.

18        And an administrative staff.

19 Q  And do they all report directly to you?

20 A  No.

21 Q  Which ones report directly to you?

22 A  Our operations manager, the associate pathologist, and

23    our services manager.

24 Q  Do you perform autopsies yourself personally?

25 A  I do.

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1   Q   Does anyone else in the Pierce County medical examiner's

2       office perform autopsies?

3   A   **Yes.**

4   Q   And who are those?

5   A   **Dr. Megan Quinn.**

6   Q   What is her title?

7   A   **Associate medical examiner.**

8   Q   Is she the one who just started?

9   A   **Yes.**

10  Q   Anyone else?

11  A   **Not at this time.**

12  Q   Did anyone else perform autopsies in Pierce County

13      medical examiner's office in the October of 2014

14      timeframe?

15  A   **Yes.**

16  Q   Who else was that?

17  A   **Dr. Matthew Lacy was at that time the associate.**

18      **We may also have had a Madigan resident.  We have**

19      **one most of the time, but I have no recollection of who**

20      **it would have been during this time.**

21  Q   How many autopsies would you estimate that you've

22      performed in the course of your career?

23  A   **Probably 4,000 to 5,000 or more.**

24      **It's hard to track it across two jobs.**

25  Q   And while you were the deputy chief medical examiner in

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1        North Carolina, you were performing autopsies there as
 2        well?
 3   A    Yes.
 4   Q    Now, in Pierce County how would it come to the medical
 5        examiner's attention that there has been a death that
 6        might fall under the medical examiner's jurisdiction?
 7   A    There are various ways a death can come to our attention.
 8            The normal one is for the 911 communications center
 9        to notify us of a death.
10            Deaths can also be reported by hospitals, even
11        funeral homes or individuals.
12   Q    And how is it determined whether it's a death that would
13        fall under your jurisdiction?
14   A    The initial calls go to our investigators.
15            The investigator who receives the call applies the
16        law and our policies and makes a determination about
17        whether that case does or does not fall under our
18        jurisdiction, and typically notifies the caller at the
19        time.
20   Q    Is that a determination that's typically made by the
21        investigator before the investigator arrives at the scene
22        where the death took place?
23   A    Yes, almost always.
24                              (Exhibit No. 14 marked
25                                  for identification.)
```

Page 12

1   Q    (By Mr. Williams)   Dr. Clark, I would like to show you a

2        document which we've marked as Exhibit No. 14, and these

3        have been Bates stamped with the designation PCME 000001

4        through 17.

5             My first question is:

6             Take a look at this, and do you recognize what this

7        is?

8   A    I do.

9   Q    And what do you recognize it as?

10  A    Exhibit No. 14 is a concatenation of multiple documents

11       that were generated by my office.

12  Q    And when you say "multiple documents," are these

13       documents that were-- let me ask it this way:

14            Does your office maintain a file for every medical

15       examination or autopsy that is performed?

16  A    Yes.

17  Q    And what are the types of documents that would be

18       contained within that file?

19  A    Each file has, at a minimum, an investigative report and

20       some sort of-- actually, no.

21            Each file has, at a minimum, an investigative

22       report, which may, in fact, decline jurisdiction.

23            If jurisdiction is declined, that's the end of it

24       and there's nothing else in the file typically.

25            Files can optionally have many other documents,

Page 13

1    including a circumstances of death narrative summary, an

2    examination summary, a toxicology report.

3         There can be other documents as well.

4  Q   Were you involved in compiling the documents that are a

5    part of Exhibit No. 14?

6  A   I was involved in writing them but not compiling them.

7  Q   Are the documents that are contained within Exhibit

8    No. 14, are these documents that are prepared in the

9    ordinary course of business for the medical examiner's

10   office?

11 A   Yes, they are.

12 Q   And are they prepared contemporaneous with the events

13   that are detailed within these documents?

14 A   To a certain extent.

15        Not all of the documents are completed at one

16   sitting.

17 Q   When you say they are not all completed at one sitting,

18   can you explain what you mean by that?

19 A   The autopsy report, for example, is dictated the same day

20   that an autopsy is performed, but that includes only the

21   external examination and the internal examination.

22        The microscopic examination is done much later,

23   sometimes when the microscopic slides are completed and

24   returned by the processing agency.

25        The toxicology is also returned at a later time.

1          When all of the studies that are needed for an

2     autopsy report are completed, then the autopsy report

3     itself is completed, but it could be on as many as three

4     different occasions.

5  Q   But the autopsy report itself is something that is

6     prepared in the ordinary course of business for the

7     medical examiner's office?

8  A   Yes.

9                           (Exhibit No. 15 marked

10                            for identification.)

11

12  Q   (By Mr. Williams)  I would like to show you what we will

13     mark as Exhibit No. 15, and these have been Bates stamped

14     PCME 000018 through 44, and I will ask you to take a look

15     and tell me if you recognize this document.

16         Do you recognize those documents or photos?

17  A   A qualified "yes."

18  Q   And what do you mean by that?

19  A   Exhibit No. 15 consists of two sets of photographs.

20         The ones that contain a placard and our case number

21     are part of the autopsy examination.  I do recognize and

22     can identify those by the case number that appears in the

23     photograph.

24         This Exhibit No. 15 also includes scene photographs,

25     which were probably made by my office, but I can't say

```
 1        that I recognize all of them definitively.
 2   Q    Okay.  To clarify, for example on what's Bates stamped
 3        PCME 21, which is the fourth page of the document, you're
 4        referring to the placard, the Pierce County placard that
 5        has the case number on it?
 6   A    That's correct.
 7   Q    And so any of the photographs with that would be
 8        photographs from the autopsy?
 9   A    Yes.
10   Q    Now, do you recognize the first page of the document that
11        appears to be a picture of a file jacket?
12   A    Yes.
13   Q    Does that appear to be a file jacket folder that would be
14        maintained by the medical examiner's office?
15   A    Yes, it does.
16   Q    With regard to the scene photographs, you said that those
17        were likely-- those may have been taken by the
18        investigator?
19   A    They would have been taken by the investigator.
20   Q    Okay.  Would the medical examiner's file only have
21        photographs that were taken by medical examiner staff or
22        would they also have photos that were taken, let's say,
23        by other agencies, such as the police department?
24   A    On this case I think we'd only have photographs that were
25        taken by medical examiner staff.
```

| | | |
|---|---|---|
| 1 | | obtain the medical records from? |
| 2 | A | **MultiCare and Franciscan.** |
| 3 | Q | And would those be kept with your file if you had |
| 4 | | received them? |
| 5 | A | **We don't print them.  We just look at them.** |
| 6 | Q | So there's an online system you can access them-- |
| 7 | A | **Yes.** |
| 8 | Q | Where are those records drawn from? |
| 9 | A | **The hospitals maintain them as part of their course of** |
| 10 | | **business.** |
| 11 | Q | And if Mr. Omelin had not been to a doctor or been to a |
| 12 | | hospital-- |
| 13 | A | **Then we wouldn't have found any.** |
| 14 | Q | Okay.  But would it be your standard to check if there |
| 15 | | were any? |
| 16 | A | **Yes.** |
| 17 | | **We would also check to see if there's a record of** |
| 18 | | **any prescription-- of any narcotics being prescribed.** |
| 19 | Q | Would that be indicated somewhere, if you found any, in |
| 20 | | the report? |
| 21 | A | **Yes, it would.** |
| 22 | Q | Any other information you would consider or you did |
| 23 | | consider? |
| 24 | A | **That's a hard question because it's been several years** |
| 25 | | **and because I'm not sure-- I don't always consider the** |

Page 27

| | | |
|---|---|---|
| 1 | | same thing in every case, but there's nothing-- there's |
| 2 | | nothing that I depended on substantially that wouldn't be |
| 3 | | referenced in the report. |
| 4 | Q | Okay.  Do you recall seeing any police reports as part of |
| 5 | | your evaluation? |
| 6 | A | I don't remember, but it wouldn't have contributed |
| 7 | | anything in a case like this. |
| 8 | Q | Do you typically have access to police reports for cases |
| 9 | | that you are investigating or do you need to request them |
| 10 | | from the police department? |
| 11 | A | We have access and can get them. |
| 12 | Q | When you say-- let me rephrase it because my question was |
| 13 | | unclear. |
| 14 | | Are you able to access them directly or do you need |
| 15 | | to make a request to the police department to-- |
| 16 | A | We can access them directly. |
| 17 | Q | And do you have any recollection of doing that in this |
| 18 | | case? |
| 19 | A | I didn't do it because I don't know how, but our |
| 20 | | investigators probably did, but if they didn't find |
| 21 | | anything relevant, then we wouldn't have a record of it. |
| 22 | Q | Okay.  Now, I understand Melissa Baker was the |
| 23 | | investigator who arrived on the scene. |
| 24 | | Would she have been the person who took custody of |
| 25 | | Mr. Omelin's body? |

Page 28

Thomas B. Clark, M.D.
August 8, 2018
Exhibit D - Page 15

1    A    **Yes.**

2    Q    And are there standard practices and procedures in your

3         office as to the handling of a body?

4    A    **Yes.**

5    Q    And what are those?

6    A    **She would have put the body into a body bag, brought it**

7         **back to the office, logged it in, and put the body in our**

8         **cooler.**

9              **We have an electronic system that shows cooler**

10        **access, so we maintain secure standards for the cooler.**

11   Q    And what temperature is the cooler set at?

12   A    **It's supposed to stay about 36 degrees.**

13   Q    And is that what it generally does stay at?

14   A    **Yes.**

15   Q    Do you recall any issues or problems with the cooler in

16        October of 2014?

17   A    **No, I don't.**

18   Q    Do you have any reason to believe that the handling of

19        Mr. Omelin's body did not comply with Pierce County

20        medical examiner's protocol?

21   A    **I do not, because if it hadn't, there would be notes**

22        **about it.**

23   Q    Now, with regard to taking blood samples, do you know

24        when blood samples were taken from Mr. Omelin?

25   A    **Approximately.**

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1  Q  And when was that?

2  A  **They would have been taken at the beginning of the**

3     **autopsy.**

4  Q  So the body would have remained in the cooler until the

5     autopsy?

6  A  **Yes.**

7  Q  And do you know where the blood samples would have been

8     taken from?

9  A  **You mean where on the body?**

10 Q  Correct.

11 A  **They were peripheral samples.**

12 Q  And by "peripheral," what does that mean?

13 A  **Usually femoral artery.**

14 Q  Is that your standard practice for blood samples?

15 A  **Yes.**

16 Q  Does your office ever have occasion to take vitreous

17    fluid for toxicology purposes?

18 A  **Vitreous isn't very useful for toxicology, but we do save**

19    **vitreous in almost all cases in case we need it for**

20    **chemistry.**

21 Q  And how long do you save it for?

22 A  **I think the disposition schedule is three years for**

23    **vitreous, but I'm not positive.**

24    **It could be two.**

25 Q  Do you know whether there are still vitreous samples for

1      have to send it to a lab that does.

2    Q   Do you know what documentation the toxicology lab

3        maintains with regard to their testing?

4    A   **They keep their raw output from their devices.**

5    Q   Do you know for how long?

6    A   **I don't.**

7    Q   Have you ever had occasion to go back to them for their

8        raw output after a period of years?

9    A   **Yes.**

10   Q   And have you had any trouble getting the raw output from

11       the tox lab?

12   A   **No.**

13   Q   Do you recall how-- the longest period of time it was

14       that you had to go back for?

15   A   **I don't, but my best guess is that this case is in**

16       **archives but probably still available.**

17   Q   And what would the raw output look like?

18   A   **It depends on what they did.**

19           **There would be output from gas chromatography that**

20       **would show a peak that correlated with this amount of**

21       **alcohol.**

22           **There probably-- I mean, there's also a mass**

23       **spectroscopy output that may or may not have peaks on it.**

24           **I don't know what this one looks like.  I haven't**

25       **seen it.**

1    Q    But generally speaking, the raw output would be the

2         graphs that show the peaks that you've described?

3    A    **Yes, and numbers to go with them.**

4    Q    Anything else that would generally be part of their raw

5         output?

6    A    **That's probably at the end of my knowledge.**

7                                  **(Exhibit No. 16 marked**

8                                  **for identification.)**

9

10   Q    (By Ms. Williams)  I would like to show you what we have

11        marked as Exhibit No. 16.

12             This is essentially-- it's a copy of the postmortem

13        examination report.

14             I wanted to mark it as a stand-alone document so we

15        can make it easier to go through.

16             Obviously you can take a look and compare that this

17        appears to be a copy of it.

18             It actually also includes both pages of the

19        toxicology report at the end.

20   A    **Yes.**

21             **It's a better copy.**

22   Q    On the cover page, "Cause of death," you listed

23        "Aspiration of gastric contents," "Other significant

24        conditions: Alcohol intoxication," correct?

25   A    **Yes.**

1  Q   And are those your-- were those your conclusions based

2      upon your medical training and experience and the

3      evaluation that you did as to Mr. Omelin?

4  A   Yes.

5  Q   If you turn to Page 2 of the document, it says, "Final

6      diagnoses," and it says, "Aspiration of gastric

7      contents," and underneath it, it says, "Fatty change of

8      the liver, mild."

9          Do you see that?

10 A   Yes.

11 Q   Why is that in your final diagnoses?

12 A   Because he had it.

13 Q   What is the significance of that, if any?

14 A   Fatty change is a nonspecific response of the liver to

15     injury.

16         The most common cause of fatty change is alcohol

17     abuse.

18         There are other things that can cause fatty change

19     as well, including obesity, diabetes, and even some

20     chemicals, such as carbon tetrachloride or dry cleaning

21     fluid.

22 Q   Based upon your review of Mr. Omelin, would you

23     characterize him as obese?

24 A   No.

25 Q   Was there any indication he had diabetes?

1    A    No.

2    Q    When you said that fatty change of the liver could be

3         caused by alcohol abuse, what do you mean by "alcohol

4         abuse"?

5    A    One drink is not likely to produce fatty change, but

6         abuse of alcohol over a period of days can produce fatty

7         change.

8              Fatty change is reversible, so if the drinking

9         stops, the fatty change goes away.

10             Since fatty change was still here and since he had a

11        positive alcohol, I would conclude that this fatty change

12        is almost certainly due to alcohol abuse.

13   Q    And then the "Opinion," it says, "This 25-year-old man

14        was found dead on his bathroom floor.  According to his

15        family, he had not seen a physician in at least four

16        years."

17             The fact that he had not seen a physician in at

18        least four years, did that have any significance to you?

19   A    Well, it probably means he doesn't have any chronic

20        diseases for which he's being treated.

21             It doesn't particularly surprise me that he hasn't

22        seen a physician.  At his age it's not uncommon not to

23        see a physician.

24   Q    And then this next paragraph, second sentence, "Anatomic

25        findings include aspiration of gastric contents and fatty

1     change of the liver."

2          Were those both things that you were able to

3     determine from the microscopic slides?

4  A  That's correct.

5  Q  And can you explain how the microscopic slides work?

6  A  During the internal examination of the autopsy, small

7     pieces of organs are taken for processing and mounting on

8     glass slides.

9          The slides are stained, coverslipped, and then they

10    are suitable for examination under a microscope.

11         It gives a closer view at a cellular level of organs

12    and shows things that can't be seen with the unaided eye.

13 Q  And it was through the microscopic slide that you were

14    able to determine there had been aspiration of gastric

15    contents; is that correct?

16 A  That's correct, but slightly inadequate in that

17    "aspiration of gastric contents" means vomiting and

18    breathing in the stomach contents, and it's not an

19    uncommon finding at autopsy, even during the gross exam

20    without the microscope, because vomiting is not an

21    uncommon reaction to death.

22         The problem is it's important to determine whether

23    aspiration is the cause of death or the result of death,

24    and that can only be done microscopically.

25         In this case I found gastric contents in the

1    periphery of the lungs along with extensive hemorrhage or

2    a bleeding reaction around it, indicating that this

3    aspiration occurred while he was still making a

4    respiratory effort, so this becomes the cause of death

5    rather than perimortem aspiration that's the result of

6    death.

7  Q   So turning to-- I want to follow up on that.

8        Turning to Page 4 of the document, which we have

9    marked as Exhibit No. 16, under the heading, "Microscopic

10   examination," you say, "Lung: Sections of each lung shows

11   aspiration of foreign material into the periphery, with

12   extensive associated intra-alveolar hemorrhage."

13 A   Yes.

14 Q   Is that what you were just explaining?

15 A   Yes.

16 Q   So what is the intra-alveolar hemorrhage?

17 A   Alveoli are the air spaces in which air exchange takes

18   place between the blood and the air, oxygen exchange and

19   carbon dioxide exchange.

20       The air spaces or alveolar spaces are rounded, and

21   normally don't have anything in them.

22       If something is in them, then that is abnormal.

23       In this case there was blood in them, so it's called

24   hemorrhage into the alveolar spaces or intra-alveolar

25   hemorrhage.

1    Q    And in your opinion what was it that caused the blood to

2         occur, the bleeding?

3    A    The bleeding is a result of continued respiratory effort.

4             He was trying to breathe even though he had

5         aspirated his gastric contents, and that negative

6         pressure pulls red cells across capillaries and into the

7         air spaces.

8    Q    And just for the nonmedically trained, when you say

9         "aspiration of gastric contents," how would you describe

10        that in layman's terms?

11   A    If one vomits, it normally comes to the outside, if one

12        is conscious and able to open the mouth and get the vomit

13        out.

14           If the vomit doesn't make it all to the outside and

15        you are breathing at the same time, then the air can pull

16        the gastric contents down the trachea, which is the

17        windpipe, and into the lungs.

18   Q    And how does that result in death?

19   A    Asphyxiation.

20           If the lungs are being blocked by gastric contents,

21        then gas exchange can't take place, so there's no oxygen.

22   Q    You indicated alcohol intoxication as a significant

23        contributing condition.

24           How does alcohol intoxication-- how did it

25        contribute to the cause of death for Mr. Omelin?

1  A   Aspiration of gastric contents, which I will subsequently

2      refer to only as "aspiration," happens in the very young,

3      the very old, and the intoxicated, and not very much in

4      anybody else.

5          So alcohol intoxication is important because without

6      it, he probably would not have aspirated and died.

7  Q   Why do you say that?

8  A   Because normal healthy people who vomit and are alert and

9      conscious typically don't aspirate their gastric

10     contents.

11 Q   So what is it about the alcohol intoxication that you

12     believe caused him to aspirate the gastric contents?

13 A   Alcohol intoxication produces a decreased level of

14     consciousness, a decreased sensation level, a decreased

15     response time, and whereas a person who is not

16     intoxicated might think to lean over or in some way get

17     the vomit out of their mouth, a person who is intoxicated

18     might not have that reaction or might not have it in

19     time.

20 Q   Did you find any other significant contributing

21     conditions, other than alcohol intoxication, with regard

22     to--

23 A   I did not.

24 Q   And is it fair to say that in performing your evaluation,

25     there could be cases that had multiple contributing

Page 44

1      conditions?

2   A   There are many cases with multiple contributing

3      conditions.

4   Q   And if you found multiple contributing conditions in

5      Mr. Omelin's case, you would have noted those in the

6      report?

7   A   Yes.

8   Q   Now, sticking with "Microscopic examination" on Page 4 of

9      Exhibit No. 16, there's a reference to the heart.

10         Do you see that?

11  A   Yes.

12  Q   "There is no evidence of acute nor old infarction.  There

13     is no significant inflammation."

14         Can you explain that?

15  A   "Infarction" is cell death.  It is, in layman's terms,

16     called a heart attack.

17         It would be unusual for a man of this age to have

18     one, but it's possible.

19         "Inflammation" is a reference to the parts of the

20     blood that respond to injury.  Specifically they're

21     called lymphocytes or neutrophils, for the most part.

22         There is a condition called myocarditis that affects

23     people at any age and is unpredictable, can result in

24     vomiting, and could have been the cause of death in this

25     case, but it isn't because there isn't any inflammation

1      in the heart, so it's an important pertinent negative.

2   Q   And that was, you said, myocarditis?

3   A   Yes.

4   Q   And you found no evidence that would suggest Mr. Omelin

5      had myocarditis?

6   A   That's correct.

7   Q   Did you find any scarring in the heart tissue?

8   A   No.

9   Q   Was there any evidence of cardiac arrest?

10         Let me rephrase that.

11         Were there any structural defects that you observed

12      in the heart?

13  A   No.

14  Q   You said, "Serial sections of"-- actually, I'm flipping

15      back, so let's go to Page 3 of your Exhibit No. 16 under

16      "Cardiovascular system."

17         It says, "The heart weighs 300 grams.   The coronary

18      arteries arise in the usual locations, are widely patent,

19      and do not have significant atherosclerotic disease."

20         What does that mean?

21  A   It means exactly what it said.

22         Coronary arteries are the blood vessels that take

23      blood from the aorta to the heart, and in somebody who

24      has a heart attack, occluded coronary arteries are the

25      usual reason.

1         They can arise or travel in nonstandard locations,

2     which can cause sudden death.

3         That wasn't the case here.

4   Q   And then "Serial sections of myocardium do not show

5     evidence of acute nor old infarction," you mentioned that

6     earlier, correct?

7   A   In a different context.

8   Q   What are you referring to in this context?

9   A   This is when I'm actually holding the heart and cutting

10    it with a knife, and the reason it's important here is if

11    there were gross evidence or visible evidence of

12    infarction, then that's the place I would have taken for

13    microscopic examination.

14        I saw nothing, so I took a random section and still

15    saw nothing.

16  Q   And, again, can you explain what "infarction" is?

17  A   "Infarction" is death of the heart cells, in this case.

18  Q   Did you see any signs of tachycardia on Mr. Omelin's

19    heart?

20  A   His heart rate was zero at the time I examined him, so he

21    did not have tachycardia, which means an increased heart

22    rate.

23  Q   I apologize.  That was a poorly phrased question.

24        If he had suffered some type of tachycardia before

25    death, is that something that would be able to be

1    discerned from the autopsy examination?

2  A  No.

3  Q  Okay.  And looking at your report, did you find any other

4     conditions that Mr. Omelin had that could have

5     contributed to his death?

6  A  The only other finding was mild fatty change of the

7     liver, but it's very unlikely that a mild degree of fatty

8     change would contribute to death.

9  Q  But it is your opinion that in this case the mild change

10    of fatty liver was likely caused by alcohol abuse?

11 A  Likely caused by alcohol abuse and likely did not

12    contribute to the death.

13 Q  Based on the work that you did in performing the autopsy

14    and all the other information you considered, do you

15    stand by your determination that the cause of death for

16    Mr. Omelin was aspiration of gastric contents with

17    alcohol intoxication as a significant contributing

18    condition?

19 A  I do.

20 Q  Have you seen anything, since you've prepared your

21    autopsy report, to suggest that your conclusions may not

22    be correct?

23 A  I have not.

24 Q  Do you recall-- let me-- having-- do you recall anyone

25    from Mr. Omelin's family mentioning to you or your office

```
 1      the possibility of food poisoning?
 2   A  I saw it in one of the notes.
 3   Q  And is that something-- did you have any discussions with
 4      anyone about that issue?
 5   A  The note says that "The decedent's father called stating
 6      concerns over possible food poisoning.  He stated that
 7      the night prior to death the decedent had opened a can of
 8      meat and made spaghetti.  Mr. Omelin stated that at the
 9      residence they noted vomit not only upstairs but also
10      outside."
11          I was aware of that, but it doesn't-- first of all,
12      it isn't very likely that you get food poisoning by
13      opening a can of meat -- more likely by eating one that's
14      been sitting outside for a while -- and it doesn't matter
15      anyway because there was a good explanation for his
16      vomiting and aspiration.
17   Q  And what was the good explanation for his vomiting and
18      aspiration?
19   A  Alcohol intoxication.
20   Q  And the 0.095 blood alcohol level at the time the test
21      was done, is that the maximum blood alcohol level he may
22      have had sometime before his death or is that simply the
23      measurements that were taken at the time the blood sample
24      was retrieved?
25   A  That is a measurement that shows his alcohol
```

Page 49

1      concentration at the time of death.

2          It could have been higher at another time.

3                    MR. WILLIAMS:  Dr. Clark, why don't we

4      take a short break.  I might be just about to turn it

5      over to Mr. Miles.

6                    VIDEOGRAPHER:  Going off record.  The

7      time now is 2:17 p.m.

8                         (Recess 2:17 to 2:30 p.m.)

9

10                   VIDEOGRAPHER:  Back on record, the

11     time now is 2:30 p.m.

12  Q  (By Mr. Williams)  Dr. Clark, I just have a few more and

13     will try to wrap this up from my standpoint.

14         Turning to Exhibit No. 14 again, and specifically

15     PCME 5, which is the circumstances of death by Melissa

16     Baker, in the third paragraph that begins "Per family"--

17     do you see that paragraph?

18  A  Yes.

19  Q  And if you go down to the fifth line, there's a sentence

20     that says, "The decedent had no medical history but had

21     been complaining of headaches for several months and had

22     refused to see a doctor."

23         Do you see that?

24  A  Yes.

25  Q  Did you find, in your assessment and evaluation, any

```
 1        evidence that his headaches could have contributed in

 2        some way to his death?

 3   A    I did not.

 4   Q    If you go down a couple lines later, it says, "She stated

 5        that the decedent rarely slept and drank a lot of coffee

 6        and Red Bull to stay alert."

 7             In your evaluation and assessment, did you see any

 8        evidence that his consumption of coffee or Red Bull

 9        contributed to his death?

10   A    No.

11   Q    And I think as you said before, had you found evidence of

12        some other contributing condition to his death, you would

13        have indicated that in the report, correct?

14   A    Yes.

15                                (Exhibit No. 17 marked

16                                 for identification.)

17

18   Q    (By Mr. Williams)  I would like to show you what we will

19        mark as Exhibit No. 17, and these are some documents that

20        we received yesterday from Plaintiff's counsel.

21             Do you recognize these documents?

22   A    Yes.

23   Q    And what are they?

24   A    Again, it's multiple documents.

25             Exhibit No. 17 begins with a case review checklist.
```

1          This is part of our peer review process when one

2      investigator has to review another investigator's work to

3      make sure that it's complete and accurate.

4          Page 2 is what we call our blue sheet.  It is a list

5      of follow-up that a case needs.  In this case there was

6      only one thing, which was obtaining a funeral home.

7          Page 3 is a letter that is self-explanatory.

8          Page 4 is a letter that is self-explanatory.

9    Q   And would these have been part of Mr. Omelin's file in

10       the medical examiner's office?

11   A   Yes.

12   Q   And just to clarify some of my questions earlier, in your

13       examination did you find any evidence of damage to

14       Mr. Omelin's heart?

15   A   No.

16   Q   And had you found any evidence of damage, would you have

17       indicated that in the report?

18   A   Yes.

19                            (Exhibit No. 18 marked

20                             for identification.)

21

22   Q   (By Mr. Williams)  I would like to show you my last

23       exhibit, which we'll mark as Exhibit No. 18.

24          Dr. Clark, do you recognize this document?

25   A   I can figure out what it is, but I've never seen it

1        before.

2    Q   Do you-- when you say you can figure out what it is, what

3        is your understanding of what it is?

4    A   It is the Washington Department of Health certificate of

5        death, but we don't see them in most cases because they

6        charge us if we want one.

7    Q   Are you familiar with how the Washington Department of

8        Health obtains the information that's included in the

9        certificate of death?

10   A   Yes.

11   Q   And how is that information obtained?

12   A   The demographic information is obtained from family.  The

13       cause of death information is obtained from my office.

14   Q   So would you have provided the State of Washington

15       Department of Health the cause of death and contributing

16       conditions for Anton Omelin that you had found in order

17       for them to prepare the death certificate?

18   A   Yes.

19                    MR. WILLIAMS:  Dr. Clark, I appreciate

20       your time, and that's all the questions I have for now.

21                    MR. MILES:  Dr. Clark, I only have a

22       few.

23           Famous last words from a lawyer, I know, but I will

24       try.

25       /////

Page 53

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1                         EXAMINATION

 2      BY MR. MILES:

 3  Q   I want to direct your attention back to Exhibit No. 16,

 4      which is your postmortem examination report, and

 5      specifically the page labelled at the bottom as PCME 10.

 6          My apologies.  It may not be labelled in that manner

 7      that you have.

 8          If you could look at the one that's labelled Page 22

 9      or Page 3 of the document.

10          At the bottom there's a section called "Respiratory

11      system."

12          Do you see that?

13  A   Yes.

14  Q   The second sentence says, "The lungs are normally formed

15      and do not have focal lesions."

16          Do you see that?

17  A   Yes.

18  Q   What does that mean?

19  A   It means that I didn't see anything grossly that was

20      abnormal.

21  Q   And when you say "grossly," what do you mean, in layman's

22      terms?

23  A   I mean what I could see with my eyes.

24  Q   With the naked eye?

25  A   Without a microscope.
```

Thomas B. Clark, M.D.
August 8, 2018
Exhibit D - Page 35

1  Q   Explain how your description here of "The lungs are

2      normally formed" is consistent with the next page and

3      your microscopic examination of the lungs.

4  A   **Microscopically I was seeing very small cellular-sized**

5      **foreign material in the periphery of the airways.**

6          **It's not possible to see that without a microscope.**

7  Q   Could you tell what type of foreign material that was?

8  A   **I didn't try.**

9  Q   What was the importance of noting the foreign material in

10     the microscopic analysis of the lungs?

11 A   **Because if the foreign material is in the periphery and**

12     **accompanied by hemorrhage, it is a very strong indication**

13     **that aspiration is real, that it occurred during life**

14     **while there was still a respiratory effort.**

15 Q   You mentioned earlier, I believe, that there was some

16     hemorrhaging or bleeding inside the lungs, right?

17 A   **Yes.**

18 Q   Is that what caused the ultimate death here?

19 A   **It probably contributed, but the occlusion of small**

20     **airways by gastric contents is what actually caused the**

21     **death.**

22 Q   Is that similar to suffocation?

23 A   **It's probably more properly referred to as asphyxiation.**

24 Q   And how would you describe asphyxiation?

25 A   **It's lack of oxygen at a cellular level.**

1   Q   And there could be different causes for that lack of

2       oxygen?

3   **A   Yes.**

4   Q   Could be foreign material in the lungs?

5   **A   That is one of them.**

6   Q   Could be bleeding in the lungs?

7   **A   That would be one.**

8   Q   Could be a combination of both?

9   **A   Yes.**

10  Q   During your work on the autopsy of Mr. Omelin, did you

11      see any evidence that a Monster Energy Drink caused or

12      contributed to his death?

13  **A   No.**

14  Q   During your work on the autopsy of Mr. Omelin, did you

15      see any evidence that a NOS Energy Drink caused or

16      contributed to his death?

17  **A   I don't even know what that is, so no.**

18                      MR. MILES:  I have no further

19      questions at this time.

20                      MR. WILLIAMS:  Nothing further.

21                      MR. PRATHER:  Nothing from me.

22                      MR. WILLIAMS:  Thank you, Dr. Clark.

23                      VIDEOGRAPHER:  This is the end of

24      Media Unit No. 1 and concludes the deposition of Thomas

25      Clark, M.D.  The time now is 2:39 p.m.

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1              Going off record.

2                          (Deposition concluded at 2:39 p.m.)

3                          (Signature waived.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Thomas B. Clark, M.D.
August 8, 2018
Exhibit D - Page 38

1     STATE OF WASHINGTON )    I, Terilynn Simons, CCR, RMR, CRR
                      ) ss a certified court reporter
2     County of Pierce    )    in the State of Washington, do
                        hereby certify:

3

4

5        That the foregoing deposition of THOMAS B. CLARK, M.D.
was taken before me and completed on August 8, 2018, and
thereafter was transcribed under my direction; that the
6    deposition is a full, true and complete transcript of the
testimony of said witness, including all questions, answers,
7    objections, motions and exceptions;

8        That the witness, before examination, was by me duly
sworn to testify the truth, the whole truth, and nothing but
9    the truth, and that the witness waived the right of
signature;

10

11       That I am not a relative, employee, attorney or counsel
of any party to this action or relative or employee of any
such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13       That I am herewith securely sealing the said deposition
and promptly delivering the same to Michael Ernest Williams.

14

15       IN WITNESS WHEREOF, I have hereunto set my signature on
the 13th day of August, 2018.

16

17

18

19                                  _____
                              Terilynn Simons, CCR, RMR, CRR
20                            Certified Court Reporter No. 2047
                            (Certification expires 07/07/19.

21

22

23

24

25

# EXHIBIT E



**Pierce County**

**Medical Examiner's Office**

3619 Pacific Avenue
Tacoma, Washington 98418
(253) 798-6494 • FAX (253) 798-2893

**THOMAS B. CLARK III, MD**
Medical Examiner

**SHARON R. JOHNSON**
Medical Examiner Services Manager

July 20, 2018

Olga Efimova, Attorney at Law
155 108th Avenue NE, Suite 210
Bellevue, WA 98004

RE: ANTON OMELIN
PCME: 14-1625

Dear Ms. Efimova:

Please find the records you have requested on the above decedent, Anton Omelin.  The fee for
these records is as follows:

| | |
|---|---|
| Investigative report  4 pages | $5.00 |
| Notes 2 pages | 2.00 |
| Postmortem exam w/toxicology 6 pages | 7.00 |
| CD rom photos (scene & autopsy) 1 disc | 2.00 |
| Postmortem diagram    1 page | 1.00 |
| Personal property form  1 page | 1.00 |
| Funeral home release   1 page | 1.00 |
| Report request form – 1 page | 1.00 |
| Total Fees | $20.00 |

This amount will be deducted from the check provided #27155 in the amount of $78.00 provided
for testimony.  Should there be any balance, with the information provided by you, we will bill
the defendant's attorney accordingly.

If I can assist you further, please feel free to contact me directly.

Respectfully,

Chris Whitwell
Medical Office Assistant
Pierce County Medical Examiner

Exhibit No.
14

T. Clark
8/08/2018
Omelin v Hansen Reporting

PCME 000001

**Exhibit E - Page 1**

## Medical Examiner's Record
### Pierce County, Washington

**\* \* \* Confidential \* \* \***
Case: 141625                                    Omelin, Anton

### Case Information

| | | | |
|---|---|---|---|
| **Case Number:** | 141625 | **Case Type:** | Body Brought In |
| **Date of Death:** | 10/30/2014   **Time:** AM | **Death Area:** | Fife |
| **Date Found:** | 10/30/2014 07:30 | **Arrive Date:** | 10/30/2014 09:35 |
| **Reported By:** | Dispatcher | **Reason:** | Unknown Cause |
| **Agency:** | Fife PD | **Call Date:** | 10/30/2014 08:41 |
| **Pronounced By:** | Dr. Stein, MAMC | **Pronounced Date:** | 10/30/2014 07:52 |

☑ Brought to Morgue   ☑ Scene Investigated   ☐ Death in Custody   ☐ Unidentified   ☐ USCPSC

### Deceased

☐ CPS Notified

| | | | |
|---|---|---|---|
| **Name:** | Omelin, Anton | **Race:** | |
| **Address:** | 4219 69th Ave E | **Gender:** | Male |
| **City:** | Fife   **State:** WA   **Zip:** 98424-3697 | **Age:** | 25 |
| **County:** | Pierce   **Military ?** ☐ | **Birth Date:** | 03/04/1989 |
| **SSN:** | | **Tag Number:** | |
| **Job:** | | **Kind of Business:** | |
| **Marital Status:** | Married | **Spouse/Maiden Name:** | |

### Incident

| | | | |
|---|---|---|---|
| **Next of Kin Notified By:** | At scene | **Notify Date:** | 10/30/2014 00:00 |
| **Agency:** | NA | **Notify Method:** | At Scene/Bedside |
| **Incident Date:** | 10/30/2014   **Time:** | **At Work ?** ☐   **Funeral Home:** | Edwards Memorial |
| **Place:** | Residence | **City:** | Fife |
| **Address:** | 4219 69th Ave E | **Zip:** | 98424-3697 |
| **Police Officer:** | Det Thompson | | |
| **Agency:** | Fife Police Department | **Case#:** | 2014-03762 |

### Location

**Location of Death Address :** 4219 69th Ave E          **Within City Limits ?** ☑
                        **City:** Fife          **Zip:** 98424-3697

### Summary

I received a heads up call from Fife dispatch at 0755 hours. I was notified that the decedent is a 25 year old male with no history and officers had not arrived to the scene yet. Per fire personnel, the decedent lives with his wife and they have a new baby. He had recent complaints of being tired and having a headache. He was found in the bathroom unresponsive by the wife this morning with apparent vomit noted on the floor and 911 was called. Tacoma Fire responded to the scene and no life saving measures were taken as death was obvious. Per fire personnel, there is no history of drug or ethanol abuse and the decedent works in the import business. I advised that I will wait to respond until requested by law enforcement. Investigator requested to respond at 0841 hours. MAB

*(Pierce County Certified Copy — Confidential Information Per RCW 68.50.105 — Medical Examiner seal)*

**Investigator:**   Baker, Melissa                                   1/7/2015 10:08:39      bharris

PCME 000002

# Medical Examiner's Record
## Pierce County, Washington

**\* \* \* CONFIDENTIAL \* \* \***

Case : 141625                    Omelin, Anton

### Identification

**Case Number:** 141625
**Last Known Alive:** 10/30/2014        **Time:** 04:00        **Witnessed By:** Not Witnessed
**Last Seen Alive By:** Heard by family member
**Deceased Found:** 10/30/2014 07:30        **Found By:** Wife
**ID Date:** 10/30/2014        **ID By:** Law Enforcement        **Method:** Photo ID

### Personal History and Fingerprints

**Fingerprints Available:** ☐        **Fingerprint Agency:**
**Dental Records Avail:** ☐        **Dentist:**
**X-Rays Available:** ☐        **Hospital/Doctor:**
**Education:**        **Military Status:**
**Primary Care Physician:** None        **Physician Will Certify:** ☐
**Last Visit:**        **Phone:**
**Diagnosis:**

**Secondary Care Physician:**        **Physician Will Certify:** ☐
**Last Visit:**        **Phone:**
**Diagnosis:**

### Aliases and Unknown Names

**Alias:**

### Other Information

**Traffic Related Incident:** ☐        **Number of Vehicles Involved:**        **Possible Drug Overdose:** ☐
**Medical History:**
None

**Suspected drugs and on scene medications:**
None

1/7/2015 10:09:39        bharris

# Medical Examiner's Record
## Pierce County, Washington

**\* \* \* CONFIDENTIAL \* \* \***

Case : 141625

Omelin, Anton

### *Survivor 1 Information*

**Last Name:** Omelin  **First:** Anna  **Middle:**  **Relationship:** Wife
**Address:** Russian- doesn't speak English
**City:**  **State:**  **Zip:** -  **Phone:** (425) 919-7565
**Notified By:** At scene  **Agency:** NA
**Notified Date:** 10/30/2014  **Notify Method:** At Scene/Bedside

### *Survivor 2 Information*

**Last Name:** Lawrence  **First:** Yuliya  **Middle:**  **Relationship:** Friend
**Address:** Family Contact/Interpreter
**City:**  **State:**  **Zip:** -  **Phone:** (425) 246-3059
**Notified By:** Wife  **Agency:** NA
**Notified Date:** 10/30/2014  **Notify Method:** At Scene/Bedside

### *Survivor 3 Information*

**Last Name:** Igans  **First:** Demetri  **Middle:**  **Relationship:** Father in Law
**Address:**
**City:**  **State:**  **Zip:** -  **Phone:** (206) 384-2777
**Notified By:**  **Agency:**
**Notified Date:**  **Notify Method:**

### *Funeral Home Selection*

**Funeral Home:** Edwards Memorial  **Authorized By:** Demetri Igans
**Date Selected:** 10/30/2014 12:45  **Date Released:** 10/31/2014  **Relation:** Father in Law

1/7/2015 10:06:39  bharris

PCME 000004

| **Medical Examiner's Record** | *** CONFIDENTIAL *** |
|---|---|
| Pierce County, Washington | Case: 141625   Omelin, Anton |

## *Circumstances of Death*

I received a heads up call from Fife dispatch at 0755 hours.  Investigator requested to respond at 0841 hours.  I arrived to the scene at 0935 hours.

The decedent is a 25 year old male with no history who was found unresponsive in the bathroom this morning by his wife who called 911.  Tacoma Fire responded to the scene and no life saving measures were taken as death was obvious.

Per family, the decedent was "normal" last night; he had one glass of bourbon and had no complaints other than feeling tired the last couple of days.  Per the son, he heard the decedent in the shower at approximately 0400 hours this morning.  The decedent lives with his wife and they have a new baby and two other children.  The wife is Russian and does not speak English so a friend Yuliya Lawrence translated the following information for the wife.  The decedent had no medical history but had been complaining of headaches for several months and had refused to see a doctor.  She stated that he worked 16-18 hours a day at their family business which imports merchandise to/from Eastern Europe.  She stated that the decedent rarely slept and drank a lot of coffee and Red Bull to stay alert.  Additionally, she stated that they had been together for 4 years and he never saw a doctor in that time and she didn't know when he last saw a doctor.  The decedent reportedly had an episode at work a few days ago where he described it to his family as "hallucinating and seeing circles in his eyes."  Family stated he would drink a beer or two but denied any history of drug or ethanol abuse.

Upon arrival to the scene, I was met by Detective Thompson, Officer Quinto, a Chaplain, and other Fife P.D. personnel, the wife and other family members, and Ms. Lawrence arrived to the scene a short time later.  The scene was a single family residence which was well kempt.  The decedent was found upstairs in the master bathroom lying on the floor.  He was nude partially lying on his right side with his back against the wall.  He had a ring on each hand.  There was apparent feces and vomit noted in the toilet and vomit in the bathroom sink and on the counter.  There were a few items lying on the floor that appeared to have been knocked off of the counter; it is unknown if this was done by the decedent, the wife, or fire personnel.  There was one empty beer bottle noted on the bathtub ledge.  The body was cold to the touch.  Rigor mortis was well developed and difficult to manipulate.  Lividity was noted in the dependent areas, purple and red in color, and blanched under pressure.  Some minor abrasions were noted to the back but no other trauma was noted.  No medications or illicit drugs were found at the scene.  Nothing suspicious was noted at the scene.

Digital images were taken and the body was transported to this office for further investigation.

*Signature:* _____   *Date:* __October 30, 2014__
   Melissa Baker, Lead Medicolegal Death Investigator

Page  1

PCME 000005

**Medical Examiner's Record**
**Pierce County, Washington**

| * * * CONFIDENTIAL * * * | |
|---|---|
| Case : 141625 | Omelin, Anton |

**Case Note**

| Note Type: | General | Note Date: | 02/09/2015 18:03 | Created by: | rthill |
|---|---|---|---|---|---|
| | | Changed Date: | 02/09/2015 18:03 | Modified by: | rthill |

Note Text: The decedent's mother is Eugeniya Naccarato (425) 306-6675. The mother had called this office regarding the autopsy results. I spoke with her and answered as best I could her questions regarding the autospy report.

**Case Note**

| Note Type: | General | Note Date: | 02/03/2015 09:00 | Created by: | pglen |
|---|---|---|---|---|---|
| | | Changed Date: | 02/03/2015 09:00 | Modified by: | pglen |

Note Text: A liason for the family, Alex Razijovich (206-898-8409) called requesting a face to face meeting with Dr. Clark. He stated that he believed that was possible. I stated that was not necessarily true and that Dr. Clark would attempt to call him if possible. I emailed Dr. Clark this information.

**Case Note**

| Note Type: | General | Note Date: | 12/30/2014 12:22 | Created by: | amidkif |
|---|---|---|---|---|---|
| | | Changed Date: | 12/30/2014 12:22 | Modified by: | amidkif |

Note Text: Bonnie found that no report request was in the folder so I completed a request.

**Case Note**

| Note Type: | General | Note Date: | 12/30/2014 12:12 | Created by: | amidkif |
|---|---|---|---|---|---|
| | | Changed Date: | 12/30/2014 12:20 | Modified by: | amidkif |

Note Text: The mother called in to find out the death certificate has been updated from "pending". I provided her the cause and manner of death verbally. She stated she thought the father (her husband) had requested a report previously. I obtained their name and mailing address and checked with Bonnie to ensure a request has been placed. Their contact information is as follows: report request address P.O. Box 59974, Renton, WA 98058 Michael Omelin and Evgeniya Naccarato (father and mother).

**Case Note**

| Note Type: | General | Note Date: | 10/31/2014 09:14 | Created by: | rthill |
|---|---|---|---|---|---|
| | | Changed Date: | 10/31/2014 09:14 | Modified by: | rthill |

Note Text: The decedent's father, Michael Omelin, called stating some concerns over possible food poisoning. He stated that the night prior to the death, the decedent had opened a can of meat and had made spaghetti. Mr. Omelin stated that at the residence, they noted vomit not only upstairs, but also outside.

**Case Note**

| Note Type: | General | Note Date: | 10/30/2014 17:24 | Created by: | rthill |
|---|---|---|---|---|---|
| | | Changed Date: | 10/30/2014 17:24 | Modified by: | rthill |

Note Text: Sightlife called stating that the family did not want to move forward with donation. Sightlife is closing this case.

**Case Note**

| Note Type: | General | Note Date: | 10/30/2014 14:57 | Created by: | nbaker |
|---|---|---|---|---|---|
| | | Changed Date: | 10/30/2014 14:57 | Modified by: | nbaker |

Note Text: I spoke to Chandi at Sightlife who stated they are calling family back at 1600 hours for consent and will notify this office once it's determined.

PCME 000006

| **Medical Examiner's Record**<br>**Pierce County, Washington** | **\* \* \* CONFIDENTIAL \* \* \***<br>Case : 141625                           Omelin, Anton |
|---|---|

**Case Note**

| Note Type: | General | Note Date: | 10/30/2014 14:37 | Created by: | ıbaker |
|---|---|---|---|---|---|
| | | Changed Date: | 10/30/2014 14:43 | Modified by: | ıbaker |

Note Text: Father is Michael Omelin (425-306-6675).

**Case Note**

| Note Type: | General | Note Date: | 10/30/2014 12:58 | Created by: | jphill1 |
|---|---|---|---|---|---|
| | | Changed Date: | 10/30/2014 13:07 | Modified by: | jphill1 |

Note Text: 2 Red top tubes of blood were drawn and taped to the body bag. Draw time 1120. JP

**Case Note**

| Note Type: | General | Note Date: | 10/30/2014 11:07 | Created by: | ıbaker |
|---|---|---|---|---|---|
| | | Changed Date: | 10/30/2014 11:07 | Modified by: | ıbaker |

Note Text: I spoke to Chandi at Sightlife and the decedent is a candidate for corneas, long bones, tissue, and heart valves. I placed no restrictions and they are seeking consent from family and will notify if they will continue with harvesting.

Page 2 of 2

PCME 000007



**Pierce County**

**Medical Examiner's Office**

3619 Pacific Avenue
Tacoma, Washington 98418
(253) 798-6494 • FAX (253) 798-2893

**THOMAS B. CLARK III, MD**
Medical Examiner

**J. MATTHEW LACY, MD**
Associate Medical Examiner

**SHARON R. JOHNSON**
Medical Examiner Services Manager

## POSTMORTEM EXAMINATION REPORT

| | |
|---|---|
| MEDICAL EXAMINER CASE #: | **14-1625** |
| NAME OF DECEASED: | **Anton Omelin** |
| DATE OF EXAMINATION: | **October 30, 2014** |
| LAW ENFORCEMENT AGENCY AND CASE#: | **Fife Police Department  2014-03762** |
| CAUSE OF DEATH: | **Aspiration of gastric contents** |
| OTHER SIGNIFICANT CONDITIONS: | **Alcohol intoxication** |
| MANNER OF DEATH: | **Accident** |



PCME 000008

14-1625
ANTON OMELIN

**FINAL DIAGNOSES:**

Aspiration of gastric contents.
Fatty change of the liver, mild.

**OPINION:**

This 25-year-old man was found dead on his bathroom floor.  According to his family, he had
not seen a physician in at least 4 years.

Autopsy examination does not show evidence of injury.  Anatomic findings include aspiration of
gastric contents and fatty change of the liver.  Toxicology testing shows an ethanol concentration
of 0.095 g/100mL, indicating that the decedent was intoxicated at the time of death.

Death is most likely due to aspiration of gastric contents.  Alcohol intoxication is a significant
contributing condition.

_____
Thomas B. Clark, III, M.D.
Medical Examiner

07 Jan 15
Date

PIERCE COUNTY
CERTIFIED COPY
CONFIDENTIAL
INFORMATION
PER RCW 68.50.105
MEDICAL EXAMINER

2

PCME 000009

**Exhibit E - Page 9**

14-1625
**ANTON OMELIN**

### External Examination:

The decedent is received in body bag unclothed. The body is that of an adequately nourished male who is 70 inches tall and weighs 165 pounds. The hair is brown. The eyes are brown. The teeth are natural. Rigor is complete. Livor is purple and posterior. The body is cold. There is a gold-colored ring on the fourth finger of the left hand. There is a silver-colored ring on the fourth finger of the right hand.

### Injuries:

There is an indistinct rectangular abrasion in the mid-right back. There is no significant evidence of injury.

### Internal Examination:

### Body Cavities:

The serosal surfaces are smooth and glistening. There is no unusual accumulation of blood or fluid.

### Head:

The scalp does not have evidence of injury. The skull is intact. The brain weighs 1540 grams. The meninges are thin and delicate, with no evidence of inflammation or hemorrhage. There is no cerebrovascular disease. There is no evidence of injury to the external surface of the brain. Serial sections of brain do not show focal lesions.

### Neck:

The hyoid bone is intact. The larynx is clear. The thyroid gland is of the usual size and configuration. There is no hemorrhage of the strap muscles.

### Cardiovascular System:

The heart weighs 300 grams. The coronary arteries arise in the usual locations, are widely patent, and do not have significant atherosclerotic disease. Serial sections of myocardium do not show evidence of acute nor old infarction. The valves are normally formed. The descending aorta is intact and does not have significant atherosclerotic disease.

### Respiratory System:

The right lung weighs 640 grams, left lung 570 grams. The lungs are normally formed and do not have focal lesions. There is no evidence of consolidation.

3

14-1625
ANTON OMELIN

**Liver, Gallbladder, Pancreas:**

The liver weighs 1900 grams.  The liver is of the usual color and consistency.  Serial sections do not show focal lesions.  The gallbladder contains liquid green bile.  The pancreas is unremarkable.

**Spleen and Lymph Nodes:**

The spleen weighs 200 grams and is unremarkable.  There are no prominent lymph nodes.

**Genitourinary System:**

The right kidney weighs 150 grams, left kidney 150 grams.  The kidneys are normally formed and do not have focal lesions.  The bladder contains 6 cubic centimeters of urine.  The prostate is unremarkable.

**Endocrine System:**

The adrenal glands are unremarkable.  There is no evidence of hemorrhage.

**Digestive System:**

The gastrointestinal tract is intact.  The stomach contains 200 cubic centimeters of partially digested food.  An appendix is present and unremarkable.  There is no evidence of bowel infarction.

**Musculoskeletal System:**

Intact.

**Histopathology:**  Sections are submitted for microscopic analysis.  Block A contains heart and right lung.  Block B contains left lung and liver.  Block C contains kidney and brain.

**Toxicology:**  Specimens are submitted for toxicologic analysis.

**MICROSCOPIC EXAMINATION:**

**Heart:**  There is no evidence of acute nor old infarction.  There is no significant inflammation.

**Lung:**  Sections of each lung show aspiration of foreign material into the periphery, with extensive associated intra-alveolar hemorrhage.

**Liver:**  There is a mild degree of fatty change.

**Kidney:**  No pathologic diagnosis.

4

14-1625
**ANTON OMELIN**

**Brain:** No pathologic diagnosis.

TBC:bh
Dictated:      10/30/14
Transcribed:   10/31/14
Finalized:     12/26/14

**RETENTION:**

Blood, body fluids, tissues, and physical/trace materials that may be collected (the exact samples vary by case) during the examination are routinely held in accordance with our retention policy prior to biohazard disposal, unless transferred to a laboratory or other agency by the Medical Examiner's Office, or otherwise released by special arrangement.

5

PCME 000012



**TOXICOLOGY LABORATORY**
**WASHINGTON STATE PATROL**
2203 Airport Way South Suite 360 Seattle, WA 98134
(206) 262-6100  FAX No. (206) 262-6145

## TOXICOLOGY REPORT

| | |
|---|---|
| **Attention:** | Dr. Thomas B. Clark III |
| **Agency:** | Pierce Co Medical Examiner |
| **Address:** | 3619 Pacific Ave |
| | Tacoma, WA 98418-7929 |

**Tox Case #:**  ST-14-10235     **Case Type:**  Death Investigation     **Report Date:**  12/19/2014

| | | | |
|---|---|---|---|
| **Agency Case #:**  14-1625 | | **Subject Name:**  Anton Omelin | |

**Evidence:**  The following evidence was submitted to the Laboratory by Jennifer Phillips of the Pierce Co Medical Examiner on 11/6/2014 via USPS-1st Class Mail:

(1)  ST-14-10235-A: VGray, Blood - Peripheral

(2)  ST-14-10235-B: VGray, Blood - Peripheral

(3)  ST-14-10235-C: VRed, Urine

## Volatile Analysis Results:

**ST-14-10235-A: Blood - Peripheral**

ST-14-10235-A was tested by Headspace - Gas Chromatography for the presence of acetone, ethanol, isopropanol, and methanol on the date(s) indicated below. The following average result was obtained:

Ethanol          0.095 ± 0.0078 g/100mL (k=3, 99.7% confidence level)          11/13/14, 11/14/14

## Drug Analysis Results:

**ST-14-10235-A: Blood - Peripheral**

ST-14-10235-A was tested by Enzyme Multiplied Immunoassay Technique (EMIT) for the presence of amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine metabolite, methadone, opiates, phencyclidine (PCP), and tricyclic antidepressants on 11/17/2014. The following result(s) was obtained:

**None Detected**

ST-14-10235-A was tested by Gas Chromatography/Mass Spectrometry for basic drugs and metabolites on 11/18/2014. The following result(s) was obtained:

**None detected**

ST-14-10235-A was tested by Gas Chromatography for acidic and neutral drugs on 12/03/2014. The following result(s) was obtained:

**None detected**

**ST-14-10235-C: Urine**

---



Request ID: ST-14-10235-0001

PCME 000013

**Exhibit E - Page 13**

| NO PROPERTY OR MONEY | Pierce County Medical Examiner's Office<br>Personal Property & Money Form | Page _____ of _____ |
|---|---|---|

Body Seal Tag #: _____    Date/Time: 10/30/14  1045    PCME Case #: 14 - 625

Name of Deceased: _Anton    Omelin_

Inventoried By (Primary): _MBaker_    _MBaker_
Print Name                    Signature

Inventoried By (Secondary): _KPhillips_    _KPhillips_
Print Name                    Signature

**Effects:**
A ☐ Wallet
B ☐ Social Security Card
C ☐ Identification x _____
D ☐ Watch
E ☐ Cell Phone
F ☐ Misc. Cards & Papers

**Money:**

☑ NONE

Currency & Coin Total: $ _____

Inventoried by (Primary): _____

Inventoried by (Secondary): _____

**Clothing:**

G ☐ Shirt  x _____
H ☐ Pants  x _____
I ☐ Sock Pair  x _____
J ☐ Coat x _____
K ☐ Hair Tie
L ☐ Sweater
M ☐ Sweatshirt

N ☐ Headwear
O ☐ Dress
P ☐ Underwear
Q ☐ Brassiere
R ☐ Skirt
S ☐ Shorts
T ☐ Pajamas

U ☐ Footwear
V ☐ Belt
W ☐ Camisole
X ☐ Onesie
Y ☐ Diaper
Z ☐ Eyeglasses

Other Effects or Clothing:
1) _Knit Wool Ring_    5) _____    9) _____
2) _Yellow Metal Ring_    6) _____    10) _____
3) _____    7) _____    11) _____
4) _____    8) _____    12) _____

**Disposition #1:** ☑ Funeral Home  ☐ Evidence  ☐ Unclaimed  ☐ Disposal  ☐ Retention  ☐ Other: _____  ☐ Agency: _____

Items released (List by Letter/Number): _KPhillips_    ☑ All of the above

Released by: _KPhillips_    _signature_    Date: _10/31/14_
Print Name                    Signature

Received by: _Ryan Turner_    _signature_    Time: _1015_
Print Name                    Signature

**Disposition #2:** ☐ Funeral Home  ☐ Evidence  ☐ Unclaimed  ☐ Disposal  ☐ Retention  ☐ Other: _____  ☐ Agency: _____

Items released (List by Letter/Number): _____    ☐ All items not in Disposition #1

Released by: _____    Date: _____
Print Name                    Signature

Received by: _____    Time: _____
Print Name                    Signature

**Disposition #3:** ☐ Funeral Home  ☐ Evidence  ☐ Unclaimed  ☐ Disposal  ☐ Retention  ☐ Other: _____  ☐ Agency: _____

Items released (List by Letter/Number): _____    ☐ All items not in Disposition #1 and #2

Released by: _____    Date: _____
Print Name                    Signature

Received by: _____    Time: _____
Print Name                    Signature

PCME's Copy –White                    Funeral Home's Copy—Yellow

PCME 000014

**Exhibit E - Page 14**




M.E.#: 14 1625

Name of Decedent: _____

Examined by: _____

Date: _____

PCME 000015

**Exhibit E - Page 15**

Pierce County Medical Examiner's Office
Authorization to Release Remains Form

PCME Office Case Number: _14-1625_

Name of decedent: _ANTON OMELIN_

Funeral home selected: _EDWARDS MEMORIAL_   Phone #: _566-1008_

Via another agency/company? _____   Phone #: _____
[If a transportation agent/company or other funeral home is to transport/receive the body (remains) for the selected funeral home,
confirm the transportation arrangements with the selected funeral home and record both the name of the selected funeral home and the
transportation agent/funeral home that will be receiving the body.]

Name of person selecting funeral home (print name): _DEMETRI IGANS_

Relationship to the decedent of person selecting funeral home: _FATHER-IN-LAW_

Date selection made: _10/30/14_   Time selection made: _12:45_

Name of M.E. staff recording selection: _BONNIE HARRIS_
                                          Print Name
____◄— Mark here if body is
being released on ROTATION    _Bonnie Harris_
(must have authorization from         Signature
Chief Investigator).

Date selected funeral home was notified that the body is ready for release: _10/31/14_

Time selected funeral home was notified that the body is ready for release: _9:00_

Funeral home notification contact person (print name): _CATHERINE_

Name of M.E. staff notifying funeral home: _Chris Whitweil_
                                             Print Name

                                           _Chris Whitweil_
                                             Signature

Medical Examiner staff member releasing the body (remains): I have directly examined the identification tag
on the body (remains), not just the label on the body bag and have verified/confirmed the identity of the body
(remains) being released. Body (remains) released by:

_____    _10/31/14_   _105_
     Print Name               Date        Time

_____
     Signature

Funeral home/transportation service receiving the body (remains): I have verified/confirmed the identity of
the body (remains) being received. Body (remains) received by:

_Ryan Turner_           _10/31/14_   _1031.5_
     Print Name               Date        Time

_____
     Signature

PIERCE COUNTY MEDICAL EXAMINER'S OFFICE
REPORT REQUEST LOG

CASE #: _14-1625_

| Date | Recipient | Initials |
|---|---|---|
| 1/23/15 | RELEASED INV, AUT, AND TOX REPORTS TO ANNA OMELIN, WIFE. | BV |
| 1/26/15 | MAILED THE ABOVE TO EVGENIYA NACCARATO, MOTHER. | BV |

PCME 000017

**Exhibit E - Page 17**

# EXHIBIT F

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

ANNA OMELIN, individually and as      )
an administrator of the Estate of     )
Anton Omelin, deceased,               )
                                      )
                Plaintiff,            )
                                      )
        vs.                           )  No. 3:17-cv-05837
                                      )
HANSEN BEVERAGE COMPANY d/b/a         )
MONSTER BEVERAGE CORPORATION, a       )
Delaware corporation, MONSTER         )
ENERGY COMPANY, a Delaware            )
corporation, RED BULL NORTH           )
AMERICA, INC., a California           )
corporation, and DOES 1-100,          )
inclusive,                            )
                                      )
                Defendants.           )


VIDEOTAPED DEPOSITION OF ANGELITO QUINTO

August 9, 2018

Seattle, Washington




Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square          2208 North 30th Street, Suite 202
600 University St.        Tacoma, WA 98403
Suite 2300                (253) 627-6401
Seattle, WA 98101         (253) 383-4884 Fax
(206) 340-1316            scheduling@byersanderson.com
(800) 649-2034            www.byersanderson.com


Serving Washington's Legal Community since 1980

```
 1                    APPEARANCES
 2  For the Plaintiff:
 3              Olga Efimova
                Cosmopolitan Legal PLLC
 4              155 108th Avenue NE
                Suite 210
 5              Bellevue, WA  98004
                425.296.8868
 6              Olgae@cosmopolitanlegal.com
 7  For Defendant Red Bull:
 8               Michael Ernest Williams
                Quinn Emanuel
 9              865 South Figueroa Street
                10th Floor
10              Los Angeles, CA  90017
                213.443.3251
11              Michaelwilliams@quinnemanuel.com
12              Kristin Carlson
                Red Bull Legal Counsel
13              1630 Stewart Street
                Santa Monica, CA  90404
14              310.460.4573
                kristin.carlson@redbull.com
15
    For Defendant Monster & Hansen Beverage Company:
16
                Marc P. Miles
17              Shook Hardy & Bacon LLP
                5 Park Plaza
18              Suite 1600
                Irvine, CA  92614-2546
19              949.475.1500
                Mmiles@shb.com
20
                Aaron Sonnhalter (via telephone)
21              Monster Vice President and Chief
                Litigation Counsel
22              1 Monster Way
                Corona Way, CA  92879
23              951.817.6064
                Aaron.sonnhalter@monsterenergy.com
24
25  Also present:  Ed Burke, Videographer
                   Anna Omelin
                   Anna Omelin
```

```
 1   A    I graduated from Washington State's Reserve Academy for--
 2        prior to me being hired on full time.
 3             I also-- right after reserve academy I got hired by
 4        Washington State by a jail, so I went through the
 5        Washington State Corrections Officer Academy.
 6             Then right after that I got hired as a full-time
 7        police officer, so I went back for Washington State's
 8        full-time Police Academy.
 9   Q    I would like to direct your attention to August 30th of
10        2014.
11             Do you recall responding to-- I'm sorry.
12             I would like to direct your attention to October
13        30th, 2014.
14             Do you recall responding to a home at 4219 69th
15        Avenue East on that morning?
16   A    I do.
17   Q    Other than what's contained in your report, which is part
18        of Exhibit No. 13, and we'll look at that, do you have
19        and recollection of the events of that morning?
20   A    Just vaguely.
21             I remember responding to the residence.
22             I remember walking into the bathroom and seeing a
23        male subject that had passed away.
24   Q    Okay.  Do you recall-- when you said you were responding
25        to the scene, do you recall what you were told in order
```

Page 9

```
1      to respond?
2   A  To my own recollection, no, I do not.
3          I do remember-- I don't know if it was-- prior to me
4      reading my report, I do remember the call being a death.
5   Q  Okay.
6   A  A death investigation is what we'd call it.
7   Q  Let me show you what's been previously marked as Exhibit
8      No. 13.
9          I notice that you also brought a copy of your
10     report.
11         Is that correct?
12  A  Yes, sir.
13  Q  And with the exception of there are some redactions in
14     Exhibit No. 13 for personal information, can you compare
15     Exhibit No. 13 to what you brought to see if the contents
16     are the same?
17  A  Yes.
18  Q  And I will represent to you that Exhibit No. 13 does not
19     contain photographs that may have been part of your other
20     report.  Those are separately identified.
21  A  Okay.
22  Q  Do you notice any differences between the two documents?
23  A  No, sir.
24  Q  So on Exhibit No. 13, if you look at the fourth page of
25     the document, there's an incident detail report.
```

1               Do you see that?

2    A    On the fourth page?

3    Q    Correct.

4    A    Okay.

5    Q    And on the fifth page there appears to be a signature

6         line with your name on it?

7    A    Yes, sir.

8    Q    Is that your signature?

9    A    It is.

10   Q    And did you prepare this incident detail report?

11   A    I did.

12   Q    And did you prepare it on October 30th, 2014, which is

13        the date that it was signed and printed?

14   A    Yes, that would mean that I prepared it that day.

15   Q    So looking at the incident detail report, it says, "On

16        October 30, 2014, at approximately 7:53 hours, I

17        responded to 4219 69th Avenue East at the request of

18        Tacoma fire department for a signal two."

19             Do you see that?

20   A    Yes, I do.

21   Q    And what is a signal two?

22   A    Basically that somebody has been found deceased.

23   Q    And when you said "at the request of Tacoma fire

24        department," did you actually-- did you get a call on

25        your radio, from the fire department, to respond?

```
 1      STATE OF WASHINGTON )    I, Terilynn Simons, CCR, RMR, CRR
                            ) ss a certified court reporter
 2      County of Pierce    )    in the State of Washington, do
                                 hereby certify:
 3

 4
            That the foregoing deposition of ANGELITO QUINTO was
 5      taken before me and completed on August 9, 2018, and
        thereafter was transcribed under my direction; that the
 6      deposition is a full, true and complete transcript of the
        testimony of said witness, including all questions, answers,
 7      objections, motions and exceptions;

 8          That the witness, before examination, was by me duly
        sworn to testify the truth, the whole truth, and nothing but
 9      the truth, and that the witness waived the right of
        signature;
10
            That I am not a relative, employee, attorney or counsel
11      of any party to this action or relative or employee of any
        such attorney or counsel and that I am not financially
12      interested in the said action or the outcome thereof;

13          That I am herewith securely sealing the said deposition
        and promptly delivering the same to Michael Ernest Williams.
14
            IN WITNESS WHEREOF, I have hereunto set my signature on
15      the 13th day of June, 2018.

16

17

18

19                                  _____
                                    Terilynn Simons, CCR, RMR, CRR
20                                  Certified Court Reporter No. 2047
                                    (Certification expires 07/07/19.
21

22

23

24

25
```

# EXHIBIT G

# Fife Police Department

**Incident Detail Report**

**Printed On: Thu, Oct 30, 2014**

| | | | | |
|---|---|---|---|---|
| *Case Number:* 2014003762 | *NCIC:* WA0270700 | *Status:* CAD Import | | *Status By:* - |
| *Juvenile:* No   *Protected:* No | *Case Hold:* No | *Additional Reports:* No | | *Status Date Time:* 10/30/2014 10:28 |

## Call For Service

*Date Reported:* 10/30/2014 Thursday   07:54   *Date Committed Start:* 10/30/2014 07:54   *Date Committed End:*
*Received By:* 235 - Woolcott, Koleen   *How Received:* CAD
*Description:* DEATH INVESTIGATION
*Event Type:*                                                                                   *CAD Seq Nbr:* FPD:2014:10:30:0
*Case Status:*                                            *Case Disposition:*                   *CAD Agency:* FIFE PD

## Scene

| | | |
|---|---|---|
| *Location:* | | |
| *Business Name:* | | |
| *Low House Nbr:* | *High House Nbr:* | *Community Code:* |
| *Street:* | | |
| *Unit Nbr/Type:* | *Intersection Street:* | |
| *City/State/Zip:* | *Address:* | |
| *LGN:* | *GEO Code:* | *Weather Conditions:* |

## Officer Information

| Officer | Dt/Tm Dispatched | Dt/Tm Assigned | Dt/Tm Arrived | Dt/Tm Cleared | Role |
|---|---|---|---|---|---|
| 218 - Quinto, Angelito | 10/30/2014 07:56 | | 10/30/2014 08:01 | 10/30/2014 10:24 | Patrol |
| S2 - Thompson, Tom | 10/30/2014 08:04 | | 10/30/2014 08:17 | 10/30/2014 10:23 | |
| D238 - | 10/30/2014 08:17 | | 10/30/2014 08:17 | 10/30/2014 10:24 | |
| D250 - | 10/30/2014 08:17 | | 10/30/2014 08:17 | 10/30/2014 10:23 | |
| S4 - Gardner, Aaron | 10/30/2014 08:40 | | 10/30/2014 08:46 | 10/30/2014 08:58 | |

Exhibit No.
13

P. Schwan
8/07/2018

*Officers Signature*
*Date:* Thursday, October 30,
*NCIC:* WA0270700
*Case Nbr:* 2014003762

Licensed to Fife Police Department

Page 1   of   5

# Fife Police Department
### Case Number 2014003762 (WA0270700)

**Incident Detail Report**

**Printed On: Thu, Oct 30, 2014**



## Offense Detail

*ISN:* 01  *Offense Code:* 105  *Literal:* Death Investigation
*Statute:*  *Status:* Pending  *Status Date:* 10/30/2014  *Criminal Activity:*
*Counts:*  *Larceny Type:*  *Campus Code:*  *Offense Level:*
*CAD Offense Code:*  *CAD Literal:* DEATH INVESTIGATION

*Remark:*  *CAD Disposition:* CLEAR
*Disposition:*

*DVI:* No  *DV Referrals:*
*Premises:*
*Location Type:* Residence/Home(includes  *Method of Entry:* Non-Forced
*Type of Weapon / Force:* apartment,condominium, and nursing home)  *Attempted/Completed* Completed
*Type of Criminal Activity:*
*Bias Motivation:* None (no bias)
*Offender Suspected of Using:* Not Applicable

## Associations



*Name:* Omelin, Anton  *Driver License:* OMELIA*116DD  **Victim**
*Role:* Victim  *Resident:*
*Phone:* (253)  *DOB:* 1989  *Age (Range):* 25  *Organization Type:*
*Address:*  *LGN:*
*Sex:* Male  *Race:* White  *Disability:*
*Eye Color:* Brown  *Hair Color:* Brown  *Height:* 5'09"  *Weight:* 165 lbs.

*Name:* Igans, Alla  *Driver License:* IGANSA*375QF
*Role:* Mentioned In Report  *Resident:*
*Phone:* (206)384-2777  *DOB:* 1963  *Age (Range):* 50  *Organization Type:*
*Address:* 6601 Park Street East, Fife, WA 98424  *LGN:*
*Sex:* Female  *Race:* White  *Disability:*
*Eye Color:* Blue  *Hair Color:* Gray  *Height:* 5'03"  *Weight:* 140 lbs.

*Name:* Igans, Dmitriy Nikolayevich  *Driver License:* IGANSDN480CQ
*Role:* Mentioned In Report  *Resident:*
*Phone:* (206)384-2777  *DOB:* 1952  *Age (Range):* 62  *Organization Type:*
*Address:* 6601 Park Street East, Fife, WA 98424  *LGN:*
*Sex:* Male  *Race:* White  *Disability:*
*Eye Color:* Brown  *Hair Color:* Gray  *Height:* 6'00"  *Weight:* 200 lbs.

*Name:* Omelin, Anna  *Driver License:* OMELIA*162CM
*Role:* Mentioned In Report  *Resident:*
*Phone:* (425)919-7565  *DOB:* 1984  *Age (Range):* 30  *Organization Type:*
*Address:*  *LGN:*
*Sex:* Female  *Race:* White  *Disability:*
*Eye Color:* Blue  *Hair Color:* Brown  *Height:* 5'04"  *Weight:* 115 lbs.

## Case Property Items:

PRR Efimova 2-13-18 (14-1625) - Page 000002

**Exhibit G - Page 2**

**Fife Police Department**
Case Number 2014003762 (WA0270700)

**Incident Detail Report**                                    **Printed On: Thu, Oct 30, 2014**

**State Property**

| ISN | TSN | PTC | Property Type Description | Date Stolen | Stolen Value | Date Recovered | Recov Value | Recov Cd |
|-----|-----|-----|--------------------------|-------------|--------------|----------------|-------------|----------|

**Citations**

| Citation Number | Date | Time | Last |
|-----------------|------|------|------|

**Vehicles**

**Related Records**

| Primary | Record Module | Record Number | NCIC | Contact Officer |
|---------|---------------|---------------|------|-----------------|

**Canine**

**Media**

| Date | Identification | Narrative |
|------|----------------|-----------|

**Synopsis**

Responded to a signal 2 at a local residence.  Investigated and general report done.

**Fife Police Department**
Case Number 2014003762 (WA0270700)

Incident Detail Report

Printed On: Thu, Oct 30, 2014

*Narrative*

On 10/30/2014 at approximately 0753 hours, I responded to 4219 69th Ave E at the request of Tacoma Fire Department for a signal 2. Fife Dispatch advised detectives were enroute as well to conduct the death investigation.

On arrival, I was contacted by Tacoma Fire and advised of a 25 year old male, later identified as Anton Omelin, DOB ████ 1989, was found deceased in the bathroom by his wife. Omelin's wife was identified as Anna Omelin, DOB ████ 1984. I was advised that rigor and lividity had both set in and Omelin had passed away sometime during the night.

I entered the residence and spoke with Omelin's father - in- law, identified as Dmitriy N. Igans, DOB ████ 1952. Due to a language barrier, I conducted most of my interview with Igans, as he was able to translate for his daughter, Omelin's wife. Igans proceeded to tell me what Anna Omelin told him regarding her husband's death.

According to Igan, Anna Omelin gave birth to their newborn son approximately 3 weeks ago. Igan said Anton Omelin asked his wife to have sex with him last night sometime around 2300 hours the evening prior. Igan said Anna Omelin refused due to the birth a few weeks ago, putting the baby to bed and then going to sleep herself. Igan said Anna Omelin heard Anton Omelin in their bathroom sometime during the night but did not know what time that was.

Anna said she woke up sometime between 0600 and 0700 hours this morning to feed their newborn, partially falling asleep while feeding the baby. Anna said she heard what sounded like water running in their bathroom so she went to check on it. Anna said that was when she discovered her husband, Anton, laying on the floor. Igan said upon discovering Anton laying on the ground, Anna immediately called Igan, saying something was wrong with Anton and requested he come over to the house. Igan advised he and his wife, who live in Radiance, immediately responded to Anna's residence. Igan said while they were enroute, he called 911, requesting medical aid. Igan said once he arrived at Anna's residence, he went to the bathroom and saw Anton laying on the floor.

I proceeded to walk up to the upstairs bathroom where Anton was located. I saw Anton laying on his right side approximately 4 feet away from the bathroom sink. While looking through the bathroom, I noticed what appeared to be vomit in the bathroom sink and counter, along with vomit on the floor next to the toilet. I did not observe anything suspicious or out of place in the bathroom or any marks of signs of injury on Anton. I cleared the bathroom and waited for detectives to arrive.

A short time later, Detective Sergeant Thompson, Detectives Gow and Nolta arrived on scene. After providing them with the information I had, they proceeded to the bathroom to begin their investigation.

I continued speaking with Igan, who advised he was the owner of a food import / export business and Anton was his general manager. According to Igan, Anton had been working up to 18 hours a day, consuming large amounts of coffee and Red Bull in addition to smoking Marlboro reds heavily.

The Pierce County Medical Examiner arrived on scene, conducted a preliminary investigation of the death, interviewed Anna Omelin, and ultimately taking possession of Anton Omelin's body.

I request this report be forwarded to Investigations for review and possible follow up.

**Fife Police Department**
Case Number 2014003762 (WA0270700)

**Incident Detail Report**                                    Printed On: Thu, Oct 30, 2014

*Narrative*

i certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true
and correct. (RCW 9A.72.085)

| Ofc. A. Quinto | 218 | Fife Police Department |
|---|---|---|
| Officer Signature | Badge # | Agency |

| Fife Police Department | 10/30/2014 |
|---|---|
| Place Signed | Date Signed |

**Case Supplemental Information**

2014003762 002 Sup Supplemental - Nolta

Printed On: Tuesday, November 11, 2014

_Narrative_

On October 30 at approximately 0820 hours I responded along with Det Sgt Thompson and Det Gow on a reported death investigation at a residence. When we arrived, Ofc Quinto advised us that the victim, Anton OMELIN had reportedly gotten up out of bed to use the bathroom early in the morning, and that later when his wife, Anna OMELIN, got out of bed, she discovered him deceased on the bathroom floor.

I then entered the residence and was directed to the upstairs master bedroom. The home appeared to be orderly and well maintained. The master bedroom has an attached bathroom with the only entrance through the bedroom. I observed the victim lying nude on the bathroom floor on his right side with his right arm under his head. I observed lividity on the front of the victim's trunk and legs, with apparent blanched white pressure areas on his stomach and front of the right thigh, indicating that he had been moved from his original position. I did not observe any signs of injury or violence to the body other than a very small abrasion on the upper/mid back. I took digital photos for documentation.

I observed what appeared to be vomit in one of the two sinks, a small amount of vomit on the floor in front of the toilet, and fecal matter and toilet paper in the toilet bowl. The victim's wife had reported hearing the victim running water in the tub after he had gone into the bathroom and I observed that the tub was wet, but empty. I did not observe any weapons, drugs or medication in the bathroom and nothing appeared out of the ordinary or suspicious. It appeared likely to me that the death was of natural or unknown causes.

The Medical Examiner's Office investigator arrived and examined the victim, then took custody of the body and transported him to the Medical Examiner's Office.

On November 6 I spoke with PCME Investigator Ryann Thill, who advised me that nothing suspicious had been found during the autopsy and there were no signs of injury. The cause of death is currently listed as unknown and they are awaiting the toxicology results.

Due to there being no apparent criminal aspects to this death, I recommend it be returned to file.

I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. (RCW 9A.72.085)

| | | |
|---|---|---|
| Det. J. Nolta | 238 | Fife Police Department |
| Officer Signature | Badge # | Agency |
| Fife, WA | 111114 | |
| Place Signed | Date Signed | |

Licensed to Fife Police Department

Page 1   of   1

**2014003762 001 Sup Supplemental**

**Case Supplemental Information**

**Printed On: Friday, October 31, 2014**

*Narrative*

On 10/31/2015, at approximately 0830 hours I received a phone call from Michael NACCARATO. NACCARATO expressed being the step-father of Anton OMELIN, subject found deceased in his apartment the previous day. NACCARATO wanted to express his concern of possible food poisoning of his son, due to vomit on the floor next to him at the time he was located, and an opened can of meat from Russia. NACCARATO was advised to contact the Pierce County Medical examiner regarding his concerns.

I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. (RCW 9A.72.085)

Sgt. P. Schwan _ErisKwan_ 251                     Fife Police Department
Officer Signature                  Badge #                        Agency

Fife, Washington
Place Signed                              10/31/2014
                                          Date Signed

**2014003762 003 Sup Supplemental - Nolta**

**Case Supplemental Information**

Printed On: **Wednesday, January 28, 2015**

*Narrative*

On January 28, 2015 I received a copy of the Medical Examiner's autopsy report. The report indicated that the cause of death was due to aspiration of gastric contents with alcohol intoxication as a significant contributing factor. The death was ruled to be accidental.

Case to be closed.

I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. (RCW 9A.72.085)

| | | |
|---|---|---|
| Det. J. Nolta | 238 | Fife Police Department |
| Officer Signature | Badge # | Agency |
| Fife, WA | | 012815 |
| Place Signed | | Date Signed |

# EXHIBIT H





Exhibit No.
12
A. Omelin
8/06/2018

**Exhibit H - Page 1**





**Exhibit H - Page 2**

OMFLIN 000483





**Exhibit H - Page 3**

OMELIN 000494





OMELIN 000495





**Exhibit H - Page 5**

OMELIN 000498





**Exhibit H - Page 6**

OMELIN 000497





**Exhibit H - Page 7**

OMEI IN 000488





**Exhibit H - Page 8**

OMELIN 000499





OMFI IN 000500



PCME 000020

**Exhibit H - Page 10**



PCME 000026

**Exhibit H - Page 11**

PCME 000028

**Exhibit H - Page 12**



PCME 000030

**Exhibit H - Page 13**



PGME 000032

**Exhibit H - Page 14**



PCME 000034

**Exhibit H - Page 15**



PCME 000040

**Exhibit H - Page 17**

# EXHIBIT I

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | |
|---|---|
| ANNA OMELIN, individually and as an administrator of the Estate of Anton Omelin, deceased,<br><br>                    Plaintiff,<br><br>          vs.<br><br>HANSEN BEVERAGE COMPANY d/b/a MONSTER BEVERAGE CORPORATION, a Delaware corporation, MONSTER ENERGY COMPANY, a Delaware corporation, RED BULL NORTH AMERICA, INC., a California corporation, and DOES 1-100, inclusive,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 3:17-cv-05837<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

VIDEOTAPED DEPOSITION OF MICHAEL J. NACCARATO

August 10, 2018

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

| | |
|---|---|
| One Union Square | 2208 North 30th Street, Suite 202 |
| 600 University St. | Tacoma, WA 98403 |
| Suite 2300 | (253) 627-6401 |
| Seattle, WA 98101 | (253) 383-4884 Fax |
| (206) 340-1316 | scheduling@byersanderson.com |
| (800) 649-2034 | www.byersanderson.com |

Serving Washington's Legal Community since 1980

```
 1                    APPEARANCES
 2   For the Plaintiff:
 3              Olga Efimova
               Cosmopolitan Legal PLLC
 4             155 108th Avenue NE
               Suite 210
 5             Bellevue, WA  98004
               425.296.8868
 6             Olgae@cosmopolitanlegal.com
 7   For Defendant Red Bull:
 8              Michael Ernest Williams
               Quinn Emanuel
 9             865 South Figueroa Street
               10th Floor
10             Los Angeles, CA  90017
               213.443.3251
11             Michaelwilliams@quinnemanuel.com
12             Kristin Carlson
               Red Bull Legal Counsel
13             1630 Stewart Street
               Santa Monica, CA  90404
14             310.460.4573
               kristin.carlson@redbull.com
15
     For Defendant Monster & Hansen Beverage Company:
16
               Marc P. Miles
17             Shook Hardy & Bacon LLP
               5 Park Plaza
18             Suite 1600
               Irvine, CA  92614-2546
19             949.475.1500
               Mmiles@shb.com
20
               Aaron Sonnhalter (via telephone)
21             Monster Vice President and Chief
               Litigation Counsel
22             1 Monster Way
               Corona Way, CA  92879
23             951.817.6064
               Aaron.sonnhalter@monsterenergy.com
24
25   Also present:  Ed Burke, Videographer
                    Anna Omelin
                    Anna Omelin
```

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

1     told you that.  You are putting that together based upon

2     the events--

3  A  **I was told that he was upstairs on the second floor**

4     **working, yeah.**

5  Q  And who do you recall telling you that?

6  A  **I think that was Dima or Anna saying-- or through a**

7     **translating, saying he was working.**

8        **I mean, it was his normal thing that he worked**

9     **late.**

10       **He had an office up on the second floor, so**

11    **that's-- it was normal that he was working late, yeah.**

12 Q  Did either of them, Dima or Anna, tell you how they knew

13    he was upstairs working at the time?

14 A  **How they knew?  No.  No, I don't-- they didn't.**

15 Q  Now, is there-- in the bathroom is there a window next

16    to the bathtub?

17 A  **I believe so.  I believe so.**

18 Q  And that was right above where you recall seeing the

19    vomit?

20 A  **Yeah, yes.**

21 Q  Now, turning back to the can of meat, where did you find

22    it?

23       Let me rephrase it.

24       Did you actually see the can of meat?

25 A  **I think I asked what he ate, and then they just showed**

**Michael J. Naccarato**
**August 10, 2018**
**Exhibit I - Page 3**

1    me the can of what he ate, that he had something like

2    spaghetti and something like that or I may have seen it,

3    but I think I asked what he had eaten, and it was

4    spaghetti with some meat, so--

5  Q  The can that you saw, was it already open?

6  A  The can that I saw was open, yes.

7  Q  Was there any meat left in it?

8  A  I think it was empty, so--

9  Q  Did you see another can like that in the house?

10 A  There were more cans in the cupboard, yes.

11 Q  Had you ever seen Anton eat that kind of meat before?

12 A  I had not.  I had not.

13      It was a product that they carried in their store,

14   so--

15 Q  Did anyone tell you whether anyone else had eaten the

16   same meat that Anton ate?

17 A  No, they did not.  I don't remember.

18 Q  Do you recall asking if anyone else had eaten it?

19 A  I don't remember.  I don't remember.

20 Q  Did you see anything else in the kitchen that you

21   recall, in terms of either alcohol or energy drinks or

22   anything like that?

23 A  I don't recall seeing anything else, no.

24 Q  You said you saw a couple beer bottles?

25 A  Mm-hm.

Page 40

1    Q    Sorry, "yes"?

2    A    Yes.

3    Q    And where were they?

4    A    I'm thinking they were Heineken, but they may have been

5         in the garbage or on the counter.   That's what I

6         remember.

7              Empty, yeah.

8    Q    Do you recall how many?

9    A    I just remember, in my-- what I can see now, looking

10        back, just a couple, so I don't remember a whole bunch.

11   Q    Two, three--

12   A    Two-- I remember two.

13   Q    Okay.  What, if anything, did you do with the can of

14        meat at that point?

15             Did you take it with you or--

16   A    Honestly, at this point, I don't remember.

17             I think-- I mean, I think that what I did was I

18        called, and when I talked to the people involved, they

19        said, "Well, we are going to pump his stomach, so we are

20        going to look at what's in his stomach, and if it's

21        botulism-- if it's something, we are going to find it,"

22        but I don't remember what we did with the can.

23             I don't remember if we set it aside or-- I don't

24        remember.

25             I know I got some answers that it was kind of like,

```
 1        "It's okay.  Thanks for the information.  We are looking
 2     into this.  We are going to investigate," and that was
 3     kind of the end of it.
 4         I mean, it wasn't a big deal.  They didn't treat it
 5     like that.
 6  Q  Who do you recall speaking to about this can of meat
 7     that you found?
 8  A  I think I called and talked to a detective, and then
 9     eventually we did meet face-to-face with the Pierce
10     County medical examiner, and that's when we learned that
11     it was not food poisoning.
12  Q  And when you said you believe you spoke to a detective,
13     was that someone at the Fife police department?
14  A  I believe so, yeah.
15        It was whoever-- yeah, it was who had jurisdiction.
16     I think that was Fife.
17  Q  Do you recall if it was a female officer?
18  A  I would-- I would recall that it was-- I thought it was
19     a male, but that's what I remember.
20  Q  And do you recall what you told them?
21  A  I do not recall exactly what I told them, no.
22  Q  Did it relate to the can of meat and possible food
23     poisoning?
24  A  It may have.  I mean, it may have.
25        We were concerned about anything.  I mean, "What
```

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1  A   We would have walked through the bedroom to get to the

2      bathroom, yes.

3  Q   And you were also downstairs on the first floor?

4  A   Yes.

5  Q   And in the kitchen as well?

6  A   Yes.

7  Q   And in the living room?

8  A   Yeah.  The living room and kitchen are right next to one

9      another, yes.

10 Q   At any point in time when you were at Anton's house

11     after his passing, did you see any cans of Monster

12     Energy Drink either opened or closed?

13 A   At any point after?

14 Q   That day.

15 A   That day, I do not remember seeing any cans of energy

16     drinks, but, again, that day was a blur, and that wasn't

17     a focus.

18 Q   The day of Anton's passing, when you were at his house,

19     did you see any cans of NOS Energy Drink either opened

20     or closed?

21 A   I saw-- I remember seeing-- I mean, I-- that day is a

22     blur, mostly from just shock, so I don't remember seeing

23     anything much else than we saw the vomit on the floor

24     and a couple of bottles of alcohol, and that's what I

25     remember seeing.

Michael J. Naccarato
August 10, 2018
**Exhibit I - Page 7**

```
 1          Beyond that, it might have been there, but I do not
 2      remember looking for them.
 3          I didn't go-- I don't remember.
 4   Q  And when you say "a couple bottles of alcohol," you mean
 5      beer bottles?
 6   A  Beer bottles of Heineken, from what I remember.
 7   Q  Do you recall seeing any bottles of cognac in the house
 8      on the day of his passing?
 9   A  I don't remember seeing bottles of cognac.
10   Q  Earlier you testified that you believe that when Anton
11      was vomiting, he was on the second floor alone.
12          Do you remember that?
13   A  Yeah.
14   Q  And I think you said that he was there because he was
15      working, right?
16   A  His office was on the same floor and his bedroom was on
17      the same floor and the bathroom was on the second floor
18      of the house, yes.
19   Q  Is it fair to say that you did not see him working on
20      the second floor the night before his death?
21   A  That is correct, I was not there.  I was not at the
22      house.
23   Q  And it was your understanding that Artem was on the
24      third floor?
25   A  It is my understanding, yes.
```

1   Q   And it was your understanding that Anna and the baby and

2       their middle child were on the first floor?

3   A   **Yeah, that's what I was-- that's what we were told,**

4       **yeah.**

5   Q   So if you were not there, Artem is on the third floor,

6       everyone else is on the first floor, what leads you to

7       believe that he was working on the second floor?

8   A   **Because of the fact that he was up working pretty much**

9       **every night.**

10          **I mean, that was his normal routine, to be working**

11      **on the computer, so--**

12  Q   And how do you know that?

13  A   **I mean, that's just-- he was working on all his**

14      **projects, trying to get them done, working incredibly**

15      **long hours, just from talking to him, yeah.**

16  Q   You had a general understanding that he worked at night?

17  A   **General understanding, correct.**

18  Q   Is it fair to say that you do not have any personal

19      knowledge about what he was doing the night before his

20      passing?

21  A   **That is correct, I was not there and did not talk to him**

22      **the night of his death.**

23  Q   And is it fair to say that you have not spoken to

24      anybody who saw him working on the second floor the

25      night prior to his death?

```
 1      STATE OF WASHINGTON )     I, Terilynn Simons, CCR, RMR, CRR
                            ) ss a certified court reporter
 2      County of Pierce    )     in the State of Washington, do
                                  hereby certify:
 3


 4

            That the foregoing deposition of MICHAEL J. NACCARATO
 5      was taken before me and completed on August 10, 2018, and
        thereafter was transcribed under my direction; that the
 6      deposition is a full, true and complete transcript of the
        testimony of said witness, including all questions, answers,
 7      objections, motions and exceptions;

 8          That the witness, before examination, was by me duly
        sworn to testify the truth, the whole truth, and nothing but
 9      the truth, and that the witness waived the right of
        signature;
10
            That I am not a relative, employee, attorney or counsel
11      of any party to this action or relative or employee of any
        such attorney or counsel and that I am not financially
12      interested in the said action or the outcome thereof;

13          That I am herewith securely sealing the said deposition
        and promptly delivering the same to Michael Ernest Williams.
14
            IN WITNESS WHEREOF, I have hereunto set my signature on
15      the 13th day of August, 2018.

16

17

18

19
                                Terilynn Simons, CCR, RMR, CRR
20                              Certified Court Reporter No. 2047
                                (Certification expires 07/07/19.
21

22

23

24

25
```

# EXHIBIT J



**Pierce County**

**Medical Examiner's Office**

3619 Pacific Avenue
Tacoma, Washington 98418
(253) 798-6494 • FAX (253) 798-2893

**THOMAS B. CLARK III, MD**
Medical Examiner

**J. MATTHEW LACY, MD**
Associate Medical Examiner

**SHARON R. JOHNSON**
Medical Examiner Services Manager

## POSTMORTEM EXAMINATION REPORT

| | |
|---|---|
| MEDICAL EXAMINER CASE #: | **14-1625** |
| NAME OF DECEASED: | **Anton Omelin** |
| DATE OF EXAMINATION: | **October 30, 2014** |
| LAW ENFORCEMENT AGENCY AND CASE#: | **Fife Police Department  2014-03762** |
| CAUSE OF DEATH: | **Aspiration of gastric contents** |
| OTHER SIGNIFICANT CONDITIONS: | **Alcohol intoxication** |
| MANNER OF DEATH: | **Accident** |



Exhibit No. 16

T. Clark
8/08/2018

14-1625
**ANTON OMELIN**

**FINAL DIAGNOSES:**

Aspiration of gastric contents.
Fatty change of the liver, mild.

**OPINION:**

This 25-year-old man was found dead on his bathroom floor.  According to his family, he had
not seen a physician in at least 4 years.

Autopsy examination does not show evidence of injury.  Anatomic findings include aspiration of
gastric contents and fatty change of the liver.  Toxicology testing shows an ethanol concentration
of 0.095 g/100mL, indicating that the decedent was intoxicated at the time of death.

Death is most likely due to aspiration of gastric contents.  Alcohol intoxication is a significant
contributing condition.

_____
Thomas B. Clark, III, M.D.
Medical Examiner

07 Jan 15
Date

PIERCE COUNTY
CERTIFIED COPY
CONFIDENTIAL
INFORMATION
PER RCW 68.50.105
MEDICAL EXAMINER

2

14-1625
ANTON OMELIN

**External Examination:**

The decedent is received in body bag unclothed. The body is that of an adequately nourished male who is 70 inches tall and weighs 165 pounds. The hair is brown. The eyes are brown. The teeth are natural. Rigor is complete. Livor is purple and posterior. The body is cold. There is a gold-colored ring on the fourth finger of the left hand. There is a silver-colored ring on the fourth finger of the right hand.

**Injuries:**

There is an indistinct rectangular abrasion in the mid-right back. There is no significant evidence of injury.

**Internal Examination:**

**Body Cavities:**

The serosal surfaces are smooth and glistening. There is no unusual accumulation of blood or fluid.

**Head:**

The scalp does not have evidence of injury. The skull is intact. The brain weighs 1540 grams. The meninges are thin and delicate, with no evidence of inflammation or hemorrhage. There is no cerebrovascular disease. There is no evidence of injury to the external surface of the brain. Serial sections of brain do not show focal lesions.

**Neck:**

The hyoid bone is intact. The larynx is clear. The thyroid gland is of the usual size and configuration. There is no hemorrhage of the strap muscles.

**Cardiovascular System:**

The heart weighs 300 grams. The coronary arteries arise in the usual locations, are widely patent, and do not have significant atherosclerotic disease. Serial sections of myocardium do not show evidence of acute nor old infarction. The valves are normally formed. The descending aorta is intact and does not have significant atherosclerotic disease.

**Respiratory System:**

The right lung weighs 640 grams, left lung 570 grams. The lungs are normally formed and do not have focal lesions. There is no evidence of consolidation.

3



14-1625
**ANTON OMELIN**

**Liver, Gallbladder, Pancreas:**

The liver weighs 1900 grams. The liver is of the usual color and consistency. Serial sections do not show focal lesions. The gallbladder contains liquid green bile. The pancreas is unremarkable.

**Spleen and Lymph Nodes:**

The spleen weighs 200 grams and is unremarkable. There are no prominent lymph nodes.

**Genitourinary System:**

The right kidney weighs 150 grams, left kidney 150 grams. The kidneys are normally formed and do not have focal lesions. The bladder contains 6 cubic centimeters of urine. The prostate is unremarkable.

**Endocrine System:**

The adrenal glands are unremarkable. There is no evidence of hemorrhage.

**Digestive System:**

The gastrointestinal tract is intact. The stomach contains 200 cubic centimeters of partially digested food. An appendix is present and unremarkable. There is no evidence of bowel infarction.

**Musculoskeletal System:**

Intact.

**Histopathology:** Sections are submitted for microscopic analysis. Block A contains heart and right lung. Block B contains left lung and liver. Block C contains kidney and brain.

**Toxicology:** Specimens are submitted for toxicologic analysis.

**MICROSCOPIC EXAMINATION:**

**Heart:** There is no evidence of acute nor old infarction. There is no significant inflammation.

**Lung:** Sections of each lung show aspiration of foreign material into the periphery, with extensive associated intra-alveolar hemorrhage.

**Liver:** There is a mild degree of fatty change.

**Kidney:** No pathologic diagnosis.

4

14-1625
ANTON OMELIN

**Brain:** No pathologic diagnosis.

TBC:bh
Dictated:       10/30/14
Transcribed:   10/31/14
Finalized:     12/26/14

**RETENTION:**

Blood, body fluids, tissues, and physical/trace materials that may be collected (the exact samples vary by case)
during the examination are routinely held in accordance with our retention policy prior to biohazard disposal, unless
transferred to a laboratory or other agency by the Medical Examiner's Office, or otherwise released by special
arrangement.

5



**TOXICOLOGY LABORATORY**

**WASHINGTON STATE PATROL**

2203 Airport Way South Suite 360 Seattle, WA 98134

(206) 262-6100  FAX No. (206) 262-6145

**TOXICOLOGY REPORT**

| | |
|---|---|
| **Attention:** | Dr. Thomas B. Clark III |
| **Agency:** | Pierce Co Medical Examiner |
| **Address:** | 3619 Pacific Ave<br>Tacoma, WA 98418-7929 |

**Tox Case #:** ST-14-10235    **Case Type:** Death Investigation    **Report Date:** 12/19/2014

| | | | |
|---|---|---|---|
| **Agency Case #:** | 14-1625 | **Subject Name:** | Anton Omelin |

**Evidence:** The following evidence was submitted to the Laboratory by Jennifer Phillips of the Pierce Co Medical Examiner on 11/6/2014 via USPS-1st Class Mail:

    (1)  ST-14-10235-A: VGray, Blood - Peripheral

    (2)  ST-14-10235-B: VGray, Blood - Peripheral

    (3)  ST-14-10235-C: VRed, Urine

## Volatile Analysis Results:

**ST-14-10235-A: Blood - Peripheral**

ST-14-10235-A was tested by Headspace - Gas Chromatography for the presence of acetone, ethanol, isopropanol, and methanol on the date(s) indicated below. The following average result was obtained:

**Ethanol**    0.095 ± 0.0078 g/100mL (k=3, 99.7% confidence level)    11/13/14, 11/14/14

## Drug Analysis Results:

**ST-14-10235-A: Blood - Peripheral**

ST-14-10235-A was tested by Enzyme Multiplied Immunoassay Technique (EMIT) for the presence of amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine metabolite, methadone, opiates, phencyclidine (PCP), and tricyclic antidepressants on 11/17/2014. The following result(s) was obtained:

**None Detected**

ST-14-10235-A was tested by Gas Chromatography/Mass Spectrometry for basic drugs and metabolites on 11/18/2014. The following result(s) was obtained:

**None detected**

ST-14-10235-A was tested by Gas Chromatography for acidic and neutral drugs on 12/03/2014. The following result(s) was obtained:

**None detected**

**ST-14-10235-C: Urine**

---



Request ID: ST-14-10235-0001

ST-14-10235-C was tested by Enzyme Multiplied Immunoassay Technique (EMIT) for the presence of amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine metabolite, methadone, opiates, phencyclidine (PCP), and tricyclic antidepressants on 11/13/2014. The following result(s) was obtained:

**None Detected**

ST-14-10235-C was tested by Semi-Quantitative Visual Reagent Strip, Bayer Ketodiastix for the presence of glucose and ketones on 11/13/2014. The following result(s) was obtained:

**None Detected**

ST-14-10235-C was tested by Spectrophotometry for the presence of acetaminophen and salicylates on 11/13/2014. The following result(s) was obtained:

**None Detected**

## COMMENTS

*All testing was performed by the Forensic Scientist listed below except as otherwise indicated. The Forensic Scientist has technically reviewed all relevant pages of testing documentation in the case record.*

**Examined by:**

Rebecca Flaherty, MSFS
Forensic Scientist 3

Date: 12 / 19 / 2014

**Reviewed by:**

Reviewer
Date: 12 / 22 / 14

RECEIVED

DEC 26 2014

BY:

# EXHIBIT K

**STATE OF WASHINGTON**
**DEPARTMENT OF HEALTH**

**CERTIFICATE OF DEATH**

CERTIFICATE NUMBER: 2014-024868

DATE ISSUED: 12/05/2017
FEE NUMBER: 73635977

FIRST AND MIDDLE NAME(S): ANTON
LAST NAME(S): OMELIN

COUNTY OF DEATH: PIERCE
DATE OF DEATH: OCTOBER 30, 2014
HOUR OF DEATH: UNKNOWN
SEX: MALE                         AGE: 25 YEARS
SOCIAL SECURITY NUMBER: 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

PLACE OF DEATH: HOME
FACILITY OR ADDRESS: 4219 69TH AVE E
CITY, STATE, ZIP: FIFE, WASHINGTON 98424

RESIDENCE STREET: 4219 69TH AVE E
CITY, STATE, ZIP: TACOMA, WA 98424
INSIDE CITY LIMITS: YES          COUNTY: PIERCE
TRIBAL RESERVATION: NOT APPLICABLE
LENGTH OF TIME AT RESIDENCE: 1 YEAR

HISPANIC ORIGIN: NO, NOT SPANISH/HISPANIC/LATINO
RACE: WHITE

BIRTH DATE: MARCH 04, 1989
BIRTHPLACE: SYKTYVKAR RUSSIA

FATHER/PARENT: PAVEL OMELIN
MOTHER/PARENT: EVGENIYA CHERNOVA

MARITAL STATUS: MARRIED
SPOUSE: ANNA SHIPILOVA

METHOD OF DISPOSITION: BURIAL
PLACE OF DISPOSITION: CALVARY CEMETERY

OCCUPATION: DISTRIBUTOR
INDUSTRY: WHOLESALE
EDUCATION: SOME COLLEGE CREDIT, BUT NO DEGREE
US ARMED FORCES: NO

CITY, STATE: TACOMA, WASHINGTON
DISPOSITION DATE: NOVEMBER 06, 2014

FUNERAL FACILITY: EDWARDS MEMORIAL CENTER

INFORMANT: EVGENIYA NACCARATO
RELATIONSHIP: MOTHER
ADDRESS: PO BOX 59974, RENTON, WA 98058

ADDRESS: 3005 BRIDGEPORT WAY W.
CITY, STATE, ZIP: UNIVERSITY PLACE, WASHINGTON 98466
FUNERAL DIRECTOR: BRIANNE L. EDWARDS

CAUSE OF DEATH:
A: ASPIRATION OF GASTRIC CONTENTS
     INTERVAL:
B:
     INTERVAL:
C:
     INTERVAL:
D:
     INTERVAL:

OTHER CONDITIONS CONTRIBUTING TO DEATH: ALCOHOL INTOXICATION

MANNER OF DEATH: ACCIDENT
AUTOPSY: YES
WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE
CAUSE OF DEATH: YES

DATE OF INJURY: OCTOBER 30, 2014
HOUR OF INJURY: UNKNOWN
INJURY AT WORK: NO
PLACE OF INJURY: RESIDENCE

DID TOBACCO USE CONTRIBUTE TO DEATH: NO
PREGNANCY STATUS IF FEMALE: NOT APPLICABLE

LOCATION OF INJURY: 4219 69TH AVENUE EAST

CITY, STATE, ZIP: FIFE, WASHINGTON 98324-3697
COUNTY: PIERCE
DESCRIBE HOW INJURY OCCURRED: ASPIRATED GASTRIC CONTENTS
WHILE INTOXICATED

CERTIFIER NAME: THOMAS B. CLARK, III, MD
TITLE: CORONER/ME
CERTIFIER ADDRESS: 3619 PACIFIC AVENUE
CITY, STATE, ZIP: TACOMA, WASHINGTON 98418-7929
DATE SIGNED: OCTOBER 31, 2014

CASE REFERRED TO ME/CORONER: YES
FILE NUMBER: 14-1625
ATTENDING PHYSICIAN: NOT APPLICABLE

IF TRANSPORTATION INJURY, SPECIFY: NOT APPLICABLE

LOCAL DEPUTY REGISTRAR: WENDY WHITE
DATE RECEIVED: NOVEMBER 03, 2014

Exhibit No.
18

T. Clark
8/08/2018

DOH 422-131 (4/18)

**Exhibit K - Page 1**

# EXHIBIT L

The Honorable Robert J. Bryan

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | | |
|---|---|---|
| ANNA OMELIN, Individually and as an Administrator of the Estate of Anton Omelin, deceased,<br><br>                    Plaintiff,<br><br>vs.<br><br>HANSEN BEVERAGE COMPANY, a Delaware Corporation, MONSTER ENERGY COMPANY, a Delaware Corporation, and RED BULL NORTH AMERICA, INC., a Foreign Corporation, and DOES 1 through 100, Inclusive,<br><br>                    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 3:17-cv-05837-RJB<br><br>PLAINTIFF ANNA OMELIN'S MOTION IN OPPOSITION TO (1) DEFENDANT RED BULL NORTH AMERICA, INC.'S MOTION TO DISMISS PLAINTIFF ANNA OMELIN'S FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6), AND (2) DEFENDANTS HANSEN BEVERAGE COMPANY d/b/a MONSTER BEVERAGE CORPORATION AND MONSTER ENERGY COMPANY'S MOTION TO DISMISS<br><br>**NOTED FOR: January 12, 2018** |

## I. PRELIMINARY STATEMENT

Plaintiff Anna Omelin respectfully submits this Motion in Opposition to Defendant

Red Bull North America, Inc.'s Motion to Dismiss Plaintiff Anna Omelin's First Amended

Complaint Pursuant to Rule 12(b)(6) ("Red Bull's Mot.") (Dkt. No. 32) and Defendants

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 1
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 1**

Hansen Beverage Company d/b/a Monster Beverage Corporation and Monster Energy Company's (jointly "MONSTER") Motion to Dismiss ("Monster's Mot.") (Dkt. No. 31). Since both RED BULL and MONSTER (jointly "Defendants") raise substantially similar arguments, Ms. Omelin's arguments presented herein are equally applicable to each Defendant's motion to dismiss.

On November 29, 2017, Anna Omelin, filed First Amended Complaint ("FAC") (Dkt. No. 26) alleging negligence and strict liability under Washington Products Liability Act ("WPLA"), and fraud against RED BULL and MONSTER as a result of her husband's death. After Defendants filed their motions to dismiss the FAC, Ms. Omelin filed a Motion for Leave to Amend the FAC, which is currently pending. *See* Dkt. No. 36.

In their motions to dismiss the FAC, Defendants allege that Ms. Omelin failed to disclose the cause of death in the original complaint (Dkt. No. 1) and the FAC. Allegations that Ms. Omelin intentionally concealed Mr. Omelin's cause of death (Red Bull's Mot. at 4) is ridiculous, as the death certificate, a publicly available document, could have been easily accessed by Defendants after the filing of the original complaint.

Furthermore, Defendants cannot interpret medical findings and circumstances of Mr. Omelin's death without medical testimony. RED BULL states that "FAC contains no facts to remotely suggest Red Bull's product proximately caused or contributed to the death of Anton Omelin." Red Bull's Mot. at 2; *see also*, Monster's Mot. at 8 ("[t]here are absolutely no factual allegations suggesting that Monster in any way caused Mr. Omelin's death"). These conclusory statements are immaterial before discovery and are being used to mislead the Court about the underlying issue, namely, whether Defendants' products could have and actually caused Mr. Omelin's death.

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 2
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 2

By way of their motions, Defendants would have this Court require Ms. Omelin to offer evidence regarding all aspects of her case without the benefit of fact and expert discovery. To support their position, Defendants argue that Ms. Omelin has failed to satisfy Fed. R. Civ. P. Rule 8 pleading requirement. Contrary to Defendants' arguments the FAC is sufficient to satisfy Rule 8. The FAC alludes to numerous studies and reports all of which point to dangerous effects and conditions caused by the consumption of Defendants' products: Monster Energy, NOS, and Red Bull Energy. *See generally* FAC. Defendants refuse to acknowledge that their products result in untimely deaths of children and young adults who were hoping to get the promised "buzz" and "wings."

Further, Ms. Omelin's WPLA does not preempt her fraud claim, and the fraud claim is pleaded with sufficient particularity under Fed. R. Civ. P. Rule 9(b). Finally, Ms. Omelin continues to contend that punitive damages should be allowed under California laws.

Up to this day, Defendants continue to promote their products with slogans, such as "Unleash the Beast" and "Red Bull gives you wings." In some way, they stay true to their promise, as their products for sure gave Mr. Omelin wings that took him to heaven. With disregard to products' harmful effects, Defendants now seek to escape liability by filing a Fed. R. Civ. P. 12(b)(6) motions to dismiss to prevent Ms. Omelin, a grieving wife and a mother of three minor children, from conducting discovery to show that Defendants value profits more than human life. It is outrageous that numerous deaths associated with consumption of Defendants' products did not cause Defendants to warn their consumers and take steps to make their products safer.

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 3
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 3

Accordingly, as outlined below, Defendants' motions to dismiss should be denied in their entirety.

## II. ARGUMENTS

### I.  PLAINTIFF ALLEGES SUFFICIENT FACTS TO STATE A PLAUSIBLE CLAIM FOR RELIEF.

#### A.  Legal Standard for FRCP Rule 12(b)(6) Motion to Dismiss.

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain **sufficient factual matter**, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotes omitted). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Such a statement should only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2001). "It may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (in reviewing the sufficiency of a complaint, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.")

All material allegations in the complaint must be taken as admitted and the Court construes the complaint in the light most favorable to the plaintiff. *Keniston v. Roberts*, 717 F.2d 1295, 1301 (9th Cir. 1983). The Court accepts conclusory legal allegations if

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 4
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 4

those conclusions can reasonably be drawn from the alleged facts. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir.1994). In reviewing a complaint, the Court must consider ***the totality of the allegations***, and not whether each allegation, taken in isolation, is plausible. *See Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) ("[t]his examination requires the court to survey the complaint in its entirety, not to simply scrutinize individual allegations in isolation")(emphasis added).

"The Rule 8 standard contains 'a powerful presumption against rejecting pleadings for failure to state a claim.'" *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir., 1997) (quoting *Auster Oil & Gas, Inc. v. Stream,* 764 F.2d 381, 386 (5th Cir.1985)). "It is axiomatic that '[t]he motion to dismiss for failure to state a claim is viewed with disfavor…'" *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir.1986) (citations omitted). "If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding." *Swierkiewicz*, 534 U.S. at 514. Therefore, a Court must not dismiss a complaint with prejudice "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–48.

Defendants' motions to dismiss focus on the lack of Mr. Omelin's cause of death in the FAC. *See* Red Bull's Mot. at 4; Monster's Mot. at 2, 8. Contrary to RED BULL's argument that Ms. Omelin "intentionally omitt[ed] dispositive documents or facts from the FAC" (Red Bull's Mot. at 5), the FAC's lack of an explicit reference to the cause of death does not come close to intentional concealment. As discussed below, the cause of death,

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 5
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 5**

aspiration of gastric contents, is meaningless in determining causation *without a medical experts' testimony*. *See infra* pp. 11-12.

Moreover, at the time the initial complaint and the FAC was filed, Ms. Omelin possessed only a medical examiner's report, which is confidential in nature. *See* RCW 68. 50.105 ( "Reports and records of autopsies or postmortems shall be confidential, except that the following persons may examine and obtain copies of any such report or record: [t]he personal representative of the decedent as defined in RCW 11.02.005, any family member, …, the prosecuting attorney or law enforcement agencies having jurisdiction…")

Importantly, the death certificate was readily available to the opposing counsel as a public document at the time the FAC was filed on November 29, 2017. Thus, it does not make sense to allege that it was concealed from them.

In its motion to dismiss, RED BULL mentions a settlement (Red Bull's Mot. at 4), a statement best characterized as a factually unsupported product of Defendant and their counsel's imagination. Nothing in the FAC or the original complaint could plausibly suggest that Ms. Omelin desired this case to end with a settlement.

Furthermore, RED BULL's counsel used terms such as "extortion" and "conspiracy." Red Bull's Mot. at 4. Such language is in no way suitable for educated professionals who must use facts, and refrain from suggesting factually unsupported and fictitious intentions of either party. RED BULL's counsel seem to forget that both extortion and conspiracy are criminal offenses. Thus, labeling Ms. Omelin and her counsel "criminals" is unacceptable. Ms. Omelin regards opposing counsel with great respect because of their professionalism and high level of morality, but it is further suggested that

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 6
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 6

opponents refrain from such expressions in the future and communicate according to professional ethical standards.

**B. Plaintiff's WPLA Claims are Sufficient to Survive Motion to Dismiss.**

In their Rule 12(b)(6) motions to dismiss, Defendants argue that Ms. Omelin's claims for negligence, strict liability, and wrongful death are improperly pleaded under the WPLA, and the FAC should be dismissed in its entirety. *See* Monster's Mot. at 3-5; Red Bull's Mot. at 5. "WPLA preempts traditional common law remedies for product-related claims." *Kaspers v. Howmedica Osteonics Corp.*, No. C15-0053JLR, 2015 WL 12085853 at *5 (W.D. Wash. Oct. 23, 2015) (citing *Wash. Water Power Co. v. Graybar Elec. Co.*, 112 Wn. 2d 847, 853, 774 P.2d 1199, 1207 (1989)).  WPLA's purpose is to eliminate common law remedies for product liability claims, including negligence, strict liability, and breach of warranty, and to provide a single cause of action. *See Wash. Water Power Co.,* 112 Wn.2d at 853.

Defendants' request to dismiss the FAC on these grounds is inconsistent with Fed. R. Civ. P. Rule 8. Rule 8 requires only that "each allegation must be simple, concise, and direct. ***No technical form is required***." Fed. R. Civ. P. 8(d)(1) (emphasis added). "Notice pleading requires the plaintiff to set forth in [her] complaint claims for relief, not causes of action, statutes or legal theories." *Id.*; Fed. R. Civ. P. 8(a)(2). Importantly, if a plaintiff alleges causes of action that have been supplanted by the WPLA, these actions are considered sufficiently plead under WPLA to withstand a motion to dismiss. *See Bingham v. Blair LLC*, No. 3:10-cv-05005 RBL, 2010 WL 3495505 at *2 (W.D. Wash. Apr. 5, 2010). In *Bingham*, the court held that a complaint alleging common law negligence, strict

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 7
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 7**

liability, and breach of warranty that otherwise satisfies FRCP Rule 8 should only be amended to fashion a single cause of action under to the WPLA. *Id.*

Defendants seem to ignore that the FAC follows the statute and merely "labels" different elements of the statute to show exactly which claims under WPLA are being pleaded. *See* FAC ¶¶ 62-107. The overall form of the FAC's causes of action (i.e., pleading negligence and strict liability claims as separate causes of action) is precisely the way it has been presented in *Frisvold,* where the Court and the parties focused on the sufficiency of pleadings, rather than its form. *See Frisvold v. Pentair Filtration Solutions LLC*, No. C17-136RSL, 2017 WL 3236972 at *2 (W.D. Wash. July 31, 2017).

Ms. Omelin contends that the FAC's pleadings are sufficient to withstand Defendants' motions to dismiss on these grounds. Furthermore, FAC sufficiently pleads all causes of action, as detailed below. Therefore, the Court should deny Defendants' motion to dismiss for failure to assert a single claim under WPLA.

### C. The FAC Plausibly Alleges Proximate Causation

To prove proximate causation, a plaintiff must present evidence of both "cause in fact" and "legal causation." *Baughn v. Honda Motor Co., Ltd.,* 107 Wn.2d 127, 727 P.2d 655, 664 (1986). Cause in fact concerns the "but for" consequences of an act or the physical connection between the act and the injury. *Baughn*, 107 Wn.2d at 142. Cause in fact is generally a question of fact reserved for the jury. *Id.*

Legal causation "rests on policy considerations as to how far the consequences of a defendant's acts should extend." *Baughn*, 107 Wn.2d at 146. It involves the "determination of whether liability should attach as a matter of law given the existence of cause in fact." *Hartley v. State*, 103 Wn.2d 768, 698 P.2d 77, 83 (1985). "Unlike factual causation,

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 8
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 8

legal causation hinges on principles of responsibility, not physics." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). "Consequently, the existence of legal causation between two events is determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." *Id.* (internal citations omitted).

Defendants contend that because the death certificate lists the cause of death as "aspiration of gastric contents" with "alcohol intoxication" as the contributing factor, Ms. Omelin cannot "plead sufficient facts to support specific causation" and "cannot do so under any scenario." Red Bull's Mot. at 6; *see also* Monster's Mot. at 8 ("[The FAC] fails to provide any plausible connection between Mr. Omelin's death and any product manufactured by Monster"). Washington law indeed professes a strict approach when interpreting a cause of death as listed on the death certificate. Under RCW 70.58.180, "the cause of death, the manner and mode in which death occurred…in the death certificate…shall be the legally accepted manner and mode by which the deceased came to his or her death and shall be the legally accepted cause of death." Naturally, a plaintiff is prevented from arguing that the cause of death was anything other than listed on the death certificate. *See, e.g., Goetz v. Life Ins. Co. of N. Am.*, No. 2:16–CV–0441–SMJ, 2017 WL 4185473, at *8 (E.D. Wash. Sept. 21, 2017).

None of the cases cited by RED BULL are similar to the case at hand, since Ms. Omelin does not dispute the death certificate findings, nor is she trying to argue that the mode and manner of death was anything other than what death certificate shows. *See, e.g., MacLay v. M/V SAHARA,* 926 F. Supp. 2d 1209 (W.D. Wash. 2013) (taking judicial notice of the mode and manner of death as stated on the death certificate); *Lloyd v. Valley Forge*

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 9
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 9

*Life Ins. Co.*, No. C06-5325 FDB, 2007 WL 2138756 (W.D. Wash. July 23, 2017) (taking

judicial notice of cause of death on the death certificate). Ms. Omelin contends that she is

allowed to bring forth medical expert testimony to merely explain the findings on the death

certificate. *See supra* pp. 10-14.

RED BULL's contention that "the death certificate makes absolutely no mention of

Red Bull Energy Drink, energy drinks in general, or any of their ingredients […]" (Red

Bull's Mot. at 6) is erroneous because nothing in the coroner's duties suggests that the

medical examiner is required to perform anything beyond determining whether the death

resulted from a criminal act. RCW 68.50.106 provides:

> "In any case in which an autopsy or post mortem is performed, the coroner
> or medical examiner, upon his or her own authority or upon the request of
> the prosecuting attorney or other law enforcement agency having
> jurisdiction, may make or cause to be made an analysis of the stomach
> contents, blood, or organs, or tissues of a deceased person and secure
> professional opinions thereon and retain or dispose of any specimens or
> organs of the deceased which in his or her discretion are desirable or
> needful for anatomic, bacteriological, chemical, or toxicological
> examination or upon lawful request are needed or desired for evidence to be
> presented in court."

When determining the cause of death, it is not unusual for a medical examiner to

describe a physiological act causing death (i.e., drowning, bullet wound) without

explaining or describing any events preceding the outcome (i.e., domestic dispute).

Importantly, it is not coroner's duty to perform an investigation to specify the party at

fault, which is left to discovery in legal cases. Revealing and detailing the reason behind

the cause of death is not a part of the coroner's responsibility since it requires additional

research. Testing for caffeine is not included in the required list of chemicals and

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 10
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 10

substances[1], which automatically incorporates tests for drugs, alcohol, and barbiturates. Therefore, there is no dispute as to medical expert's conclusion that the death was due to aspiration of gastric contents with alcohol intoxication as a contributing factor, but the data requires additional explanation of medical experts, which will be done during discovery.

Alcohol intoxication, as it appears to be a factor in Mr. Omelin's death, by itself is in need of medical evaluation. Taken the measurements of Mr. Omelin's alcohol blood level at the time of his death, which were only marginally above the limit appropriate to drive a vehicle, it is erroneous to conclude that his death was caused by alcohol intoxication alone[2]. Mr. Omelin had no medical issues and drank in moderation. FAC ¶ 16. Logically, it is unimaginable that a healthy young man could have started to vomit uncontrollably after consuming only two to three (2-3) shots of cognac[3] (FAC ¶ 15), let alone to choke on his vomit.

When arguing that "[Ms. Omelin] has not plausibly alleged general causation" (Red Bull's Mot. at 8), RED BULL fails to grasp the manner of Mr. Omelin's death and the nature of allegations made in the FAC. First, RED BULL argues that nothing in the FAC suggests that Red Bull Energy Drink is "capable of causing aspiration of gastric contents with alcohol intoxication as the contributing factor." *Id*. Although an accurate reinstatement of Mr. Omelin's cause of death, RED BULL's argument is devoid of any

[1] *See Drug List and their Uncertainty Values,* http://www.wsp.wa.gov/forensics/docs/toxicology/other_docs/drugs_routinely_tested.pdf (last accessed January 6, 2018); Request for Judicial Notice ("RJN"), Ex. C.
[2] "Mixing energy drinks with alcohol may be even more problematic. Energy drinks can blunt the feeling of intoxication, which may lead to heavier drinking and alcohol-related injuries." *See* Ex. B, p. 1.
[3] The determination of the amount of alcohol consumed by Mr. Omelin on the night of his death was calculated based on Mr. Omelin's BAC as stated in medical examiner's report.

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 11
(3:17-cv-05837-RJB)
COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429
**Exhibit L - Page 11**

logical explanation.

Aspiration "occurs when [a person] inhale[s] food, drink, vomit or saliva into [his or her] lungs. Aspiration is more likely if something disturbs [someone's] normal gag reflex, such as a brain injury or swallowing problem, or excessive use of alcohol or drugs." *See Pneumonia - Symptoms and Causes – Mayo Clinic*

https://www.mayoclinic.org/diseases-conditions/pneumonia/symptoms-causes/syc-20354204 (last visited December 30, 2017); *see also*, Request for Judicial Notice ("RJN"), Ex. A. Symptoms and circumstances surrounding Mr. Omelin's death (*see* FAC ¶¶ 9-20) are identical to the symptoms contributed to consumption of energy drinks (including Red Bull Energy Drink and related MONSTER products). *See generally* FAC.

Next, RED BULL argues that "[p]laintiff's 'caffeine' theory borders on the absurd," because the caffeine levels in energy drinks are less than in home-brewed coffee and Starbucks drip coffee. Red Bull's Mot. at 8. First, contrary to RED BULL's arguments, nothing in the FAC suggests that Ms. Omelin concedes with the fact that "home-brewed coffee has a higher caffeine content that Red Bull Energy Drink." *Id.*; *See generally* FAC. RED BULL citation to FAC ¶¶ 37, 39 is erroneous and misleading. The above-referenced paragraphs state that "[c]affeine in doses up to 400 mg (about five cups of coffee) is generally recognized as safe by the [FDA]." (FAC ¶ 37). In FAC ¶ 39, Ms. Omelin specifies the amounts of caffeine found in relevant energy drinks.

By comparing caffeine content in coffee to the amount of caffeine found in its product (*see* Red Bull's Mot. at 8), RED BULL misunderstands the significant difference between the beverages. While regular coffee is normally made out of a natural, whole coffee bean, no information is available on the source of the caffeine (synthetic caffeine is

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 12
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 12**

sometimes used as a replacement for natural whole beans) contained in Defendants'
products. This issue is appropriate for discovery, as Defendants do not disclose the source
of their caffeine on their products' labels, websites, and other publicly available media
sources. Moreover, nothing suggests that regular coffee contains additional ingredients,
such as Taurine or Guarana, which are contained in Red Bull Energy Drink (Taurine) and
MONSTER's beverages (Taurine and Guarana).  FAC ¶ 40.

Furthermore, RED BULL's evidence that Taurine is a natural amino acid that
"supports neurological development and helps regulate the level of water and minerals in
the blood…" is ambiguous. Red Bull's Mot. at 9. RED BULL fails to grasp Taurine's
pharmacology. The efficacy of such supplement depends on quantity ingested. Thus,
something that is good for a person in small quantities can be dangerous, and even lethal,
when consumed in larger proportions. RED BULL cites to an article that states in part:
"***Up to 3,000 milligrams a day*** of supplemental taurine is generally considered safe.
***Moderation is important, however***. Little is known about the effects of heavy or long-term
taurine use." *See* "*Taurine is listed as an ingredient in many energy drinks. What is
taurine? Is it safe?*" https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-
eating/expert-answers/taurine/faq-20058177 (last visited November 28, 2017). Without a
benefit of discovery, it is impossible to tell how much taurine is contained in a single can
of Red Bull Energy Drink[4], as such information does not appear on the product's label.

Further, RED BULL argues that "[p]laintiff's allegations do not adequately plead
general causation" by referring to reports cited in the FAC. Mot. at 13. RED BULL

---

[4] Similarly, discovery is needed to analyze Taurine and Guarana content in MONSTER's
products.

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 13
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 13**

challenges the said reports by arguing that none of the reports mention RED BULL's

products directly and rather use a catch-all "energy drinks." *Id*. Contrary to RED BULL's

contentions, the cited reports do identify RED BULL's products by mentioning ingredients

contained in the studied beverages. *See* FAC ¶¶ 35, 44, 52. It is hard to believe that

"beverages that contain caffeine, taurine, …, and are marketed to improve energy, weight

loss, stamina, athletic performance, and concentration," include all energy drinks but

miraculously exclude those manufactured by RED BULL. FAC ¶ 35.

Further, articles that specifically name RED BULL, do not just show correlation

but present results of a medical study with healthy adults. "The study focused on effects of

additional components commonly found in energy drinks, including 'Monster Energy,'

'NOS Original' and 'Red Bull Energy Drink.' 'Blood pressure increased by close to 5

points after drinking the energy drink, but by just under 1 point after drinking the caffeine

beverage. Blood pressure also remained elevated six hours later.'" FAC ¶ 44.

Based on preceding arguments, the FAC contains sufficient information to show

proximate cause.

**D. Plaintiff's Design Defect Claim Satisfies Pleading Requirements.**

Contrary to RED BULL's attempt to brand Ms. Omelin's claim for design defect as

insufficiently pleaded, the FAC contains sufficient details to show otherwise. *See* Red

Bull's Mot. at 10.

RED BULL argues that Ms. Omelin "has not alleged plausible facts regarding any

purported 'defects' in Red Bull Energy Drink." *Id*. Amazingly, RED BULL seems to

believe that the FAC must contain enough information to survive summary judgment, by

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 14
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 14

supporting its arguments with cases dealing with summary judgment and post-discovery[5] and requiring Ms. Omelin to plead enough facts to satisfy the heightened burden. *See* Red Bull's Mot. at 7-8. The allegations presented in the FAC are sufficient to satisfy Rule 8 requirements and far more detailed and extensive than deemed sufficient in *Braden*. *See Braden v. Tornier, Inc.*, No. Co9-5529 RJB, 2009 WL 3188075 (W.D. Wash. Sept. 30, 2009). As the court in *Braden* appropriately pointed out: "to force Plaintiff to plead facts in support of the theory would shut the courthouse doors before Plaintiffs had an opportunity to meaningfully engage in the process." *Braden,* 2009 WL 3188075 at *3.

Moreover, RED BULL is trying to misconstrue the law by focusing on those parts of the law that directly furnish its position. By citing to *Bombardi*, RED BULL fails to notify the Court that "there are some accidents as to which there is common experience dictating that they do not ordinarily occur without a defect, and as to which the inference that a product is defective should be permitted." *Bombardi v. Pochel's Appliance and TV Co.*, 10 Wn. App. 243, 246 (1974). "A product is defective when it is 'in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.'" *Id.* (citations omitted).

Throughout the FAC, Ms. Omelin alleges that combination of high amounts caffeine along with other ingredients, namely taurine, cause severe deadly health effects, which include nausea, vomiting, cardiovascular problems, and death. *See* FAC ¶¶ 32-60. In addition to numerous allegations (*see generally* FAC) of recorded and scientifically identified risks posed by energy drinks, including Red Bull Energy Drink, the FAC clearly

---

[5] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 15
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 15**

states that an ordinary consumer, such as Mr. Omelin, "would not and could not anticipate that a product designed to promote vitality and increase energy would lead to severe health risks." *See* FAC ¶ 69.

Because of the foregoing, Ms. Omelin has sufficiently pleaded the design defect claim pursuant to Fed. R. Civ. P. Rule 8.

### E. Plaintiff Sufficiently Pleaded Failure to Warn Claim.

RED BULL argues that "the FAC […] fails to allege a plausible claim based on a failure to warn theory." Red Bull's Mot. at 11. By stretching the reality, RED BULL tries to escape from liability by comparing their product to common, everyday food, such as milk, and by claiming that "there is no duty to warn against things generally known or obvious." *Id*. Although a true assertion about dairy products, it is unrelated to energy drinks. The dangers associated with energy drinks are not "hazards known to everyone" as they are being promoted as vitalizing beverage that is a part of a healthy lifestyle, but cause severe health risks to their users. *Id.; See generally* FAC. (citation omitted).

Next, RED BULL argues that it "had no duty to warn Mr. Omelin of the effects of his consumption of other manufacturers' alcoholic products." *Id*. at 12. The argument is absurd in the light of allegations made in the FAC. Ms. Omelin did not allege that RED BULL must warn of risks associated with consumption of other manufacturer's product. The FAC plainly states:

> Placing a warning(s), such as "Do not use with alcohol and while exercising," "Do not exceed two drinks in a 24-hour period," "May cause cardiovascular problems, nausea, vomit, insomnia, and death," would be adequate to warn customers of severe health risks associated with consumption of "Monster Beverage," "NOS Original" and "Red Bull Energy Drink."

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 16
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 16

FAC ¶ 78. The proposed warning is attributable to Red Bull Energy Drink, Monster Energy, and NOS Original alone and not to any alcoholic beverage consumed by Mr. Omelin prior to his unfortunate demise. Nor does the FAC allege any facts that could suggest that Defendants' products contain alcohol. *See generally* FAC.

Furthermore, "[l]iability may be found in the case of inadequate warnings because "[a] product may […] not be reasonably safe when placed in the hands of the ultimate user without first giving an adequate warning concerning the manner in which to safely use the product." *Teagle v. Fischer & Porter Co.*, 89 Wash.2d 149, 155, 570 P.2d 438 (1977). RED BULL cites *Braaten* failing to appreciate a rather glaring distinction between the cases. *See* Red Bull's Mot. at 12; *see also, Braaten v. Saverhagen Holdings*, 165 Wn. 2d 373, 385 (2008) (a manufacturer of valves and pumps to be used on ships is not required to warn their consumers of asbestos-containing insulation manufactured by a different producer). The FAC alleges that Red Bull Energy Drink should not be mixed with alcohol, as a part of exercise routine, and overconsumed. *See generally* FAC. To allow the end consumer, such as Mr. Omelin, to appreciate the hidden dangers of mixing energy drinks with alcoholic beverages, the FAC proposes a warning to be placed on products' label to warn consumers of severe health risks caused by Defendants' products. FAC ¶ 78.

Moreover, the existing warning and caffeine content has no practical relationship to Ms. Omelin's claim. Mr. Omelin does not fall under any warned category of persons, namely he was not a child at the time of his death, nor was he suffering from sensitivity to caffeine. Surprisingly, Mr. Omelin was not pregnant or nursing. The present warning does nothing to warn consumers that a product, marketed for its vitality-promoting qualities and ability to give energy, can and will cause severe health risks if used along with alcohol, to

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 17
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 17

hydrate and promote stamina during exercise, and the risks of overconsumption. *See* FAC ¶ 75.

Additionally, there is no evidence suggesting that the present warning was in place prior to and at the time of Mr. Omelin's death. Contrary to RED BULL's contention that "[p]laintiff concedes, every can of Red Bull Energy Drink purchased and consumed by Mr. Omelin state the amount of caffeine and contained [a warning]" nothing in the FAC states that the warning and the caffeine content was present at the time Mr. Omelin purchased and consumed the products. Red Bull's Mot. at 12; *see generally* FAC. Such information is available only to Defendants, thus discovery is needed to ascertain the existence of the warning at the time of Mr. Omelin's death.

It is further argued that the FAC fails to allege any facts to suggest that Mr. Omelin would heed an additional warning, if any were given. Red Bull's Mot. at 11. RED BULL tries to support its position by citing to cases dealing with summary judgment and are inapplicable to Rule 12(b)(6) motion to dismiss and the Rule 8 pleadings[6]. Red Bull's Mot. at 13. RED BULL agrees that the warning "appears prominently in bold font on the center of a can." *Id*. Thus, it is difficult to argue that the warning has not be seen or read, taken it was present on the can at the time of Mr. Omelin's death. In either situation, the question of whether Mr. Omelin read and understood the warning is a subject proper for discovery and should not prevent Ms. Omelin from properly pleading her claim under Rule 8. Additionally, even if Mr. Omelin acknowledged the presence and content of the warning, the warning is inadequate and did not apply to Mr. Omelin. *See supra* p.17.

---

[6] *See supra* note 4.

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 18
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 18

Based on the foregoing argument, failure to warn claim is sufficiently pleaded under Rule 8.

### F. Plaintiff Withdraws Manufacturing Defect Claim.

Plaintiff hereby voluntarily withdraws her Manufacturing Defect Claim under RCW 7.72.030(2)(a) and all allegations pertaining thereto. *See* FAC ¶¶ 89-94.

### G. Plaintiff Pled Claims for Fraud with Sufficient Particularity.

Defendants' argument that Ms. Omelin's fraud claim is "nothing but a recast version of her failure to warn claim based on concealment," misstates Ms. Omelin's claim for fraud. Red Bull's Mot. at 15; Monster's Mot. at 6. Nothing in the FAC's Third Cause of Action for Fraud points to Defendants' failure to warn. It does suggest, however, that despite their knowledge of their products' dangerous propensities, Defendants continued to market their products as safe and no more dangerous than regular soda to induce Mr. Omelin and other consumers to purchase their products. FAC ¶¶ 108-130.

Furthermore, Ms. Omelin's fraud claims are sufficiently pleaded pursuant to Rule 9(b) of Federal Rules of Civil Procedure. Under Fed. R. Civ. P. 9(b), plaintiff's fraud claims must "state with particularity the circumstances constituting fraud." Allegations of time, place and date are not required by the Rule 9(b), nor are they the only way to effectuate the rule's policies. *See In re Natl. Mortg. Equity Corp. Mortg. Pool Certificates Securities Litig.*, 636 F. Supp. 1138, 1159 (9th Cir. 1986). If other allegations are made with great specificity, the complaint as a whole may adequately describe the nature and circumstances of the alleged misrepresentations to satisfy Rule 9(b). *Id.* Moreover, allegations of fraud based on information and belief "may be relaxed with respect to matters within the

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 19
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 19**

opposing party's knowledge." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993). "In such situations, plaintiffs cannot be expected to have personal knowledge of the relevant facts." *Id*. (citing *Wool v. Tandem Computers Inc*., 818 F.2d 1433, 1439 (9th Cir. 1987).

Defendants fail to acknowledge contentions made in the FAC's "Factual Allegations" section. The FAC alleges that MONSTER and RED BULL target their advertising campaign "primarily towards young males, with alluring product names…These advertising campaigns promote the psychoactive, performance-enhancing, and stimulate effects of energy drinks and appear to glorify drug use." FAC ¶ 20. The FAC goes further by mentioning Defendants' slogans used to associate their products with healthy lifestyle. *Id*. There is nothing on Defendants' websites, advertisements or labels that would indicate that either Defendant took steps to identify health risks associated with consumption of their products.

Moreover, unlike *Baughn*, where the purported fraud was based on lack of warning on the drug label, Defendants did not limit their fraudulent concealment to label only but actively involved marketing campaign to promote potential benefits of their products. *Id.; Baughn v. Johnson & Johnson*, No. C15-5283 BHS, 2015 WL 4759151 at *3 (W.D. Wash. Aug. 12, 2015). Defendants' concealment was directed towards Mr. Omelin and other consumers, a fact sufficiently pleaded throughout the FAC. *See generally* FAC.

Contrary to Defendants' arguments that Ms. Omelin "failed to identify specific facts related to each health risk and 'allege what harm the purported [risk] poses to consumers," (*see* Red Bull's Mot. at 16; *see also*, Monster's Mot. at 7) the FAC alleges, among other things, that 1) "Studies have shown that a caffeine overdose can cause cardiovascular problems, nausea, vomiting, convulsions, and death"; 2) "A combination of

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 20
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 20**

excessive ingestion of caffeine- and taurine- containing energy drinks and strenuous physical activity can produce myocardial ischemia by inducing coronary vasospasm with potentially fatal results"; and 3) "U.S. Center for Disease Control and Prevention warned against mixing energy drinks and alcohol, arguing energy drinks mask the depressant effects of alcohol." FAC ¶¶ 28, 30, 36.

Further, RED BULL compares numerous cited studies and articles to "[r]andom anecdotal examples of disgruntled consumers posting their views on websites…" Red Bull's Mot. at 16. Most, if not all, studies cited in the FAC come from reputable medical associations or medical professionals. *See* FAC ¶¶ 32-60. Even if such studies were not enough for Defendants to stop and reconsider their marketing approach and/or their products' formula, Defendants should have performed internal studies to show the safety of their products. If such studies were available at the time of Mr. Omelin's death, of which Ms. Omelin knows nothing, they shall surface during discovery.

Defendants' assertion that no evidence is available to show Mr. Omelin's reliance on the advertisements (Red Bull's Mot. at 16) is an issue suitable for discovery as many information, such as mode and means of disseminating advertising campaign, is in Defendants' control. Unlike Defendant in *Eisen*, who was alive at the time of a lawsuit, Mr. Omelin cannot testify nor produce any evidence to support his claim. *See Eisen v. Porsche Cars N. Am., Inc.*, No. CV 11–9405 CAS (FEMx) 2012 WL 841019 (C.D. Cal. Feb. 22, 2012). This contention is also true with respect to the "representative samples of advertisements…", as the information on what was available at the time of Mr. Omelin's death remains unknown prior to discovery. *See* Red Bull's Mot. at 16.

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 21
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 21**

In sum, the FAC makes clear "the who, what, when, where, and how" of the misconduct charged – namely, that Defendants knew of the risks associated with consumption of their products, yet they intentionally withheld information regarding dangers that their products posed to Mr. Omelin and other consumers. Since some of the information, such as 2014 marketing materials and internal studies, are solely in RED BULL's control[7], Ms. Omelin cannot plead any additional facts beyond those already pleaded, nor is she required to do so under the circumstances[8]. Accordingly, and contrary to Defendants' conclusory assertions, the FAC satisfies the requirements of Rule 9(b).

## H. Punitive Damages.

Ms. Omelin's request for punitive damages is proper, as "in Washington, the location where fraudulent conduct occurred is the most significant contact for the issue of punitive damages." *Kammerer v. W. Gear Corp.*, 635 P.2d 708, 712 (1981) (Jurisdiction where the fraudulent act occurred is a significant factor in determining the applicability of punitive damages). In this case, most of the fraudulent conduct occurred in California, where Defendants' headquarters are located, and where most of the decisions regarding the ingredients, marketing, advertising, and placement of warnings were made.

In California, punitive damages are available in any action for breach of a non-contractual obligation, including products liability actions, "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or

---

[7] The same argument is equally applicable to MONSTER.
[8] Allegations of fraud based on information and belief "may be relaxed with respect to matters within the opposing party's knowledge." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 22
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

Exhibit L - Page 22

malice." Cal. Civ. Code § 3294(a); *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 810, 174 Cal.Rptr. 348 (Ct. App. 1981).

### I. Plaintiff's Wrongful Death Actions May Be Maintained as a Matter of Law.

A survival action is maintained on behalf of decedent's spouse only if the decedent could have maintained the action had he lived. *See Ives v. Ramsden*, 174 P.3d 1231, 1239 (Wash. 2008). Because all claims have been properly plead on behalf of Mr. Omelin, Ms. Omelin can maintain the wrongful death action pursuant to RCW 4.20. *et. seq.*

### IV. CONCLUSION

Based on the arguments provided, Defendants' motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should be denied in its entirety. In the alternative, Ms. Omelin should be allowed to amend her FAC before dismissal.

Respectfully submitted this on 8th day of January, 2018.

By: s/ *Olga Efimova*
Olga Efimova, WSBA #52498
**Cosmopolitan Legal, PLLC**
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Telephone: (425) 296-8868
Fax: (877) 230-2429
E-mail: olgae@cosmopolitanlegal.com
***Attorney for Plaintiff Anna Omelin***

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 23
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 23**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2018, I electronically filed the foregoing with

the Clerk of the Court using CM/ECF system, which will send notification of such filing to

all parties of record who have appeared in this matter

DATED this 8th day of January, 2018

s/ Olga Efimova
Olga Efimova, WSBA #52498
**Cosmopolitan Legal, PLLC**
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Telephone: (425) 296-8868
Fax: (877) 230-2429
E-mail: olgae@cosmopolitanlegal.com
*Attorney for Plaintiff Anna Omelin*

PLAINTIFF'S OPPOSITION TO DEF. RED BULL'S MOTION TO DISMISS - 24
(3:17-cv-05837-RJB)

COSMOPOLITAN LEGAL, PLLC
151 108th Ave NE, Unit 210
Bellevue, WA 98004
Phone: (425)296-8868
Fax: (877)230-2429

**Exhibit L - Page 24**